# EXHIBIT A

## (Certificate of Incorporation)

EXHIBIT 4.05

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

AMBAC INC.

AMBAC Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), DOES HEREBY CERTIFY as follows:

1. The name of the Corporation is AMBAC Inc. The Corporation was originally incorporated under the name of AMBAC Inc. and the original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on April 29, 1991.

2. Pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, this Amended and Restated Certificate of Incorporation restates and integrates and further amends the Restated Certificate of Incorporation of the Corporation.

3. The text of the Restated Certificate of Incorporation of the Corporation is hereby restated and further amended to read in its entirety as follows:

ARTICLE I

NAME

The name of the corporation is Ambac Financial Group, Inc. (the "CORPORATION").

ARTICLE II

REGISTERED OFFICE AND REGISTERED AGENT

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

ARTICLE III

CORPORATE PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "GENERAL CORPORATION LAW").

ARTICLE IV

CAPITAL STOCK

Section 4.1.  AUTHORIZED CAPITAL.  The total number of shares of all classes of stock that the Corporation shall have authority to issue is 104,000,000 consisting of 100,000,000 shares of Common Stock, par value $.01 per share (the "COMMON STOCK") and 4,000,000 shares of Preferred Stock, par value $.01 per share (the "PREFERRED STOCK").

SECTION 4.2.  PREFERRED STOCK.  The designations and the powers, preferences and rights and the qualifications, limitations or restrictions thereof of the shares of each class as Preferred Stock are as follows:

(a) The Preferred Stock may be issued from time to time in one or more series, the shares of each series to have such voting powers, full or limited, and such designations, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof as are stated and expressed herein or in the resolution or resolutions providing for the issuance of such series, adopted by the Board of Directors as hereinafter provided; provided, however, that in the event the Board of Directors of the Corporation provides that any series of Preferred Stock shall be given voting powers, such series shall not be entitled to vote separately as a single class other than as expressly required by law and for the election of one or more additional directors of the Corporation in the case of dividend arrearages or other specified events and such series of Preferred Stock shall not be granted the right to cast in excess of one vote per share of Preferred Stock.

(b) Authority is hereby expressly granted to the Board of Directors, subject to the provisions of this Article IV and to the limitations prescribed by law, to authorize the issuance of one or more series of Preferred Stock and with respect to each such series to fix by resolution or resolutions providing for the issuance of such series the voting powers, full or limited, if any, of the shares of such series and the designations, preferences and relative, participating, optional or other special rights and the qualifications, limitations or restrictions thereof. The authority of the Board of Directors with respect to each series shall include, but not be limited to, the determination or fixing of the following:

(i)  The designation of such series;

(ii) The dividend rate of such series, the conditions and dates upon which such dividends shall be payable, the relation which such dividends shall bear to the dividends payable on any other class or classes of stock, and whether such dividends shall be cumulative or non- cumulative;

(iii) Whether the shares of such series shall be subject to redemption by the Corporation and, if made subject to such redemption, the times, prices and other terms and conditions of such redemption;

(iv) The terms and amount of any sinking fund provided for the purchase or redemption of the shares of such series;

(v) Whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes or of any other series of any class or classes of stock, or for debt securities, of the Corporation and, if provision be made for conversion or exchange, the times, prices, rates, adjustments, and other terms and conditions of such conversion or exchange;

(vi) The extent, if any, to which the holders of the shares of such series shall be entitled to vote with respect to the election of directors or otherwise;

(vii) The restrictions, if any, on the issue or reissue of any additional Preferred Stock; and

(viii) The rights of the holders of the shares of such series upon the dissolution of, or upon the distribution of assets of, the Corporation.

SECTION 4.3.  SERIES A JUNIOR PARTICIPATING PREFERRED STOCK.  Pursuant to the authority vested in the Board of Directors in accordance with Section 4.2 hereof, the Board of Director has authorized the creation of a series of Preferred Stock with the designation and amount thereof and the voting powers, preferences and relative, participating, optional and other special rights of the shares of such series, and the qualifications, limitations or restrictions thereof as follows:

(a) DESIGNATION AND AMOUNT.  The shares of such series shall be designated as "SERIES A JUNIOR PARTICIPATING PREFERRED STOCK" and the number of shares constituting such series shall be 500,000.

(b) DIVIDENDS AND DISTRIBUTIONS.

(i) Subject to the prior and superior rights of the holders of any shares of any series of Preferred Stock ranking prior and superior to the shares of Series A Junior Participating Preferred Stock with respect to dividends, the holders of shares of Series A Junior Participating Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, quarterly dividends payable in cash on the fifteenth day of March, June, September and December in each year (each such date being referred to herein as a "QUARTERLY DIVIDEND PAYMENT DATE"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series A Junior Participating Preferred Stock, in an amount per share (rounded to the nearest cent) equal to the greater of (a) $1.00 or (b) subject to the provision for adjustment hereinafter set forth, 100 times the aggregate per share amount of all cash dividends, and 100 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions other than a dividend payable in shares of Common Stock or a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise), declared on the Common Stock since the immediately preceding Quarterly Dividend Payment Date, or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series A Junior Participating Preferred Stock. In the event the Corporation shall at any time after January 31, 1996 (the "RIGHTS DECLARATION DATE") (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount to which holders of shares of Series A Junior Participating Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding sentence shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(ii) The Corporation shall declare a dividend or distribution on the Series A Junior Participating Preferred Stock as provided in subparagraph (b)(i) above immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); provided that, in the event no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date, a dividend of $1.00 per share on the Series A Junior Participating Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

(iii) Dividends shall begin to accrue and be cumulative on outstanding shares of Series A Junior Participating Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares of Series A Junior Participating Preferred Stock, unless the date of issue of such shares is prior to the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue from the date of issue of such shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the

record date for the determination of holders of shares of Series A Junior Participating Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which events such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date. Accrued but unpaid dividends shall not bear interest. Dividends paid on the shares of Series A Junior Participating Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding. The Board of Directors may fix a record date for the determination of holders of shares of Series A Junior Participating Preferred Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be no more than 30 days prior to the date fixed for the payment thereof.

(c) VOTING RIGHTS.  The holders of shares of Series A Junior Participating Preferred Stock shall have the following voting rights:

(i) Each share of Series A Junior Participating Preferred Stock shall entitle the holder thereof to one vote on all matters submitted to a vote of the stockholders of the Corporation.

(ii) Except as otherwise provided herein or by law, the holders of shares of Series A Junior Participating Preferred Stock and the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(iii) (A) If at any time dividends on any Series A Junior Participating Preferred Stock shall be in arrears in an amount equal to six (6) quarterly dividends thereon, the occurrence of such contingency shall mark the beginning of a period (herein called a "DEFAULT PERIOD") which shall extend until such time when all accrued and unpaid dividends for all previous quarterly dividend periods and for the current quarterly dividend period on all shares of Series A Junior Participating Preferred Stock then outstanding shall have been declared and paid or set apart for payment. During each default period, all holders of Preferred Stock (including holders of the Series A Junior Participating Preferred Stock) with dividends in arrears in an amount equal to six (6) quarterly dividends thereon, voting as a class, irrespective of series, shall have the right to elect two (2) Directors.

(B) During any default period, such voting right of the holders of Series A Junior Participating Preferred Stock may be exercised initially at a special meeting called pursuant to subparagraph (C) of this subsection (c)(iii) or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders, provided that such voting right shall not be exercised unless the holders of ten percent (10%) in number of shares of Preferred Stock outstanding shall be present in person or by proxy. The absence of a quorum of the holders of Common Stock shall not affect the exercise by the holders of Preferred Stock of such voting right. At any meeting at which the holders of Preferred Stock shall exercise such voting right initially during an existing default period, they shall have the right, voting as a class, to elect Directors to fill such vacancies, if any, in the Board of Directors as then exist up to two (2) Directors or, if such right is exercised at an annual meeting, to elect two (2) Directors. If the number which may be so elected at any special meeting does not amount to the required number, the holders of the Preferred Stock shall have the right to make such increase in the number of Directors as shall be necessary to permit the election by them of the required number. After the holders of the Preferred Stock shall have exercised their right to elect Directors in any default period and during the continuance of such period, the number of Directors shall not be increased or decreased except by vote of the holders of Preferred Stock as herein provided or pursuant to the rights of any equity securities ranking senior to or pari passu with the Series A Junior Participating Preferred Stock.

(C) Unless the holders of Preferred Stock shall, during an existing default period, have previously exercised their right to elect Directors, the Board of Directors may order, or any stockholder or stockholders owning in the aggregate not less than ten percent (10%) of the total number of shares of Preferred Stock outstanding, irrespective of series, may request, the calling of special meeting of the holders of Preferred Stock, which meeting shall thereupon be called by the President, a Vice-President or the Secretary of the Corporation. Notice of such meeting and of any annual meeting at which holders of Preferred Stock are entitled to vote pursuant to this subparagraph (c)(iii)(C) shall be given to each holder of record of Preferred Stock by mailing a copy of such notice to him at his last address as the same appears on the books of the Corporation. Such meeting shall be called for a time not earlier than 20 days and not later than 60 days after such order or request or in default of the calling of such meeting within 60 days after such order or request, such meeting may be called on similar notice by any stockholder or stockholders owning in the aggregate not less than ten percent (10%) of the total number of shares of Preferred Stock outstanding. Notwithstanding the provisions of this subparagraph (c)(iii)(C) no such special meeting shall be called during the period within 60 days immediately preceding the date fixed for the next annual meeting of the stockholders.

(D) In any default period, the holders of Common Stock, and other classes of stock of the Corporation if applicable, shall continue to be entitled to elect the whole number of Directors until the holders of Preferred Stock shall have exercised their right to elect two (2) Directors voting as a class, after the exercise of which right (x) the Directors so elected by the holders of Preferred Stock shall continue in office until their successors shall have been elected by such holders or until the expiration of the default period, and (y) any vacancy in the Board of Directors may (except as provided in subparagraph (iii)(B) of this subsection (c)) be filled by vote of a majority of the remaining Directors theretofore elected by the holders of the class of stock which elected the Director whose office shall have become vacant. References in this paragraph (iii) to Directors elected by the holders of a particular class of stock shall include Directors elected by such Directors to fill vacancies as provided in clause (y) of the foregoing sentence.

(E) Immediately upon the expiration of a default period, (x) the right of the holders of Preferred Stock as a class to elect Directors shall cease, (y) the term of any Directors elected by the holders of Preferred Stock as a class shall terminate, and (z) the number of Directors shall be such number as may be provided for in the Certificate of Incorporation or By-laws irrespective of any increase made pursuant to the provisions of subparagraph (iii)(B) of this subsection (c) (such number being subject, however, to change thereafter in any manner provided by law or in the Certificate of Incorporation or By-laws). Any vacancies in the Board of Directors effected by the provisions of clauses (y) and (z) in the preceding sentence may be filled by a majority of the remaining Directors.

(iv) Except as set forth herein, holders of Series A Junior Participating Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

(d) CERTAIN RESTRICTIONS.

(i) Whenever quarterly dividends or other dividends or distributions payable on the Series A Junior Participating Preferred Stock as provided in subsection (b) are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or not declared, on shares of

Series A Junior Participating Preferred Stock outstanding shall have been paid in full, the Corporation shall not

(A) declare or pay dividends on, make any other distributions on, or redeem or purchase or otherwise acquire for consideration any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Junior Participating Preferred Stock;

(B) declare or pay dividends on or make any other distributions on any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Junior Participating Preferred Stock, except dividends paid ratably on the Series A Junior Participating Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

(C) redeem or purchase or otherwise acquire for consideration shares of any stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Junior Participating Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such parity stock in exchange for shares of any stock of the Corporation ranking junior (either as to dividends or upon dissolution, liquidation or winding up) to the Series A Junior Participating Preferred Stock; or

(D) purchase or otherwise acquire for consideration any shares of Series A Junior Participating Preferred Stock, or any shares of stock ranking on a parity with the Series A Junior Participating Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(ii) The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (i) of this subsection (d), purchase or otherwise acquire such shares at such time and in such manner.

(e) REACQUIRED SHARES. Any shares of Series A Junior Participating Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors, subject to the conditions and restrictions on issuance set forth herein.

(f) LIQUIDATION, DISSOLUTION OR WINDING UP.

(i) Upon any liquidation (voluntary or otherwise), dissolution or winding up of the Corporation, no distribution shall be made to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Series A Junior Participating Preferred Stock shall have received $100 per share, plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment (the "SERIES A LIQUIDATION PREFERENCE"). Following the payment of the full

amount of the Series A Liquidation Preference, no additional distributions shall be made to the holders of shares of Series A Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Common Stock shall have received an amount per share (the "COMMON ADJUSTMENT") equal to the quotient obtained by dividing (i) the Series A Liquidation Preference by (ii) 100 (as appropriately adjusted as set forth in paragraph (iii) below to reflect such events as stock splits, stock dividends and recapitalizations with respect to the Common Stock) (such number in clause (ii), the "ADJUSTMENT NUMBER"). Following the payment of the full amount of the Series A Liquidation Preference and the Common Adjustment in respect of all outstanding shares of Series A Junior Participating Preferred Stock and Common Stock, respectively, holders of Series A Junior Participating Preferred Stock and holders of shares of Common Stock shall receive their ratable and proportionate share of the remaining assets to be distributed in the ratio of the Adjustment Number to 1 with respect to such Series A Junior Participating Preferred Stock and Common Stock, on a per share basis, respectively.

(ii) In the event, however, that there are not sufficient assets available to permit payment in full of the Series A Liquidation Preference and the liquidation preferences of all other series of preferred stock, if any, which rank on a parity with the Series A Junior Participating Preferred Stock, then such remaining assets shall be distributed ratably to the holders of such parity shares in proportion to their respective liquidation preferences. In the event, however, that there are not sufficient assets available to permit payment in full of the Common Adjustment, then such remaining assets shall be distributed ratably to the holders of Common Stock.

(iii) In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the Adjustment Number in effect immediately prior to such event shall be adjusted by multiplying such Adjustment Number by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(g) CONSOLIDATION, MERGER, ETC. In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case the shares of Series A Junior Participating Preferred Stock shall at the same time be similarly exchanged or changed in an amount per share (subject to the provision for adjustment hereinafter set forth) equal to 100 times the aggregate amount of stock, securities, cash and/or any other property (payable in kind), as the case may be, into which or for which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series A Junior Participating Preferred Stock shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(h) NO REDEMPTION. The shares of Series A Junior Participating Preferred Stock shall not be redeemable.

(i) RANKING. The Series A Junior Participating Preferred Stock shall rank junior to all other series of the Corporation's Preferred Stock as to the payment of dividends and the distribution of assets, unless the terms of such series shall provide otherwise.

(j) AMENDMENT.  The Certificate of Incorporation of the Corporation shall not be further amended in any manner which would materially alter or change the powers, preferences or special rights of the Series A Junior Participating Preferred Stock so as to affect them adversely without the affirmative vote of the holders of a majority or more of the outstanding shares of Series A Junior Participating Preferred Stock, voting separately as a class.

(k) FRACTIONAL SHARES.  Series A Junior Participating Preferred Stock may be issued in fractions of a share which shall entitle the holder, in proportion to such holder's fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series A Junior Participating Preferred Stock.

SECTION 4.4.  COMMON STOCK.  Except as otherwise provided by this Certificate of Incorporation or as otherwise from time to time provided by law, the holders of Common Stock shall be entitled to one vote per share on all matters to be voted on by the stockholders of the Corporation.

SECTION 4.5.  SUBSTANTIAL STOCKHOLDER.

(a) So long as any Person other than the Corporation or a Subsidiary thereof is (without giving effect to this Section 4.5(a)) the beneficial owner of capital stock representing 10% or more of the votes entitled to be cast by the holders of all outstanding shares of capital stock (a "SUBSTANTIAL STOCKHOLDER"), the record holders of the shares of capital stock beneficially owned by such Substantial Stockholder shall have limited voting rights on all matters, as follows: with respect to the shares of capital stock that would entitle such record holders in the aggregate to cast less than 10% of the votes entitled to be cast by the holders of all Outstanding shares of capital stock, such record holders shall be entitled to cast the vote per share specified in this Certificate of Incorporation; and with respect to the shares of capital stock that would otherwise entitle such record holders in the aggregate to cast 10% or more of the votes entitled to be cast by the holders of all outstanding shares of capital stock, such record holders shall not be entitled to cast any votes for such shares, so that such record holders shall be entitled to cast with respect to all shares of capital stock held by such record holders in the aggregate only such number of votes that would equal (after giving effect to this Section 4.5(a)) one vote less than 10% of the votes entitled to be cast by all holders of outstanding shares of capital stock; provided, however, that the restriction on voting contained in this Section 4.5(a) shall not apply to any capital stock beneficially owned by any Substantial Stockholder whose acquisition or ownership of capital stock representing 10% or more of the votes entitled to be cast by the holders of all Outstanding shares of capital stock has been approved by the Wisconsin Insurance Commissioner. The aggregate voting power of such record holders, so limited, for all shares of capital stock beneficially owned by the Substantial Stockholder shall be allocated proportionately among such record holders as follows: for each such record holder, this allocation shall be accomplished by multiplying the aggregate voting power (after giving effect to the provisions of this Section 4.5(a)) of the Outstanding shares of capital stock beneficially owned by the Substantial Stockholder by a fraction the numerator of which is the number of votes that the shares of capital stock owned of record by such record holder would have entitled such record holder to cast were no effect given to this Section 4.5(a), and the denominator of which is the total number of votes which all shares of capital stock beneficially owned by the Substantial Stockholder would have entitled their record holders to cast were no effect given to this Section 4.5(a).

(b) The Board of Directors by majority vote shall have the power and duty to determine for the purposes of this Article IV, on the basis of information known to them after reasonable inquiry, (i) whether a Person is a Substantial Stockholder, (ii) the number of shares of capital stock beneficially owned by any Person, (iii) whether a Person is an Affiliate or Associate of another, (iv) the Persons who may be deemed to be the record holders of shares beneficially owned by a Substantial Stockholder

and (v) such other matters with respect to which a determination is required under this Article IV. Any such determination made in good faith shall be binding and conclusive on all parties.

(c) The Board of Directors shall have the right to demand that any Person who is reasonably believed to be a Substantial Stockholder (or to hold of record shares of capital stock beneficially owned by a Substantial Stockholder) supply the Corporation with complete information as to (i) the record holder or holders of all shares beneficially owned by such Person, (ii) the number of shares of capital stock beneficially owned by such Person and held of record by each such record holder, and (iii) any other factual matter relating to the applicability or effect of this Article IV, as may reasonably be requested of such Person, and such Person shall furnish such information within ten days after the receipt of such demand.

(d) Nothing contained in this Article IV shall be construed to relieve any Substantial Stockholder from any fiduciary obligation imposed by law.

SECTION 4.6. QUORUM. Except as otherwise provided in this Certificate of Incorporation, the presence in person or by proxy of the holders of record of shares of capital stock entitling the holders thereof to cast a majority of the votes (after giving effect, if required, to the provisions of Section 4.5(a)) entitled to be cast by the holders of all Outstanding shares of capital stock entitled to vote shall constitute a quorum at all meetings of the stockholders.

SECTION 4.7. MAJORITY VOTE. If any class or series of the Corporation's capital stock shall be entitled to more or less than one vote for any share, on any matter for which such class or series is entitled to vote with one or more other classes or series, together as one class, every reference in this Certificate of Incorporation, the By-laws and in any relevant provision of law to a majority or other proportion of stock shall refer to such majority or other proportion of the votes of such stock.

SECTION 4.8. NO PREEMPTIVE RIGHTS. Except as otherwise provided by this Certificate of Incorporation or as otherwise from time to time provided by law, no holder of shares of any class or series of capital stock of the Corporation or of any security or obligation convertible into, or of any warrant, option or right to subscribe for, purchase or otherwise acquire, shares of any class or series of capital stock of the Corporation, whether now or hereafter authorized, shall, as such holder, have any preemptive right to subscribe for, purchase or otherwise acquire shares of any class or series of capital stock of the Corporation or any security or obligation convertible into, or any warrant, option or right to subscribe for, purchase or otherwise acquire, shares of any class or series of capital stock of the Corporation, whether now or hereafter authorized.


ARTICLE V

Definitions

As used in this Certificate of Incorporation, the following terms shall have the following meanings:

"AFFILIATE", with respect to any Person, means any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For purposes of this definition, "CONTROL" (including, with correlative meanings, the terms "CONTROLLING," "CONTROLLED BY" or "UNDER COMMON CONTROL WITH"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, by common management or otherwise. A Person having a contract or arrangement giving that Person control is deemed to be in control despite any limitations placed by law on the validity of the contract or arrangement. A corporation is deemed to be under

common control with any corporation, regardless of ownership, if substantially the same group of persons manage the two corporations.

"ASSOCIATE", used to indicate a relationship with a specified Person, shall mean (i) any Person (other than the Corporation or a Subsidiary) of which such specified Person is an officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of the voting securities of such Person, (ii) any trust or other estate in which such specified Person has a substantial beneficial interest or as to which such specified Person serves as trustee or in a similar fiduciary capacity, (iii) any relative or such spouse of such specified Person or any relative of such spouse who has the same home as such specified Person or who is a director or officer of the Corporation or any Subsidiary, and (iv) any Person who is a director or officer of such specified Person or any of its parents or subsidiaries (other than the Corporation or a Subsidiary).

A Person shall be deemed a "BENEFICIAL OWNER" of any shares of capital stock of the Corporation (a) which such Person or any of its Affiliates or Associates beneficially owns, directly or indirectly; (b) which such Person or any of its Affiliates or Associates has, directly or indirectly, the right to vote pursuant to any agreement, contract, arrangement or understanding, or (c) which are beneficially owned, directly or indirectly, by any other Person with which such Person or any of its Affiliates or Associates has any contract, agreement, arrangement or understanding for the purpose of holding or voting of any capital stock of the Corporation.

"OUTSTANDING", when used in reference to shares of stock, shall mean issued shares, excluding shares held in treasury.

"PERSON" shall mean any individual, firm, corporation or other entity and shall include any group comprised of any Person and any other Person with whom such Person or any Affiliate or Associate of such Person has any agreement, contract, arrangement or understanding, directly or indirectly, for the purpose of acquiring, holding, voting or disposing of any shares of capital stock of the Corporation.

"SUBSIDIARY" shall mean any corporation of which a majority of any class of equity securities is beneficially owned, directly or indirectly, by the Corporation.

"SUBSTANTIAL STOCKHOLDER" shall be defined as in Section 4.5 of this Certificate of Incorporation.


ARTICLE VI

DIRECTORS

Section 6.1.  WRITTEN BALLOT.  Elections of directors of the Corporation need not be by written ballot, except and to the extent provided in the By-laws of the Corporation.

SECTION 6.2.  NO LIABILITY.  To the fullest extent permitted by the General Corporation Law as it now exists and as it may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director.

ARTICLE VII

INDEMNIFICATION OF DIRECTORS, OFFICERS AND OTHERS

SECTION 7.1.  INDEMNIFICATION.  (a) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the

Corporation) by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a false plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person seeking indemnification did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c) To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 7.1(a) and (b) or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(d) Any indemnification under Sections 7.1(a) and (b) (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in such Sections 7.1(a) and (b). Such determination shall be made (i) by the Board of Directors of the Corporation by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (ii) if such a quorum is not obtainable, or, even if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (iii) by the stockholders of the Corporation.

(e) Expenses incurred by a director or officer of the Corporation in defending a civil or criminal action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation authorized in this Article VII. Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors of the Corporation deems appropriate.

(f) The indemnification and advancement of expenses provided by, or granted pursuant to, the other sections of this Article VII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, by-law,

agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(g) The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of Section 145 of the General Corporation Law.

(h) For purposes of this Article VII, references to "THE CORPORATION" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VII with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

(i) For purposes of this Article VII, references to "OTHER ENTERPRISES" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "SERVING AT THE REQUEST OF THE CORPORATION" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves service by, such director, officer, employee or agent with respect to any employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "NOT OPPOSED TO THE BEST INTERESTS OF THE CORPORATION" as referred to in this Article VII.

(j) The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VII shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

ARTICLE VIII

BY-LAWS

The directors of the Corporation shall have the power to adopt, amend or repeal the By-laws of the Corporation.

ARTICLE IX

REORGANIZATION

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation

under the provisions of section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

ARTICLE X

AMENDMENT

The Corporation reserves the right to amend, alter, change or repeal any provision of this Certificate of Incorporation, in the manner now or hereafter prescribed by law and the Certificate of Incorporation, and all rights conferred on stockholders in this Certificate of Incorporation are subject to this reservation.

IN WITNESS WHEREOF, AMBAC Inc. has caused this Amended and Restated Certificate of Incorporation to be signed on this 10th day of July, 1997, in its name and on its behalf by its Chairman, President and Chief Executive Officer.

/s/  Phillip B. Lassiter
------------------------
Phillip B. Lassiter
Chairman, President and
Chief Executive Officer

13

# EXHIBIT B

## (By-Laws)

Exhibit 3.04

**BY−LAWS**

**OF**

**AMBAC FINANCIAL GROUP, INC.**

Amended through
October 21, 2008

**TABLE OF CONTENTS**

**Page**

**ARTICLE I**
**OFFICES**

| | | |
|---|---|---|
| SECTION 1.01 | Registered Office | 1 |
| SECTION 1.02 | Other Offices | 1 |

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

| | | |
|---|---|---|
| SECTION 2.01 | Annual Meetings | 1 |
| SECTION 2.02 | Special Meetings | 1 |
| SECTION 2.03 | Notice of Meetings | 1 |
| SECTION 2.04 | Waiver of Notice | 2 |
| SECTION 2.05 | Adjournments | 2 |
| SECTION 2.06 | Quorum | 2 |
| SECTION 2.07 | Voting | 3 |
| SECTION 2.08 | Proxies | 3 |
| SECTION 2.09 | Chairman and Secretary at Meetings | 3 |
| SECTION 2.10 | Inspectors of Election | 3 |
| SECTION 2.11 | List of Stockholders | 4 |
| SECTION 2.12 | Notice of Stockholder Business | 4 |
| SECTION 2.13 | Notice of Stockholder Nominees | 5 |
| SECTION 2.14 | Stockholders' Consent in Lieu of Meeting | 5 |

**ARTICLE III**
**BOARD OF DIRECTORS**

| | | |
|---|---|---|
| SECTION 3.01 | General Powers | 6 |
| SECTION 3.02 | Number and Term of Office | 6 |
| SECTION 3.03 | Resignation | 7 |
| SECTION 3.04 | Removal | 7 |
| SECTION 3.05 | Vacancies | 7 |
| SECTION 3.06 | The Chairman | 7 |
| SECTION 3.07 | Meetings | 7 |
| SECTION 3.08 | Committees of the Board | 9 |
| SECTION 3.09 | Directors' Consent in Lieu of Meeting | 9 |
| SECTION 3.10 | Action by Means of Telephone or Similar Communications Equipment | 10 |
| SECTION 3.11 | Compensation | 10 |

|  |  | **Page** |
|---|---|---|
| | **ARTICLE IV** | |
| | **OFFICERS** | |
| SECTION 4.01 | Officers | 10 |
| SECTION 4.02 | Authority and Duties | 10 |
| SECTION 4.03 | Term of Office, Resignation and Removal | 10 |
| SECTION 4.04 | Vacancies | 11 |
| SECTION 4.05 | The Chief Executive Officer | 11 |
| SECTION 4.06 | The President | 11 |
| SECTION 4.07 | Vice Chairmen, Vice Presidents and Managing Directors | 11 |
| SECTION 4.08 | The Secretary | 12 |
| SECTION 4.09 | Assistant Secretaries | 12 |
| SECTION 4.10 | The Treasurer | 12 |
| SECTION 4.11 | Assistant Treasurers | 12 |
| | **ARTICLE V** | |
| | **CHECKS, DRAFTS, NOTES AND PROXIES** | |
| SECTION 5.01 | Checks, Drafts and Notes | 13 |
| SECTION 5.02 | Execution of Proxies | 13 |
| | **ARTICLE VI** | |
| | **SHARES AND TRANSFERS OF SHARES** | |
| SECTION 6.01 | Certificates Evidencing Shares | 13 |
| SECTION 6.02 | Transfers of Shares | 14 |
| SECTION 6.03 | Holder of Record | 14 |
| SECTION 6.04 | Addresses of Stockholders | 14 |
| SECTION 6.05 | Lost, Destroyed and Mutilated Certificates | 14 |
| SECTION 6.06 | Regulations | 14 |
| SECTION 6.07 | Fixing Date for Determination of Stockholders of Record | 14 |
| | **ARTICLE VII** | |
| | **SEAL** | |
| SECTION 7.01 | Seal | 15 |
| | **ARTICLE VIII** | |
| | **FISCAL YEAR** | |
| SECTION 8.01 | Fiscal Year | 15 |

|  |  | **Page** |
| --- | --- | --- |
| | **ARTICLE IX** | |
| | **INDEMNIFICATION AND INSURANCE** | |
| SECTION 9.01 | Indemnification | 15 |
| SECTION 9.02 | Insurance for Indemnification | 18 |
| | **ARTICLE X** | |
| | **AMENDMENTS** | |
| SECTION 10.01 | Amendments | 18 |

BY−LAWS
OF
AMBAC FINANCIAL GROUP, INC.
**(Amended through October 21, 2008)**

ARTICLE I
OFFICES

**SECTION 1.01 <u>Registered Office.</u>** The registered office of Ambac Financial Group, Inc. (the **"*Corporation*"**) in the State of Delaware shall be at the principal office of The Corporation Trust Company in the City of Wilmington, County of New Castle, and the registered agent in charge thereof shall be The Corporation Trust Company.

**SECTION 1.02 <u>Other Offices.</u>** The Corporation may also have an office or offices at any other place or places within or without the State of Delaware as the Board of Directors of the Corporation (the **"*Board*"**) may from time to time determine or the business of the Corporation may from time to time require.

ARTICLE II
MEETINGS OF STOCKHOLDERS

**SECTION 2.01 <u>Annual Meetings.</u>** The annual meeting of Stockholders *(as defined in Section 2.03)* of the Corporation for the election of directors of the Corporation (**"*Directors*"**), and for the transaction of such other business as may properly come before such meeting, shall be held at such place, date and time as shall be fixed by the Board and designated in the notice or waiver of notice of such annual meeting.

**SECTION 2.02 <u>Special Meetings.</u>** Special meetings of Stockholders for any purpose or purposes may be called by the Board or the Chairman of the Board of the Corporation (the **"*Chairman*"**), the President of the Corporation (the "**President**") or the Secretary of the Corporation (the "**Secretary**"), to be held at such place, date and time as shall be designated in the notice or waiver of notice thereof. Business transacted at all special meetings shall be confined to the objects stated in the notice of special meeting.

**SECTION 2.03 <u>Notice of Meetings,</u>** (a) Except as otherwise provided by law, written notice of each annual or special meeting of Stockholders stating the place, date and time of such meeting and, in the case of a special meeting, the purpose or purposes for which such meeting is to be held, shall be given to each recordholder of

1

By–laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

shares of common stock of the Corporation issued and outstanding ("***Shares***") entitled to vote thereat, not less than 10 nor more than 90 days before the date of such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the recordholder of Shares (a "***Stockholder***") at such Stockholder's address as it appears on the records of the Corporation.

(b) Notice of a special meeting of Stockholders may be given by the person or persons calling the meeting, or, upon the written request of such person or persons, such notice shall be given by the Secretary on behalf of such person or persons. If the person or persons calling a special meeting of Stockholders give notice thereof, such person or persons shall deliver a copy of such notice to the Secretary. Each request to the Secretary for the giving of notice of a special meeting of Stockholders shall state the purpose or purposes of such meeting.

SECTION 2.04 **Waiver of Notice.** Notice of any annual or special meeting of Stockholders need not be given to any Stockholder who files a written waiver of notice with the Secretary, signed by the person entitled to notice whether before or after such meeting. Neither the business to be transacted at, nor the purpose of, any meeting of Stockholders need to be specified in any written waiver of notice thereof. Attendance of a Stockholder at a meeting, in person or by proxy, shall constitute a waiver of notice of such meeting, except when such Stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the grounds that the notice of such meeting was inadequate or improperly given.

SECTION 2.05 **Adjournments.** Whenever a meeting of Stockholders, annual or special, is adjourned to another date, time or place, notice need not be given of the adjourned meeting if the date, time and place thereof are announced at the meeting at which the adjournment is taken. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Stockholder entitled to vote thereat. At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting. Any previously scheduled meeting of the Stockholders may be postponed, and (*unless the Certificate of Incorporation of the Corporation* (the "***Certificate of Incorporation***") *otherwise provides*) any special meeting of the Stockholders may be canceled, by resolution of the Board upon public notice given prior to the date previously scheduled for such meeting of Stockholders.

SECTION 2.06 **Quorum.** Except as otherwise provided by law or the Certificate of Incorporation, the recordholders of a majority of the Shares entitled to vote thereat, present in person or by proxy, shall constitute a quorum for the transaction of business at all meetings of Stockholders, whether annual or special. If, however, such quorum shall not be present in person or by proxy at any meeting of Stockholders, the presiding officer at the meeting of the Stockholders entitled to vote thereat may adjourn the meeting from time to time in accordance with Section 2.05 hereof until a quorum shall be present in person or by proxy.

By-laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

SECTION 2.07 **Voting.** Each Stockholder shall be entitled to one vote for each Share held of record by such Stockholder. Except as otherwise provided by law or the Certificate of Incorporation, when a quorum is present at any meeting of Stockholders, the vote of the recordholders of a majority of the Shares constituting such quorum shall decide any question brought before such meeting.

SECTION 2.08 **Proxies.** Each Stockholder entitled to vote at a meeting of Stockholders or to express, in writing, consent to or dissent from any action of Stockholders without a meeting may authorize another person or persons to act for such Stockholder by proxy. Such authorization must be in writing and executed by the Stockholder or his or her authorized officer, director, employee or agent. No proxy shall be voted or acted upon more than three years from its date, unless the proxy provides for a longer period. Each proxy shall be delivered to the inspectors of election prior to or at the meeting. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A Stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or by filing a subsequent duly executed proxy with the Secretary of the Corporation. Unless a greater number of affirmative votes is required by the Certificate of Incorporation, these by-laws, the rules or regulations of any stock exchange applicable to the Corporation, or as otherwise required by law or pursuant to any regulation applicable to the Corporation, if a quorum exists at any meeting of Stockholders, Stockholders shall have approved any matter, other than the election of directors, if the votes cast by Stockholders present in person or represented by proxy at the meeting and entitled to vote on the matter in favor of such matter exceed the votes cast by such Stockholders against such matter. Directors shall be elected by a plurality of the votes cast.

SECTION 2.09 **Chairman and Secretary at Meetings.** At any meeting of Stockholders, the Chairman, or in his absence, the President, or if neither such person is available, then a person designated by the Board, shall preside at and act as chairman of the meeting. The Secretary, or in his absence a person designated by the chairman of the meeting, shall act as secretary of the meeting.

SECTION 2.10 **Inspectors of Election.** The votes at each meeting of Stockholders shall be supervised by not less than two inspectors of election who shall decide all questions respecting the qualification of voters, the validity of the proxies and the acceptance or rejection of votes. The Board shall, in advance of any meeting of Stockholders, appoint two or more inspectors of election to act at the meeting and make a written report thereof. The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act. In the event that there are less than

3

two inspectors present and acting at any meeting, the chairman of the meeting shall appoint an additional inspector or inspectors so that there shall always be at least two inspectors to act at the meeting. Each inspector, before entering upon the discharge of this or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.

SECTION 2.11 **List of Stockholders.** A complete list of the Stockholders entitled to vote at each meeting of Stockholders, arranged in alphabetical order, and showing the address and number of shares registered in the name of each Stockholder, shall be prepared and made available for examination during regular business hours by any Stockholder for any purpose germane to the meeting. The list shall be available for such examination for a period of not less than ten days prior to the meeting and during the whole time of the meeting either at a place within the city where the meeting is to be held, which place shall be specified in the notice of meeting or, if not so specified, at the place where the meeting is to be held.

SECTION 2.12 **Notice of Stockholder Business.** At an annual meeting of the Stockholders, only such business shall be conducted as shall have been brought before the meeting (a) by or at the direction of the Board or (b) by any Stockholder who complies with the notice procedures set forth in this Section 2.12. For business to be properly brought before an annual meeting by a Stockholder, the Stockholder must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a Stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation, not less than sixty days nor more than ninety days prior to the meeting; provided, however, that in the event that less than seventy days' notice or prior public disclosure of the date of the meeting is given or made to the Stockholders, notice by the Stockholder to be timely must be received not later than the close of business on the 10th day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure was made. A Stockholder's notice to the Secretary shall set forth as to each matter the Stockholder proposes to bring before the annual meeting (a) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting; (b) the name and address, as they appear on the Corporation's books, of the Stockholder proposing such business; (c) the class and number of shares of the Corporation which are beneficially owned by the Stockholder; and (d) any material interest of the Stockholder in such business. Notwithstanding anything in these By−laws to the contrary, no business shall be conducted at an annual meeting except in accordance with the procedures set forth in this Section 2.12. The chairman of an annual meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting and in accordance with the provisions of this Section 2.12, and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted. Notwithstanding the foregoing provisions of this Section 2.12, a Stockholder seeking to have a proposal included in the Corporation's proxy statement shall comply with the requirements of Regulation 14A under the Securities Exchange Act of 1934, as amended (*including, but not limited to, Rule 14a−8 or its successor provision.*)

4

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

**SECTION 2.13 <u>Notice of Stockholder Nominees.</u>** Only persons who are nominated in accordance with the procedures set forth in these By−laws shall be eligible for election as Directors. Nominations of persons for election to the Board may be made at a meeting of Stockholders (a) by or at the direction of the Board or (b) by any Stockholder entitled to vote for the election of Directors at the meeting who complies with the notice procedures set forth in this Section 2.13. Nominations by Stockholders shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a Stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than sixty days nor more than ninety days prior to the meeting; <u>provided,</u> <u>however,</u> that in the event that less than seventy days' notice or prior public disclosure of the date of the meeting is given or made to Stockholders, notice by the Stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of the meeting was mailed or such public disclosure was made. Such nominations and written notice of any nominations by Stockholders under this section shall contain the following information: (a) name, residence and business address of the nominating Stockholder; (b) a representation that the Stockholder is a record holder or beneficial owner of the Corporation's voting shares and a statement of the number of such shares; (c) a representation that the Stockholder intends to appear in person or by proxy at the meeting to nominate the individuals specified in the notice, if the nominations are to be made at a meeting of Stockholders; (d) information regarding each nominee such as would be required to be included in a proxy statement or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended; (e) a description of all arrangements or understandings between and among the Stockholder and each and every nominee; and (f) the written consent of each nominee to serve as a Director, if elected. The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the procedures prescribed by these By−laws, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded.

**SECTION 2.14 <u>Stockholders' Consent in Lieu of Meeting.</u>** (a) <u>Consents to Corporate Action.</u> Any action which is required to be or may be taken at any annual or special meeting of Stockholders, subject to the provisions of Subsections (b) and (c) of this Section 2.14, may be taken without a meeting, without prior notice and without a vote if consents in writing, setting forth the action so taken, shall have been signed by the holders of the outstanding Shares having not less than the minimum number of votes that would be necessary to authorize or to take such action at a meeting at which all Shares entitled to vote thereon were present and voted; <u>provided,</u> <u>however,</u> that prompt notice of the taking of the corporate action without a meeting and by less than unanimous written consent shall be given to those Stockholders who have not consented in writing.

5

(b) <u>Determination of Record Date of Action by Written Consent</u>. The record date for determining Stockholders entitled to express consent to corporate action in writing without a meeting shall be fixed by the Board. Any Stockholder of record seeking to have the Stockholders authorize or take corporate action by written consent without a meeting shall, by written notice to the Secretary, request the Board to fix a record date. Upon receipt of such a request, the Secretary shall place such request before the Board at its next regularly scheduled meeting, <u>provided, however,</u> that if the Stockholder represents in such request that he intends, and is prepared, to commence a consent solicitation as soon as is permitted by the Securities Exchange Act of 1934, as amended, and the regulations thereunder and other applicable law, the Secretary shall, as promptly as practicable, call a special meeting of the Board, which meeting shall be held as promptly as practicable. At such regular or special meeting, the Board shall fix a record date as provided in Section 213(a) (*or its successor provision*) of the General Corporation Law of the State of Delaware (the "***General Corporation Law***"). Should the Board fail to fix a record date as provided for in this Subsection (b), then the record date shall be the day on which the first written consent is expressed.

(c) <u>Procedures for Written Consent</u>. In the event of the delivery to the Corporation of a written consent or consents purporting to represent the requisite voting power to authorize or take corporate action and/or related revocations, the Secretary shall provide for safekeeping of such consents and revocations and shall, as promptly as practicable, engage nationally recognized independent judges of election for the purpose of promptly performing a ministerial review of the validity of the consents and revocations. No action by written consent and without a meeting shall be effective until such judges have completed their review, determined that the requisite number of valid and unrevoked consents has been obtained to authorize or take action specified in the consents, and certified such determination for entry in the records of the Corporation kept for the purpose of recording the proceedings of meetings of Stockholders.

ARTICLE III
BOARD OF DIRECTORS

**SECTION 3.01 <u>General Powers</u>.** The business and affairs of the Corporation shall be managed by the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law, the Certificate of Incorporation or these By−laws directed or required to be exercised or done by Stockholders.

**SECTION 3.02 <u>Number and Term of Office</u>.** The number of Directors shall be three or such greater number as shall be fixed from time to time by the Board. Directors need not be Stockholders. Directors shall be elected at the annual meeting of Stockholders, and each Director shall hold office until his successor is elected and qualified, or until his earlier death or resignation or removal in the manner hereinafter provided.

6

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

     **SECTION 3.03 <u>Resignation</u>.** Any Director may resign at any time by giving written notice to the Board, the Chairman or the Secretary. Such resignation shall take effect at the time specified in such notice or, if the time is not specified, upon receipt thereof by the Board, the Chairman or the Secretary, as the case may be. Unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.

     **SECTION 3.04 <u>Removal</u>.** Any or all of the Directors may be removed, with or without cause, at any time by vote of the recordholders of a majority of the Shares then entitled to vote at an election of Directors, or by written consent of the recordholders of Shares pursuant to Section 2.14 hereof.

     **SECTION 3.05 <u>Vacancies</u>.** Vacancies occurring on the Board as a result of the removal of Directors without cause may be filled only by vote of the recordholders of a majority of the Shares then entitled to vote at an election of Directors, or by written consent of such recordholders pursuant to Section 2.14 hereof. Vacancies occurring on the Board for any other reason, including, without limitation, vacancies occurring as a result of the creation of new directorships that increase the number of Directors, may be filled by such vote or written consent or by vote of the Board or by written consent of the Directors pursuant to Section 3.09 hereof. If the number of Directors then in office is less than quorum, such other vacancies may be filled by vote of a majority of the Directors then in office or by written consent of all such Directors pursuant to Section 3.09 hereof. Unless earlier removed pursuant to Section 3.04 hereof, each Director chosen in accordance with this Section 3.05 shall hold office until the next annual election of Directors by the Stockholders and until his successor shall be elected and qualified.

     **SECTION 3.06 <u>The Chairman</u>.** The Chairman of the Board may also be the Chief Executive Officer or any other officer of the Corporation. The Chairman shall be appointed by a majority of the directors of the Board of Directors and shall be designated by the Board as either a Non−Executive Chairman or in accordance with the provisions of Section 4.01 of these By−laws, an Executive Chairman of the Board. (References in these By−laws to the "Chairman" shall mean the Non−Executive Chairman or Executive Chairman, as designated by the Board). The Chairman shall have the power to call special meetings of Stockholders, to call special meetings of the Board and, if present, to preside at all meetings of Stockholders and all meetings of the Board. The Chairman shall perform all duties incident to the office of Chairman and all such other duties as may from time to time be assigned to him by the Board or these By−laws.

     **SECTION 3.07 <u>Meetings</u>.** (a) <u>Annual Meetings</u>. As soon as practicable after each annual election of Directors by the Stockholders, the Board shall meet for the purpose of organization and the transaction of other business, unless it shall have transacted all such business by written consent pursuant to Section 3.09 hereof.

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

(b) <u>Stated Meetings</u>. The Board may provide for stated meetings of the Board.

(c) <u>Other Meetings</u>. Other meetings of the Board shall be held at such times as the Chairman, the President, the Secretary or a majority of the Board shall from time to time determine.

(d) <u>Notice of Meetings</u>. No notice need be given of any organization or stated meeting of the Board for which the date, hour and place have been fixed by the Board. The Secretary shall give written notice to each Director of each other organization and stated meeting and of all special meetings of the Board, which notice shall state the place, date, time and purpose of such meeting. Notice of each such meeting shall be given to each Director, if by mail, addressed to him at his residence or usual place of business, at least two days before the day on which such meeting is to be held, or shall be sent to him at such place by telecopy, telegraph, cable, or other form of recorded communication, or be delivered personally or by telephone or e−mail not later than the day before the day on which such meeting is to be held. A written waiver of notice, signed by the Director entitled to notice, whether before or after the time of the meeting referred to in such waiver, shall be deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of any meeting of the Board need be specified in any written waiver of notice thereof. Attendance of a Director at a meeting of the Board shall constitute a waiver of notice of such meeting, except as provided by law.

(e) <u>Place of Meetings</u>. The Board may hold its meetings at such place or places within or without the State of Delaware as the Board or the Chairman may from time to time determine, or as shall be designated in the respective notices or waivers of notice of such meetings.

(f) <u>Quorum and Manner of Acting</u>. One−third of the total number of Directors then in office (*but in no event less than three Directors*) shall be present in person at any meeting of the Board in order to constitute a quorum for the transaction of business at such meeting, and the vote of a majority of those Directors present at any such meeting at which a quorum is present shall be necessary for the passage of any resolution or act of the Board, except as otherwise expressly required by law, the Certificate of Incorporation or these By−laws. In the absence of a quorum for any such meeting, a majority of the Directors present thereat may adjourn such meeting from time to time until a quorum shall be present.

(g) <u>Organization</u>. At each meeting of the Board, one of the following shall act as chairman of the meeting and preside, in the following order of precedence:

       (i) the Chairman;

       (ii) the President;

       (iii) any Director chosen by a majority of the Directors present.

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

The Secretary or, in the case of his absence, any person (*who shall be an Assistant Secretary, if an Assistant Secretary is present*) whom the chairman of the meeting shall appoint shall act as secretary of such meeting and keep the minutes thereof.

**SECTION 3.08 Committees of the Board.** The Board may designate one or more committees, each committee to consist of one or more Directors. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another Director to act at the meeting in the place of any such absent or disqualified member. A majority of the members of any committee of the Board shall be present in person at any meeting of the committee in order to constitute a quorum for the transaction of business at such meeting, and the act of a majority of the members present at any such meeting at which a quorum is present shall be the act of the committee. In the absence of a quorum for any such meeting, a majority of the members present thereat may adjourn such meeting from time to time until a quorum shall be present. Any committee of the Board, to the extent provided in the resolution of the Board designating such committee, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; provided, however, that no such committee shall have such power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the General Corporation Law to be submitted to stockholders for approval or (ii) adopting, amending or repealing these By−laws. In addition, each committee of the Board so appointed may appoint a sub−committee of the Board in furtherance of the duties delegated to it by the Board. Each committee of the Board shall keep regular minutes of its proceedings and report the same to the Board when so requested by the Board.

**SECTION 3.09 Directors' Consent in Lieu of Meeting.** Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by all the members of the Board or such committee and such consent is filed with the minutes of the proceedings of the Board or such committee.

9

SECTION 3.10 **Action by Means of Telephone or Similar Communications Equipment.** Any one or more members of the Board, or of any committee thereof, may participate in a meeting of the Board or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

SECTION 3.11 **Compensation.** Unless otherwise restricted by the Certificate of Incorporation, the Board may determine the compensation of Directors. In addition, as determined by the Board, Directors may be reimbursed by the Corporation for their expenses, if any, in the performance of their duties as Directors. No such compensation or reimbursement shall preclude any Director from serving the Corporation in any other capacity and receiving compensation therefore.

ARTICLE IV
OFFICERS

SECTION 4.01 **Officers.** The officers of the Corporation shall be the President, the Secretary and a Treasurer and may include one or more of the following: A Chairman, Vice Chairmen, Vice Presidents, Managing Directors, Assistant Secretaries and Assistant Treasurers. Any two or more offices may be held by the same person provided that the office of President and Secretary shall not be held by the same person. Without limiting the generality of the foregoing, the Board may designate the Chairman of the Board, as an Executive Chairman, in which case such person shall be an officer of the Corporation and shall have, in addition to the duties set forth in these By−laws, such powers and authority as determined by the Board. If the Chief Executive Officer is absent or incapacitated, the Board or any committee designated by the Board for such purpose shall determine the person who shall have all the power and authority of the Chief Executive Officer.

SECTION 4.02 **Authority and Duties.** All officers shall have such authority and perform such duties in the management of the Corporation as may be provided in these By−laws or, to the extent not so provided, by resolution of the Board.

SECTION 4.03 **Term of Office, Resignation and Removal.** (a) Each officer shall be appointed by the Board and shall hold office for such term as may be determined by the Board. Each officer shall hold office until his successor has been appointed and qualified or his earlier death or resignation or removal in the manner hereinafter provided. The Board may require any officer to give security for the faithful performance of his duties.

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

       (b) Any officer may resign at any time by giving written notice to the Board, the President or the Secretary. Such resignation shall take effect at the time specified in such notice or, if the time be not specified, upon receipt thereof by the Board, the President or the Secretary, as the case may be. Unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.

       (c) All officers and agents appointed by the Board shall be subject to removal, with or without cause, at any time by the Board or by the action of the recordholders of a majority of the Shares entitled to vote thereon

     **SECTION 4.04 <u>Vacancies</u>.** Any vacancy occurring in any office of the Corporation, for any reason, shall be filled by action of the Board. Unless earlier removed pursuant to Section 4.03 hereof, any officer appointed by the Board to fill any such vacancy shall serve only until such time as the unexpired term of his predecessor expires unless reappointed by the Board.

     **SECTION 4.05 <u>The Chief Executive Officer</u>.** The Chief Executive Officer (the "CEO") shall be the chief executive officer of the Corporation and shall have general and active management and control of the business and affairs of the Corporation, subject to the control of the Board, and shall see that all orders and resolutions of the Board are carried into effect. The CEO shall have the power to call special meetings of Stockholders, to call special meetings of the Board and, if present, to preside at all meetings of Stockholders and all meetings of the Board. The CEO shall perform all duties incident to the office of CEO and all such other duties as may from time to time be assigned to him by the Board or these By−laws.

     **SECTION 4.06 <u>The President</u>.** The President shall be the chief operating officer of the Corporation and shall have general and active management and control the operations of the Corporation, subject to the control of the Board, and shall see that all orders and resolutions of the Board are carried into effect. The President shall perform all duties incident to the office of President and all such other duties as may from time to time be assigned to him by the Board or these By−laws.

     **SECTION 4.07 <u>Vice Chairmen, Vice Presidents and Managing Directors</u>.** Vice Chairmen, Vice Presidents and Managing Directors, if any, in order of their seniority or in any other order determined by the Board, shall generally assist the President and perform such other duties as the Board or the President shall prescribe, and in the absence or disability of the President, shall perform the duties and exercise the powers of the President. A Managing Director may be designated as a Senior Managing Director. A Vice President may be designated as an Executive Vice President, a Senior Vice President, a First Vice President, a Vice President or an Assistant Vice President.

11

By-laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

SECTION 4.08 **The Secretary.** The Secretary shall, to the extent practicable, attend all meetings of the Board and all meetings of Stockholders and shall record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform the same duties for any committee of the Board when so requested by such committee. He or she shall give or cause to be given notice of all meetings of Stockholders and of the Board, shall perform such other duties as may be prescribed by the Board, the Chairman or the President and shall act under the supervision of the Chairman and the President. He or she shall keep in safe custody the seal of the Corporation and affix the same to any instrument that requires that the seal be affixed to it and which shall have been duly authorized for signature in the name of the Corporation and, when so affixed, the seal shall be attested by his or her signature or by the signature of the Treasurer of the Corporation (the "**_Treasurer_**") or an Assistant Secretary or Assistant Treasurer of the Corporation. He or she shall keep in safe custody the certificate books and stockholder records and such other books and records of the Corporation as the Board, the Chairman or the President may direct and shall perform all other duties incident to the office of Secretary and such other duties as from time to time may be assigned to him or her by the Board, the Chairman or the President.

SECTION 4.09 **Assistant Secretaries.** Assistant Secretaries of the Corporation ("**_Assistant Secretaries_**"), if any, in order of their seniority or in any other order determined by the Board, shall generally assist the Secretary and perform such other duties as the Board or the Secretary shall prescribe, and, in the absence or disability of the Secretary, shall perform the duties and exercise the powers of the Secretary.

SECTION 4.10 **The Treasurer.** The Treasurer shall have the care and custody of all the funds of the Corporation and shall deposit such funds in such banks or other depositories as the Board, or any officer or officers, or any officer and agent jointly, duly authorized by the Board, shall, from time to time, direct or approve. He shall disburse the funds of the Corporation under the direction of the Board and the President. He shall keep a full and accurate account of all moneys received and paid on account of the Corporation and shall render a statement of his accounts whenever the Board, the Chairman or the President shall so request. He shall perform all other necessary actions and duties in connection with the administration of the financial affairs of the Corporation and shall generally perform all the duties usually appertaining to the office of treasurer of a corporation. When required by the Board, he shall give bonds for the faithful discharge of his duties in such sums and with such sureties as the Board shall approve.

SECTION 4.11 **Assistant Treasurers.** Assistant Treasurers of the Corporation ("**_Assistant Treasurers_**"), if any, in order of their seniority or in any other order determined by the Board, shall generally assist the Treasurer and perform such other duties as the Board or the Treasurer shall prescribe, and, in the absence or disability of the Treasurer, shall perform the duties and exercise the powers of the Treasurer.

ARTICLE V
CHECKS, DRAFTS, NOTES AND PROXIES

**SECTION 5.01 Checks, Drafts and Notes.** All checks, drafts and other orders for the payment of money, notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation and in such manner as shall be determined from time to time, by resolution of the Board.

**SECTION 5.02 Execution of Proxies.** The President, or, in the absence or disability of both of them, any Vice Chairman, Vice President or Managing Director, may authorize, from time to time, the execution and issuance of proxies to vote shares of stock or other securities of other corporations held of record by the Corporation and the execution of consents to action taken or to be taken by any such corporation. All such proxies and consents, unless otherwise authorized by the Board, shall be signed in the name of the Corporation by the President or any Vice Chairman, Vice President or Managing Director.

ARTICLE VI
SHARES AND TRANSFERS OF SHARES

**SECTION 6.01 Certificates Evidencing Shares.** Shares shall be evidenced by (1) certificates in such form or forms as shall be approved by the Board or (2) they shall be uncertificated. Each registered holder shall be provided a certificate of stock representing the number of shares owned by such holder.

If certificates of stock are issued, they shall be issued in consecutive order and shall be numbered in the order of their issue, and shall be signed by the Chairman, the Chief Executive Officer, the President or any Vice Chairman, Vice President or Managing Director and by the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer; provided that if such a certificate is manually signed by one such officer, any other signature on the certificate may be a facsimile and, if such a certificate is countersigned by a transfer agent or registrar other than the Corporation or its employee, any other signature on the certificate may be a facsimile. No certificate for a fractional share of Common Stock shall be issued. In the event any such officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to hold such office or to be employed by the Corporation before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such officer had held such office on the date of issue.

13

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

      **SECTION 6.02 <u>Transfers of Shares</u>.** Transfers of Shares shall be made upon the books of the Corporation: (1) upon presentation of the certificates by the registered holder in person or by duly authorized attorney, or upon presentation of proper evidence of succession, assignment or authority to transfer the stock, and upon surrender of the appropriate certificate(s), or (2) in the case of uncertificated shares, upon receipt of proper transfer instructions from the registered owner of such uncertificated shares, or from a duly authorized attorney or from an individual presenting proper evidence of succession, assignment or authority to transfer the stock. The Corporation may impose such additional conditions to the transfer of its Shares as may be necessary or appropriate for compliance with applicable law or to protect the Corporation, a Transfer Agent or the Registrar from liability with respect to such transfer.

      **SECTION 6.03 <u>Holder of Record</u>.** The Corporation shall be entitled to treat the holder of any Share or Shares of stock as the holder in fact thereof and accordingly shall not be bound to recognize any equitable or other claim to or interest in such share or on the part of any other person whether or not it shall have express or other notice thereof, save as expressly provided by the laws of the State of Delaware.

      **SECTION 6.04 <u>Addresses of Stockholders</u>.** Each Stockholder shall designate to the Corporation an address at which notices of meetings and all other corporate notices may be served or mailed to such Stockholder, and, if any Stockholder shall fail to so designate such an address, corporate notices may be served upon such Stockholder by mail directed to the mailing address, if any, as the same appears in the stock ledger of the Corporation or at the last known mailing address of such Stockholder.

      **SECTION 6.05 <u>Lost, Destroyed and Mutilated Certificates</u>.** Each recordholder of Shares shall promptly notify the Corporation of any loss, destruction or mutilation of any certificate or certificates evidencing any Share or Shares of which he is
the recordholder. The Board, in its discretion, or any transfer agent thereunto duly authorized by the Board, may authorize the issue of a new certificate in place of any certificate theretofore issued and alleged to have been mutilated, lost, stolen or destroyed, upon the surrender of the mutilated certificate or, in the case of loss, theft or destruction of the certificate, upon satisfactory proof of such loss, theft or destruction, and the Board may, in its discretion, require, and its transfer agents and registrars may so require, the recordholder of the Shares evidenced by the lost, stolen or destroyed certificate or his legal representative to give the Corporation a bond sufficient to indemnify the Corporation against any claim made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

      **SECTION 6.06 <u>Regulations</u>.** The Board may make such other rules and regulations as it may deem expedient, not inconsistent with these By−laws, concerning the issue, transfer and registration of certificates evidencing Shares.

      **SECTION 6.07 <u>Fixing Date for Determination of Stockholders of Record</u>.** In order that the Corporation may determine the Stockholders entitled to notice of or to vote at any meeting of Stockholders or any adjournment thereof, or to express consent to, or to dissent from, corporate action in writing without a meeting, or entitled to

14

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix, in advance, a record date, which shall not be more than 60 nor less than 10 days before the date of such meeting, nor more than 60 days prior to any other such action. A determination of the Stockholders entitled to notice of or to vote at a meeting of Stockholders shall apply to any adjournment of such meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

ARTICLE VII
SEAL

**SECTION 7.01 Seal.** The Board may approve and adopt a corporate seal, which shall be in the form of a circle and shall bear the full name of the Corporation, the year of its incorporation and the words "Corporate Seal Delaware".

ARTICLE VIII
FISCAL YEAR

**SECTION 8.01 Fiscal Year.** The fiscal year of the Corporation shall end on the thirty−first day of December of each year unless changed by resolution of the Board.

ARTICLE IX
INDEMNIFICATION AND INSURANCE

**SECTION 9.01 Indemnification.** (a) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (*other than an action by or in the right of the Corporation*) by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (*including attorneys' fees*), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had

15

no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (*including attorney's fees*) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c) To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 9.01(a) and (b) of these By−laws, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses *(including attorneys' fees)* actually and reasonably incurred by him in connection therewith.

(d) Any indemnification under Section 9.01(a) and (b) of these By−laws (*unless ordered by a court*) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in Section 9.01(a) and (b) of these By−laws. Such determination shall be made (i) by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (ii) if such quorum is not obtainable, or, even if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (iii) by the stockholders of the Corporation.

(e) Expenses *(including attorneys' fees)* incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director

16

By−laws of Ambac Financial Group, Inc.
Amended through October 21, 2008

or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation pursuant to this Article IX. Such expenses *(including attorneys' fees)* incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board deems appropriate.

(f) The indemnification and advancement of expenses provided by, or granted pursuant to, other Sections of this Article IX shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, by−law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(g) For purposes of this Article IX, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (*including any constituent of a constituent*) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article IX with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

(h) For purposes of this Article IX, references to "other enterprises" shall include employee benefit plans, references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves service by, such director, officer, employee or agent with respect to any employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article IX.

(i) The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

SECTION 9.02 **Insurance for Indemnification.** The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of Section 145 of the General Corporation Law.

ARTICLE X
AMENDMENTS

SECTION 10.01 **Amendments.** Any By−law (including these By−laws) may be adopted, amended or repealed by the vote of the recordholders of a majority of the Shares then entitled to vote at an election of Directors or by written consent of Stockholders pursuant to Section 2.14 hereof, or by vote of the Board or by a written consent of Directors pursuant to Section 3.09 hereof.

# EXHIBIT C

**(Savings Plan)**

# AMBAC FINANCIAL GROUP, INC.

## SAVINGS INCENTIVE PLAN

(Amended and Restated as of January 1, 2006)

# SECTION 1
## HISTORY AND PURPOSE

# SECTION 2
## DEFINITIONS

*Account or Accounts* ...................................................................................................................... 2
*Affiliate* ............................................................................................................................................ 2
*After-tax Contribution* .................................................................................................................... 2
*After-tax Contribution Account* ...................................................................................................... 2
*Base Compensation* ........................................................................................................................ 2
*Basic Profit-Sharing Contribution* .................................................................................................. 3
*Basic Profit-Sharing Contribution Account* .................................................................................... 3
*Beneficiary* ...................................................................................................................................... 3
*Cash-out Amount* ............................................................................................................................ 3
*Catch-Up Contribution* ................................................................................................................... 3
*Code* ................................................................................................................................................ 3
*Committee or Committees* ............................................................................................................... 3
*Company* ......................................................................................................................................... 3
*Compensation Committee* ............................................................................................................... 3
*Contribution* .................................................................................................................................... 3
*Direct Rollover* ............................................................................................................................... 4
*Discretionary Profit-Sharing Contribution* ..................................................................................... 4
*Distributee* ...................................................................................................................................... 4
*Effective Date* ................................................................................................................................. 4
*Eligible Employee* ........................................................................................................................... 4
*Eligible Retirement Plan* ................................................................................................................. 4
*Eligible Rollover Distribution* ........................................................................................................ 4
*Employee* ......................................................................................................................................... 5
*Employer* ......................................................................................................................................... 5
*Entry Date* ....................................................................................................................................... 5
*ERISA* .............................................................................................................................................. 5
*Excluded Individual* ........................................................................................................................ 5
*Highly Compensated Employee* ...................................................................................................... 6
*Hour of Service* ............................................................................................................................... 6
*Investment Fund* .............................................................................................................................. 6
*Investment Manager* ........................................................................................................................ 6
*IRS* ................................................................................................................................................... 6
*Limitation Year* ............................................................................................................................... 6
*Matching Contribution* .................................................................................................................... 6
*Matching Contribution Account* ...................................................................................................... 6
*Military Leave* ................................................................................................................................. 7
*Non-highly Compensated Employee* ............................................................................................... 7

*Normal Retirement Age*.................................................................................... 7
*Participant* ....................................................................................................... 7
*Pension Plan* .................................................................................................... 7
*Plan*.................................................................................................................. 7
*Plan Administrative Committee* ...................................................................... 7
*Plan Administrator*.......................................................................................... 7
*Plan Investment Committee* ............................................................................ 7
*Plan Year* ......................................................................................................... 8
*Pretax Contribution Account* ......................................................................... 8
*Pretax Contributions*....................................................................................... 8
*Prior Plan* ........................................................................................................ 8
*Profit-Sharing Contributions* ......................................................................... 8
*Qualified Domestic Relations Order* .............................................................. 8
*Qualified Plan* .................................................................................................. 8
*Retirement* ....................................................................................................... 8
*Returning Veteran* ........................................................................................... 8
*Rollover Contribution* ..................................................................................... 8
*Rollover Contribution Account* ....................................................................... 8
*Spouse* .............................................................................................................. 9
*Supplemental Profit-Sharing Contribution*.................................................... 9
*Supplemental Profit-Sharing Contribution Account* ..................................... 9
*Total and Permanent Disability*...................................................................... 9
*Trust Agreement* .............................................................................................. 9
*Trust Fund*........................................................................................................ 9
*Trustee*.............................................................................................................. 9
*USERRA* ........................................................................................................... 9
*Valuation Date* ................................................................................................. 9

## SECTION 3
## ELIGIBILITY AND PARTICIPATION

3.1    Eligibility ............................................................................................... 10
3.2    Elections.................................................................................................. 10
3.3    Establishment of Accounts ..................................................................... 11
3.4    Special Rules for Cadre Financial Services, Inc..................................... 11
3.5    Special Rules for Ambac Securities Inc.................................................. 11
3.6    Special Rules for Ambac Employees Formerly Associated with MBIA Ambac
International .......................................................................................................... 12

## SECTION 4
## CONTRIBUTIONS

4.1    General Rule ............................................................................................ 13
4.2    Pretax Contributions .............................................................................. 13
4.3    After-tax Contributions........................................................................... 13
4.4    Rollover Contributions............................................................................ 13
4.5    Changes in Contribution Rates. .............................................................. 14

| | | |
|---|---|---|
| 4.6 | Basic, Supplemental and Discretionary Profit-Sharing Contributions | 14 |
| 4.7 | Matching Contributions | 15 |
| 4.8 | Catch-Up Contributions | 16 |
| 4.9 | Compliance with Section 402(g) of the Code | 17 |
| 4.10 | Compliance with Sections 401(k)(3) and 401(m) of the Code. | 17 |
| 4.11 | Changes Effected by the Plan Administrator | 18 |
| 4.12 | Compliance with Section 415 of the Code | 18 |
| 4.13 | Special Definitions | 19 |
| 4.14 | Contributions for Participants Returning from Military Leave | 20 |

## SECTION 5
## INVESTMENT OF CONTRIBUTIONS

| | | |
|---|---|---|
| 5.1 | Investment of Contributions | 22 |
| 5.2 | Investment of Supplemental Profit-Sharing Contributions | 23 |
| 5.3 | Default Allocation | 24 |
| 5.4 | Responsibility for Investments | 24 |

## SECTION 6
## VESTING

| | | |
|---|---|---|
| 6.1 | General | 25 |

## SECTION 7
## DISTRIBUTION AND TRANSFER OF ACCOUNTS

| | | |
|---|---|---|
| 7.1 | Termination Payment | 26 |
| 7.2 | Form and Timing of Distributions | 26 |
| 7.3 | Benefits Payable upon the Death of a Participant | 27 |
| 7.4 | Form of Payment | 27 |
| 7.5 | Proof of Death and Right of Beneficiary or Other Person | 27 |
| 7.6 | Minimum Required Distributions | 28 |
| 7.7 | Eligible Rollover Distributions | 28 |
| 7.8 | QDROs | 28 |
| 7.9 | Voluntary Direct Transfers from the Plan to Another Qualified Plan | 29 |

## SECTION 8
## WITHDRAWALS WHILE STILL EMPLOYED

| | | |
|---|---|---|
| 8.1 | Withdrawals of After-tax Contributions | 30 |
| 8.2 | Withdrawals on or After Age 59½ | 30 |
| 8.3 | Hardship Withdrawals | 30 |
| 8.4 | Manner of Making Withdrawal | 31 |
| 8.5 | Allocation of Withdrawals Among Investment Funds | 32 |
| 8.6 | Liquidity | 32 |

# SECTION 9
## LOANS TO PARTICIPANTS

9.1    Application for Loan ................................................................................................ 33
9.2    Amount Available for Loan. ................................................................................... 33
9.3    Terms and Conditions ............................................................................................ 33
9.4    Loans Treated as Directed Investments ................................................................ 34
9.5    Loan Acceleration Events ...................................................................................... 34
9.6    Deduction of Loan Amounts from Investment Funds ........................................... 34
9.7    Liquidity ................................................................................................................. 35
9.8    Suspension of Repayment of Loans ...................................................................... 35
9.9    Defaults .................................................................................................................. 36
9.10   Remedies ................................................................................................................ 36
9.11   Valuation ................................................................................................................ 36
9.12   Death ...................................................................................................................... 36
9.13   Participant Deemed to Be In-Service ..................................................................... 36

# SECTION 10
## ACCOUNTS AND RECORDS OF THE PLAN
## AND VALUATION OF ACCOUNTS

10.1   Accounts and Records ............................................................................................ 37
10.2   The Trust Fund ...................................................................................................... 37
10.3   Investment Funds and Valuation of Participants' Accounts .................................. 37
10.4   No Rights Created by Allocation ........................................................................... 38
10.5   Non-Reversion ....................................................................................................... 38
10.6   Return of Certain Contributions ............................................................................ 38
10.7   Source of Benefits ................................................................................................. 38

# SECTION 11
## ADMINISTRATION OF THE PLAN

11.1   In General .............................................................................................................. 39
11.2   The Compensation Committee .............................................................................. 39
11.3   Chairman, Secretary, Agents ................................................................................ 39
11.4   Meetings ................................................................................................................. 39
11.5   Powers and Duties of the Plan Administrative Committee .................................... 40
11.6   Powers and Duties of the Plan Investment Committee .......................................... 41
11.7   Powers and Duties of the Plan Administrator ....................................................... 43
11.8   Multiple Capacities. .............................................................................................. 44
11.9   Conclusiveness of Reports, Etc. ........................................................................... 44
11.10  Delegation and Employment of Agents ................................................................ 44
11.11  Named Fiduciary ................................................................................................... 44
11.12  Action by Majority of Either Committee .............................................................. 44
11.13  Rules and Regulations of the Committees ............................................................ 45
11.14  Committee Membership and Resignation .............................................................. 45
11.15  Compensation and Expenses of the Committees ................................................... 45

11.16   Indemnity for Liability ................................................................. 45
11.17   Claims ......................................................................................... 45
11.18   Members' Own Participation ....................................................... 47
11.19   Qualified Domestic Relations Orders ......................................... 47
11.20   Mandatory No-Trading Periods .................................................. 47

## SECTION 12
## WITHDRAWAL OF AN EMPLOYER, MERGER, CONSOLIDATION
## AND TRANSFERS OF ASSETS

12.1   Procedures for Withdrawal ............................................................ 48
12.2   Contributions upon Withdrawal .................................................... 48
12.3   Effect of Withdrawal ..................................................................... 49
12.4   Merger, Consolidation or Transfer of Plan Assets ....................... 49
12.5   Determinations, Approvals and Notifications ................................ 49
12.6   Voluntary Direct Transfers into the Plan from Another Qualified Plan .......................... 49

## SECTION 13
## AMENDMENT AND TERMINATION

13.1   Right to Amend or Terminate Plan and Trust ............................... 50
13.2   Termination of the Plan ................................................................ 51

## SECTION 14
## TOP-HEAVY PROVISIONS

14.1   Top-Heavy Plan ............................................................................ 53
14.2   Top-Heavy Ratio .......................................................................... 53
14.3   Minimum Employer Contribution ................................................ 55
14.4   Special Definitions ....................................................................... 56

## SECTION 15
## MISCELLANEOUS

15.1   No Enlargement of Employee Rights ........................................... 58
15.2   Sole Source of Benefits ................................................................ 58
15.3   Trust Agreement ........................................................................... 58
15.4   Restrictions on Alienation ............................................................ 58
15.5   Incompetence ............................................................................... 59
15.6   Notice of Address ......................................................................... 59
15.7   Required Information .................................................................... 60
15.8   Representations ............................................................................. 60
15.9   Exclusive Benefit .......................................................................... 60
15.10   Communications .......................................................................... 60
15.11   Headings ...................................................................................... 61
15.12   Interpretation of Plan ................................................................... 61
15.13   Trust Agreement ........................................................................... 61
15.14   Severability .................................................................................. 61

15.15 Expenses ................................................................................................................... 61
15.16 Service of Legal Process .......................................................................................... 61
15.17 Governing Law ......................................................................................................... 61

APPENDIX A - Participating Affiliates

# SECTION 1
## History and Purpose

Effective as of January 1, 2006, the Plan is amended and restated to incorporate certain amendments and to adopt certain technical and other amendments. Effective as of January 1, 2002, the Prior Plan was amended and restated in accordance with the Economic Growth and Tax Relief Reconciliation Act of 2001 (the "*2001 Tax Act*"). The purpose of the Plan is to encourage employees to make and continue careers with the Company by providing eligible employees with a convenient way to save on a regular and long-term basis, all as set forth herein and in the Trust Agreement adopted as part of this Plan. The benefits provided under this Plan shall depend upon the investment results achieved, and, accordingly, may vary with respect to each participating employee. The IRS has determined that the Plan as in effect immediately prior to January 1, 2002 is qualified under Section 401(a) of the Code.

Effective August 1, 1991, AMBAC Indemnity Corporation adopted the Vanguard Prototype Savings Plan (the "*Vanguard Plan*"). Effective January 1, 1992, the Company's predecessor, AMBAC, Inc., assumed the adoption of the Vanguard Plan from AMBAC Indemnity Corporation, which the IRS determined met the requirements for qualification. As of January 1, 1996, the Company amended and restated the Vanguard Plan to be an individually designed plan called the AMBAC, Inc. Savings Incentive Plan. Effective April 30, 1997 the Company amended the Plan to bring it into compliance with certain newly enacted requirements under the Code and to change the name of the Plan to the Ambac Financial Group, Inc. Savings Incentive Plan. Effective January 1, 2000, the Company again amended the Plan to bring it into compliance with certain newly enacted requirements under the Code. Effective as of January 1, 2002, the Company amended and restated the Plan in accordance with the Economic Growth and Tax Relief Reconciliation Act of 2001 ("*EGTRAA*").

Except as otherwise required by law or specifically provided herein, the rights of any person who terminated employment or who retired on or before the Effective Date of the Plan, including his eligibility for benefits and the time and form in which benefits, if any, will be paid, shall be determined solely under the terms of the Plan as in effect on the date of such termination of employment or retirement, unless such person is thereafter reemployed by an Employer and becomes a Participant in the Plan.

The Plan and the Trust Agreement adopted as part of this Plan, are intended to continue to qualify as a plan and trust which meet the requirements of Sections 401(a) and 501(a), respectively, of the Code or any other applicable provisions of law, including, without limitation, ERISA. The Plan is a "profit-sharing plan" for purposes of Section 401(a) of the Code.

1

# SECTION 2
## Definitions

Whenever used in the Plan, the following terms shall have the respective meanings set forth below unless otherwise expressly provided herein or unless a different meaning is plainly required by the context. Whenever used, the masculine shall be deemed to include the feminine and a singular word shall be deemed to include the plural where the context requires.

"*Account*" or "*Accounts*" means the account or accounts established and maintained on behalf of a Participant pursuant to Section 3.3, including the Participant's After-tax Contribution Account, Basic Profit-Sharing Contribution Account, if any, Matching Contribution Account, Pretax Contribution Account, Rollover Contribution Account, if any, and Supplemental Profit-Sharing Contribution Account, investment gains and losses thereon, and any expenses allocated thereto and any other accounts designated from time to time by the Plan Administrative Committee.

"*Affiliate*" means the Company, and any corporation, trade or business if it and the Company are members of a controlled group of corporations, or are under common control, or are members of an affiliated service group, within the meaning of Sections 414(b), 414(c), and 414(m) of the Code, respectively; and any other entity required to be aggregated with the Company pursuant to Section 414(o) of the Code and the regulations thereunder; *provided, however*, that for purposes of Section 4.8, the definitions prescribed by Sections 414(b) and 414(c) of the Code shall be modified in accordance with Section 415(h) of the Code.

"*After-tax Contribution*" means those contributions made to the Plan prior to January 1, 1999 by the Participant in accordance with his election to deduct from his Base Compensation in like amount.

"*After-tax Contribution Account*" means the separate account maintained for each Participant pursuant to Section 3.3 which represents his interest in the Trust Fund attributable to his After-tax Contributions, if any, investment gains and losses thereon, and any expenses allocated thereto.

"*Base Compensation*" means only the standard basic pay of an Employee from an Employer paid in a regular payroll period. All income other than standard basic pay is excluded from Base Compensation, such as (by way of example but not limited to): overtime, bonuses, incentive compensation payments, special cash awards, premiums, allowances, amounts recognized by an Employee in connection with the exercise of nonqualified stock options or the vesting of restricted stock, the payment of restricted stock units and the payment of stock bonuses, any amount paid to the Employee prior to becoming a Participant, and dividends paid on restricted shares of stock or on restricted stock units. Base Compensation is determined before taxes and deductions and without regard to any Pretax Contributions or any other salary reductions not includible in a Participant's gross income, including, without limitation, amounts not includible by reason of Section 125, Section 129 or, effective as of January 1, 2001, Section 132(f)(4) of the Code. Notwithstanding the above, for purposes of this Plan, a Participant's Base Compensation taken into account under the Plan for a given Plan Year shall not exceed the limitation applicable to that Plan Year under Section 401(a)(17) of the Code, as

such limitation may be adjusted from time to time for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code, which is incorporated into the Plan by reference.

"*Basic Profit-Sharing Contribution*" means the contribution made by an Employer on behalf of a Participant pursuant to Section 4.6(a) and allocated on behalf of a Participant pursuant to Section 4.6(d).

"*Basic Profit-Sharing Contribution Account*" means the separate account maintained for each Participant pursuant to Section 3.3 which represents his interest in the Trust Fund attributable to Basic Profit-Sharing Contributions, investment gains and losses thereon, and any expenses allocated thereto.

"*Beneficiary*" means the person, persons, entity or entities, including one (1) or more trusts, last designated by a Participant as a beneficiary or co-beneficiary to receive benefits payable under the Plan in the event of the death of the Participant; *provided, however*, that a married Participant may designate someone other than his Spouse as Beneficiary only if the designation is accompanied by the written notarized consent of his Spouse; and *provided further* that no designation shall be effective unless it is received by the Plan Administrative Committee before the Participant's death. If no such designation is in effect at the time of the Participant's death, or if no person, persons, entity or entities so designated as the Participant's Beneficiary shall survive the Participant, the Beneficiary shall be the Participant's surviving Spouse, if any, or if there shall be no such surviving Spouse, the Beneficiary shall be the estate of the Participant.

"*Cash-out Amount*" means $5,000 or such greater amount as may be specified by Section 411(a)(11) of the Code, determined without consideration of any Rollover Contributions into the Plan.

"*Catch-Up Contribution*" is a Contribution in accordance with Section 4.8.

"*Code*" means the Internal Revenue Code of 1986, as now in effect or as hereafter amended, together with the rules and regulations promulgated thereunder. A reference to a provision of the Code shall, if such provision is amended, refer to the successor to such provision.

"*Committee*" or "*Committees*" means the Plan Administrative Committee and Plan Investment Committee, or either of them, as provided for in Section 11.

"*Company*" means Ambac Financial Group, Inc., a Delaware corporation, or any successor thereto.

"*Compensation Committee*" means the Compensation Committee of the Board of Directors of the Company or its successor.

"*Contribution*" means any contribution made to the Plan by or on behalf of a Participant pursuant to Section 4, including any Basic Profit-Sharing Contribution, Discretionary Profit-Sharing Contribution, Matching Contribution, Pretax Contribution, Catch-Up Contribution, Rollover Contribution and Supplemental Profit-Sharing Contribution.

"*Direct Rollover*" means a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

"*Discretionary Profit-Sharing Contribution*" means any discretionary contribution made by the Company (or any other applicable Employer) to the Plan for a given Plan Year pursuant to Section 4.6(c) and allocated to the Accounts of a Participant in the manner specified by the Plan Administrative Committee.

"*Distributee*" means an Employee or former Employee. In addition, the Employee's or former Employee's surviving Spouse and the Employee's or former Employee's Spouse or former Spouse who is the alternate payee under a Qualified Domestic Relations Order are Distributees with regard to the interest of the Spouse or former Spouse.

"*Effective Date*" means January 1, 2006.

"*Eligible Employee*" shall mean an Employee described in Section 3.1, who is not an Excluded Individual.

"*Eligible Retirement Plan*" means an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity (other than an endowment contract) described in Section 408(b) of the Code, a Qualified Plan that accepts the Distributee's Eligible Rollover Distribution, an annuity plan described in Section 403(a) of the Code, an annuity contract or custodial account described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan. In the case of a distribution to a Spouse, Eligible Retirement Plan shall have the meaning set forth in this definition.

"*Eligible Rollover Distribution*" means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution shall not include (a) any distribution that is (i) one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's Beneficiary or (ii) for a specified period of ten years or more; (b) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; (c) the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and (d) any distribution made upon the hardship of the Employee. Notwithstanding anything in the immediately prior sentence of this definition to the contrary, (x) a portion of a distribution shall not fail to be an Eligible Rollover Distribution merely because a portion consists of after-tax employee contributions that are not includible in gross income; *provided, however*, that such portion may be distributed only to an individual retirement account or annuity under Section 408(a) or (b) of the Code, or to a qualified defined contribution plan under Section 401(a) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not

so includible and (y) any distribution due to financial hardship shall not be an Eligible Rollover Distribution.

"*Employee*" shall mean any individual who is actively employed as a common law employee of the Employer. No individual shall be considered an Employee by reason of service to the Employer or an Affiliate solely as a director.

"*Employer*" means, with respect to each Employee, the Company and any other Affiliate, the board of directors or equivalent governing body of which has adopted the Plan with the approval of the Board such terms and conditions and effective as of such date as the Board or Plan Administrative Committee shall specify, as reflected in the books and records of the Company and as set forth in Appendix A. Each Employer that so participates in the Plan shall be deemed thereby to appoint the Plan Administrative Committee, the Plan Investment Committee and the Trustee all with the power and authority conferred hereby, or by the Trust Agreement, upon such parties. Such power and authority to act as such agents for the Employer shall continue until the Plan is completely terminated as to the Employer and the relevant portion of the Trust Fund has been distributed from the Trust as provided in Section 12 or 13. An Affiliate listed in Appendix A ceases to be an Employer (i) at the time said Affiliate ceases to be an Affiliate, unless the Plan Administrative Committee expressly permits the former Affiliate to continue as an Employer for the purposes of the Plan; or (ii) is removed from Appendix A by the Plan Administrative Committee or the Board of Directors.

"*Entry Date*" means the first day of the first payroll period of each month.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as now in effect or as hereafter amended, together with the rules and final and temporary regulations promulgated thereunder. All citations to sections of ERISA or other references are to such sections or other references as they may from time to time be amended, renumbered or replaced by successor provisions.

"*Excluded Individual*" shall mean any individual who is treated or designated by the Company as an independent contractor, leased employee (including, without limitation, a Statutory Leased Employee), temporary employee provided through an agency, consultant, or any individual who performs services for an Employer under an agreement or arrangement (which may be written, oral or evidenced by the payroll practices of the Employer) with the individual or with another organization that provides the services of the individual to the Employer, under which the individual is treated as an independent contractor or is otherwise treated as an employee of an entity other than the Employer (such as a leasing organization), or (C) a student hired for a specified period known as a "co-op" or an "intern". Excluded Individuals are not eligible to participate in or receive benefits under the Plan. If any Excluded Individual shall be determined by a court or a federal, state or local regulatory or administrative authority to have served as a common law employee of the Employer, such determination shall not alter this exclusion as an Eligible Employee for purposes of this Plan. For purposes of this definition, "*Statutory Leased Employee*" means any person (other than an employee on the payroll of the Company) who, pursuant to an agreement between the Company and any other person, has performed services for the Company (or for the Company and related persons, determined in accordance with Section 414(n)(6) of the Code) on a substantially full-time basis

for a period of at least one year, and such services are performed under the primary direction or control by the Company.

(ii) Excluded Individual shall also mean (A) any Employee whose terms of employment are the subject of a collective bargaining agreement unless that agreement provides for his participation in this Plan, (B) any Employee who is a nonresident alien of the United States with no United States source earned income from an Employer and (C) any individual who is a temporary employee who has less than 500 Hours of Service during the relevant computation period.

"*Highly Compensated Employee*" means any Employee who was a five-percent owner at any time during the year or the preceding year or, for the preceding year, had compensation determined in accordance with Section 4.13(e) from the Company (or other applicable Employer) in excess of $95,000, as indexed, and was in the top-paid group of Employees for such preceding year. An Employee shall be considered a five-percent owner if, at any time during the Plan Year, the Employee was a five-percent owner as defined in Section 416(i)(1)(B)(i) of the Code. An Employee is in the top-paid group of Employees if such Employee is included in the group consisting of the top twenty percent of the Employees when ranked on the basis of compensation paid during the Plan Year, as determined in accordance with Section 414(q)(3) of the Code. A former Employee shall be treated as a Highly Compensated Employee if such Employee was a Highly Compensated Employee when he experienced a Termination of Service, or such Employee was a Highly Compensated Employee at any time after attaining age fifty-five.

"*Hour of Service*" means an hour for which the Employee is directly or indirectly compensated by an Employer, or is entitled to payment for the performance of duties rendered for the Company or other Employer or Affiliate, or for reasons other than the performance of duties in accordance with Department of Labor Regulation Section 2530.200b-2, or for back pay, irrespective of mitigation of damages, which has been either awarded or agreed to by an Employer provided that the same Hours of Service shall not have been credited before.

"*Investment Fund*" means each segregated or commingled fund or funds selected by the Plan Investment Committee from time to time as an alternative under the Plan for the investment of Plan assets; *provided, however*, that the Ambac Financial Group, Inc. Stock Fund shall be an Investment Fund.

"*Investment Manager*" means any investment adviser appointed under Section 11.3 to manage the investment of Trust Fund assets.

"*IRS*" means the United States Internal Revenue Service.

"*Limitation Year*" means, for purposes of Section 415 of the Code, the Plan Year.

"*Matching Contribution*" means any Company (or other applicable Employer) Contributions made pursuant to Section 4.7.

"*Matching Contribution Account*" means the separate account maintained for each Participant pursuant to Section 3.3 which represents his interest, if any, in the Trust Fund

attributable to any Matching Contributions made on his behalf, investment gains and losses thereon, and any expenses allocated thereto.

"*Military Leave*" means an absence from employment with the Company (or other applicable Employer) due to the performance of duty, on a voluntary or involuntary basis, in a uniformed service of the United States under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, and a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty. An individual shall not be deemed to have been absent due to Military Leave unless (i) such person has given advance written or verbal notice of such uniformed service to the Company (or other applicable Employer), (ii) the cumulative length of the absence and all previous Military Leaves from the Company (or other applicable Employer) does not exceed five years or such other period of time permitted by USERRA and (iii) such individual reports to, or submits an application for reemployment to, the Company (or other applicable Employer) in accordance with Sections 4312(e) and (f) of USERRA. Notwithstanding anything contained herein to the contrary, the Committee may, on a uniform and nondiscriminatory basis, deem an individual's absence to be a Military Leave if such absence would qualify for a Military Leave but for the fact that the time period exceeds the maximum period of Military Leave set forth in clause (ii) above.

"*Non-highly Compensated Employee*" means, for any Plan Year, an Employee who is not a Highly Compensated Employee as defined in this Section 2.

"*Normal Retirement Age*" means the later of the date a Participant attains age 65 or the fifth anniversary of the first day of the first Plan Year in which the Participant commenced participation in the Plan.

"*Participant*" means an Employee who has satisfied the eligibility and participation requirements set forth in Section 3 of the Plan. An individual shall continue to be a Participant as long as he or she has a balance credited to his Account.

"*Pension Plan*" means the Ambac Financial Group, Inc. Pension Plan, as amended from time to time.

"*Plan*" means this Ambac Financial Group, Inc. Savings Incentive Plan, as herein set forth, as it may be hereafter amended from time to time.

"*Plan Administrative Committee*" means the committee that administers the Plan as provided in Section 11.

"*Plan Administrator*" means the Senior Vice President, Chief Administrative Officer and Employment Counsel or the successor thereto, or such other person as may be appointed by the Plan Administrative Committee, pursuant to Section 11.

"*Plan Investment Committee*" means the committee that administers the Plan with respect to the selection of Investment Funds and Investment Managers and the formulation of investment policy for the assets of the Plan as provided in Section 11.

"*Plan Year*" means the calendar year.

"*Pretax Contribution Account*" means the separate account maintained for each Participant pursuant to Section 3.3 which represents his interest in the Trust Fund attributable to Pretax Contributions made on his behalf, investment gains and losses thereon, and any expenses allocated thereto.

"*Pretax Contributions*" means those contributions made to the Plan by an Employer on behalf of a Participant in accordance with such Participant's election to reduce his taxable Base Compensation by a like amount pursuant to Section 4.2 and Section 4.8.

"*Prior Plan*" means the terms and provisions of the Plan as in effect immediately prior to the Effective Date.

"*Profit-Sharing Contributions*" means those contributions made to the Plan by an Employer on behalf of a Participant, including Basic Profit-Sharing Contributions made pursuant to Section 4.6(a), Supplemental Profit-Sharing Contributions made pursuant to Section 4.6(b) and Discretionary Profit-Sharing Contributions, if any, made pursuant to Section 4.6(c).

"*Qualified Domestic Relations Order*" means any judgment, decree or order (including approval of a settlement agreement) which has been determined by the Plan Administrative Committee, in accordance with procedures established under the Plan, to constitute a qualified domestic relations order within the meaning of Section 414(p) of the Code ("*QDRO*").

"*Qualified Plan*" means a plan meeting the requirements of Section 401(a) of the Code, the related trust of which qualifies for tax-exempt status under Section 501(a) of the Code or an annuity plan described in Section 403(a) of the Code.

"*Retirement*" means termination of employment with an Employer under circumstances entitling the individual to an immediate pension under the Pension Plan.

"*Returning Veteran*" means a Participant or former Participant who is absent due to a Military Leave and thereafter performs an Hour of Service.

"*Rollover Contribution*" means an amount contributed by an Employee who is, or will be, an Eligible Employee, to a Rollover Contribution Account that the Plan Administrator determines qualifies as an Eligible Rollover Distribution; *provided, however*, that amounts received from the Employee are transferred to the Plan by the Employee within sixty (60) days following the receipt thereof by the Employee directly from the Eligible Retirement Plan (or within such other period provided by the Secretary of the Treasury pursuant to Section 408(b)(3)(I) of the Code); and *provided further* that such amounts are not includible in the Employee's gross income. The Plan will not accept Rollover Contributions of after-tax amounts.

"*Rollover Contribution Account*" means a subaccount maintained as part of the Account to which an Eligible Employee's Rollover Contributions and investment gains and losses thereon and any expenses allocated thereto, are allocated in accordance with Section 4.4.

"*Spouse*" means the individual of the opposite gender to whom a Participant is married under the laws of the state or country in which the Participant is domiciled, and under the laws of the United States, *provided, however*, that a common law spouse shall not be a Spouse.

"*Supplemental Profit-Sharing Contribution*" means the contribution made by the Company (or any other applicable Employer) on behalf of a Participant pursuant to Section 4.6(b) that is allocated pursuant to Section 4.6(d).

"*Supplemental Profit-Sharing Contribution Account*" means the separate account maintained for each Participant pursuant to Section 3.3 which represents his interest in the Trust Fund attributable to Supplemental Profit-Sharing Contributions, investment gains and losses thereon, and any expenses allocated thereto.

"*Total and Permanent Disability*" shall have the meaning assigned to such term or similar term under the long-term disability plan of the Employer applicable to such Participant.

"*Trust Agreement*" means the agreement entered into between the Company and the Trustee to carry out the purposes of the Plan as the same may be amended, from time to time.

"*Trust Fund*" means the cash and other properties arising from Contributions made with respect to the Plan that are held and administered by the Trustee pursuant to the Trust Agreement.

"*Trustee*" means the trustee of the Plan, and any successors thereto.

"*USERRA*" means the Uniformed Service Employment and Reemployment Rights Act of 1994, as amended from time to time, and any regulations thereunder.

"*Valuation Date*" means any business day of the year (excluding any days on which the New York Stock Exchange is closed).

## SECTION 3
### Eligibility and Participation

**3.1    Eligibility.**

(a) **Prior Plan Participants.** Each Eligible Employee who was a Participant in the Prior Plan on the Effective Date shall continue to be a Participant in the Plan on the Effective Date.

(b) **All Other Employees.** Each other Employee who is not an Excluded Individual shall be eligible to become a Participant on the first day of the first payroll period occurring in the month coincident with or next following the date such Employee completes six months of Service. An Eligible Employee may elect to become a Participant and make Pretax Contributions and, if eligible, Catch-Up Contributions by completing and filing the appropriate written enrollment forms with the Plan Administrative Committee or its designee. An Eligible Employee shall become a Participant at the time that his Account is credited with Contributions pursuant to Section 4.6, even if such Eligible Employee does not elect to make Pretax Contributions.

"*Service*" means any "*eligibility computation period*" during which an Employee completed at least 500 Hours of Service as determined by the Plan Administrative Committee in accordance with the applicable regulations, and shall include Hours of Service completed by such Employee as a leased employee (as such term is defined in Section 414(n) of the Code, without consideration of Section 414(n)(2)(B) of the Code). For purposes of the definition of Service only, an "*eligibility computation period*" is each six-consecutive-month period beginning on the date the Employee first performs an Hour of Service and renewing for additional six-month periods thereafter. Notwithstanding anything in this Section 3.1 to the contrary, to determine Service solely for purposes of eligibility to participate in the Plan with respect to a former Employee who is rehired and who is not an Excluded Individual, Hours of Service performed by such former Employee prior to his or her termination of employment shall be included in the eligibility computation period.

**3.2    Elections.** To make Pretax Contributions under the Plan, an Eligible Employee must complete the appropriate enrollment forms as required by the Plan Administrator containing substantially all of the following information, undertakings and agreements:

(a) A Pretax Contribution election whereby the Eligible Employee elects to reduce his Base Compensation by an amount permitted under Section 4.2 to be contributed by the Employer to the Trust Fund on behalf of the Eligible Employee as Pretax Contributions;

(b) An authorization by the Eligible Employee for his Employer to make regular payroll deductions from his Base Compensation pursuant to the Pretax Contribution election;

(c) An initial investment election as to the allocation of the Contributions made to the Plan by or on behalf of an Eligible Employee among the Investment Funds in accordance with Section 5;

(d) Designation of the Eligible Employee's Beneficiary;

(e) An agreement to be bound by all of the terms and conditions of the Plan and the Trust Agreement and any agreement with any other funding agency, including an insurance company, constituting part of the Plan and the Trust Fund; and

(f) Such other elections, agreements or undertakings as the Plan Administrative Committee or Plan Investment Committee may from time to time deem necessary or advisable.

3.3    **Establishment of Accounts.** The Plan Administrative Committee shall establish and maintain or cause to be established and maintained in respect to each Participant an Account showing his interest under the Plan and in the Trust Fund (including separate accounts showing his respective interest, if any, in each of the Investment Funds) with respect to (i) periods prior to January 1, 1999, After-tax Contributions made under Section 4.3, (ii) Basic Profit-Sharing Contributions made under Section 4.6(a), (iii) Matching Contributions made under Section 4.7(a), (iv) Pretax Contributions made under Section 4.2, (v) Rollover Contributions made under Section 4.4, (vi) Supplemental Profit-Sharing Contributions made under Section 4.6(b) and (vii) such other Accounts as the Plan Administrative Committee may require. Each Participant shall be furnished with a written statement of his Account and the value of each such separate interest at least annually and upon any distribution to him. In maintaining the Accounts under the Plan or causing them to be maintained, the Plan Administrative Committee may conclusively rely on the valuations of the Trust Fund in accordance with the Plan and the terms of the Trust Agreement.

3.4    **Special Rules for Cadre Financial Services, Inc.** Effective as of April 30, 1997, each Employee who is employed by Cadre Financial Services, Inc., a Delaware corporation, or its predecessors ("*Cadre*"), shall be eligible to become a Participant in accordance with the provisions of Section 3.1 above. Such Employee's first Hour of Service will be the first hour of service for which the Employee was compensated by Cadre.

3.5    **Special Rules for Ambac Securities Inc.** Effective as of April 30, 1997, each Employee who is employed by Ambac Securities Inc. ("*Ambac Securities*"), a Delaware corporation known as Cadre Securities Inc., prior to April 1, 2002, shall be eligible to become a Participant in accordance with the provisions of Section 3.1 as soon as practicable after Ambac Securities is acquired by the Company. With respect to any Employee who is employed by Ambac Securities as of the date of the acquisition of Ambac Securities by the Company, such

Employee's first Hour of Service will be the first hour of service for which the Employee was compensated by Ambac Securities.

3.6 **Special Rules for Ambac Employees Formerly Associated with MBIA Ambac International.** Effective as of January 1, 2000, each Employee who (a) was employed by MBIA Insurance Corp. ("*MBIA*"), (b) in connection with such employment and as their primary responsibility provided direct services to the joint marketing vehicle known as MBIA Ambac International (the "*JV*"), and (c) becomes employed by an Employer immediately after such Employee's termination of employment with MBIA, shall be eligible to become a Participant in accordance with the provisions of Section 3.1 above. With respect to any Employee who was employed by MBIA and performed direct services for the JV as of September 1, 1999, such Employee's first Hour of Service will be September 1, 1999.

## SECTION 4
## Contributions

**4.1**   **General Rule.** Subject to the following provisions of this Section 4, (i) a Participant may elect to make Pretax Contributions in accordance with Section 4.2, and, if eligible, Catch-Up Contributions in accordance with Section 4.8 and (ii) an Employee may elect, upon the approval of the Plan Administrative Committee, to make Rollover Contributions to a Rollover Contribution Account to be established on his behalf in accordance with Section 4.4.

**4.2**   **Pretax Contributions.** Subject to Section 4.8 and Section 414(v) of the Code, for each payroll period and during Military Leave, a Participant may elect to have his Employer contribute to the Plan on his behalf an amount of Pretax Contributions not less than one percent (1%) and not more than twenty percent (20%) of his Base Compensation in whole percentage increments with respect to amounts deferred; *provided, however,* that the Plan Administrative Committee may provide a smaller maximum percentage for Highly Compensated Employees to the extent the Committee determines such percentage is necessary or advisable to comply with applicable limits under the Code. If the Participant's Base Compensation should increase or decrease, the contribution percentage elected shall apply to the adjusted rate of Base Compensation. Pretax Contributions shall be credited to the Participant's Pretax Contribution Account in accordance with Section 3.3 and shall be allocated among the Investment Funds in accordance with Section 5.

**4.3**   **After-tax Contributions.** Participants will not be permitted to elect to make After-tax Contributions. After-tax Contributions that have been credited to the Participant's After-tax Contribution Account in accordance with Section 3.3 prior to January 1, 1999 shall remain in such account and distributed to the Participant in accordance with the terms of the Plan.

**4.4**   **Rollover Contributions.**

      (a) **General Rule.** An Employee (whether or not otherwise a Participant) may request the Plan Administrator to direct the Trustee to accept a Rollover Contribution from or on behalf of the Employee and place it in a Rollover Contribution Account for the Employee.

      (b) **Application.** The Employee shall make application to the Plan Administrator, submitting an election form under Section 3.2 and whatever information is deemed necessary and sufficient by the Plan Administrator to establish compliance with the requirements of this Section 4.4 and the Code. In connection with this application, the Plan Administrator may require that the Employee provide a statement from the plan administrator of the distributing plan that the distributing plan is a Qualified Plan, or such other

information that the Plan Administrator may request to establish a good faith determination that the distributing plan is a Qualified Plan.

(c) **Allocation.** Amounts accepted by the Plan Administrator shall be placed in a Rollover Contribution Account established for the Employee and shall become part of the Trust Fund. Amounts credited to the Employee's Rollover Contribution Account shall be allocated among the Investment Funds in accordance with Section 5 and shall be distributed in the same manner and at the same time as described in Sections 7 and 8.

**4.5    Changes in Contribution Rates.** A Participant may elect to change his rate of Pretax Contributions within the limitations specified in Section 4.2 by delivering appropriate instructions to the Plan Administrator. Any such change received by the Plan Administrator shall become effective with thirty (30) days after written notice of such change is received from the Plan Administrator by the Employer. A Participant may make such election no more than once during any calendar month.

**4.6    Basic, Supplemental and Discretionary Profit-Sharing Contributions.**

(a) **Basic Profit-Sharing Contributions.** Each year, the Company (or other applicable Employer) shall make a Basic Profit-Sharing Contribution for each Participant who meets the requirements of Sections 3.1 and 4.6(d), in an amount equal to three percent (3%) of Base Compensation earned by such Participant during that portion of the Plan Year in which he or she is an Eligible Employee. Such contributions shall be allocated to the Basic Profit-Sharing Contribution Account of each such Participant. Basic Profit-Sharing Contributions shall be invested in accordance with Section 5.

(b) **Supplemental Profit-Sharing Contributions.** Each year, the Company (or other applicable Employer) shall make a Supplemental Profit-Sharing Contribution for each Participant, who meets the requirements of Section 4.6(d), in an amount equal to three percent (3%) of Base Compensation earned by such Participant during that portion of the Plan Year he or she is an Eligible Employee. Such contributions shall be allocated to the Supplemental Profit-Sharing Contribution Account of each such Participant in accordance with Sections 3.3 and 4.6(d). Supplemental Profit-Sharing Contributions shall be invested in accordance with Section 5.

(c) **Discretionary Profit-Sharing Contributions.** The Company (or other applicable Employer) may make a Discretionary Profit-Sharing Contribution to the Plan for any Plan Year. Any Discretionary Profit-Sharing Contribution shall be equal to an amount determined by the Company (or other applicable Employer), in its sole discretion, by resolution adopted on or before the date fixed by law for filing its federal income tax return, including extensions, for the taxable year with or within which the applicable Plan Year ends. Such Discretionary Profit-Sharing Contribution shall be allocated to the

Account specified by the Plan Administrative Committee for each Participant who meets the requirements of Section 4.6(e), in accordance with the allocation method provided in Section 4.6(e). Discretionary Profit-Sharing Contributions shall be invested in accordance with Section 5.

(d) **Allocation of Basic and Supplemental Profit-Sharing Contributions.** In accordance with rules applied in a uniform and nondiscriminatory manner by the Plan Administrative Committee, Basic and Supplemental Profit-Sharing Contributions shall be allocated for each Plan Year in accordance with Section 4.6(a) or Section 4.6(b), respectively, to the Account of each Participant for the portion of such Plan Year during which he or she is an Eligible Employee without regard to whether such Eligible Employee made Pretax Contributions during such Plan Year.

Basic and Supplemental Profit-Sharing Contributions for any Plan Year shall be delivered to the Trustee to be allocated to each eligible Participant's Account on a date after the end of each Plan Year but no later than the date fixed by law for the filing of the Company's (or other applicable Employer's) federal income tax return, including extensions, for the taxable year with or within which such Plan Year ends.

(e) **Allocation of Discretionary Profit-Sharing Contributions.** In accordance with rules applied in a uniform and nondiscriminatory manner by the Plan Administrative Committee, an allocation of Discretionary Profit-Sharing Contributions may be made to the Account of each Participant who actively participated in the Plan at any time during the Plan Year. Discretionary Profit-Sharing Contributions shall be allocated according to the ratio that each such Participant's Base Compensation earned while a Participant bears to the total Base Compensation of all such Participants. Discretionary Profit-Sharing Contributions for any Plan Year may be delivered to the Trustee to be allocated to each eligible Participant's Account on a date after the end of each Plan Year but no later than the date fixed by law for the filing of the Company's (or other applicable Employer's) federal income tax return (including extensions) for the taxable year with or within which such Plan Year ends.

### 4.7 Matching Contributions.

(a) **General Rule.** The Company (or other applicable Employer) shall make Matching Contributions on behalf of each Participant in an amount equal to 50% of the total Pretax Contributions made on behalf of the Participant for each payroll period, up to 6% of such Participant's Base Compensation for such payroll period. Except as provided in Section 4.7(b) and subject to the requirements of applicable law, Matching Contributions shall generally be delivered to the Trustee to be allocated to such Participant's Matching Contribution Account on a monthly basis. Matching Contributions shall be allocated to each Participant's Matching Contribution Account in accordance with Section 3.3 and invested in accordance with Section 5.

(b) **Catch-Up Contributions.** If any Catch-Up Contributions are recharacterized as Pretax Contributions, the Company shall, subject to the limit on Matching Contributions set forth in this Section 4.7(a), make Matching Contributions in respect of such recharacterized Catch-Up Contributions on behalf of such Participant. Matching Contributions for a Plan Year pursuant to this Section 4.7(b) shall be made to a Participant's Matching Contribution Account no later than the time prescribed by law for filing the income tax return of the Company for the fiscal year of the Company (including extensions thereto) which coincides with, or ends within, such Plan Year.

**4.8    Catch-Up Contributions.**

(a) **Eligibility.** Effective as of January 1, 2002, Participants who will attain age 50 before the close of the Plan Year and who are not eligible to make any additional Pretax Contributions to the Plan before the close of such Plan Year pursuant to Section 4.1, due to the application of any limitation imposed by the Plan or the Code, shall be eligible to make Pretax Contributions referred to as Catch-Up Contributions in accordance with, and subject to the limitations of, Section 414(v) of the Code, which limitations are incorporated into the Plan by reference, as they may be adjusted from time to time.

(b) **Amount.** The maximum amount of Catch-Up Contributions which may be made by a Participant described in Section 4.8(a) for the Plan Year beginning January 1, 2006 shall be $5,000. The maximum amount of Catch-Up Contributions for any subsequent Plan Year shall be that amount set forth in section 414(v) of the Code, as indexed.

(c) **Method.** A Participant described in Section 4.8(a) may make Catch-Up Contributions by electing a reduction in Base Compensation for each payroll period during a Plan Year, subject to the limitation set forth in Section 4.8(b), in either (i) a flat dollar amount or (ii) a percentage of Base Compensation from 1% to 100% .

(d) **Impact on Other Limitations.** Such Catch-Up Contributions shall not be taken into account for purposes of Section 4.2 regarding limitations on Pretax Contributions and Sections 4.9 and 4.13 implementing the required limitations of Section 402(g) of the Code and Section 415 of the Code, respectively. The Plan shall not be treated as failing to satisfy Section 4.10, Section 4.12 and Section 9 implementing the requirements of Sections 401(k)(3) and 401(k)(12) of the Code and Section 416 of the Code, respectively, or Section 410(b) of the Code by reason of the permitting Participants to make Catch-Up Contributions.

(e) **No Match.** Catch-Up Contributions shall not be eligible for Matching Contributions unless recharacterized as Pretax Contributions under Section 4.7(b).

4.9     **Compliance with Section 402(g) of the Code.**

(a) **Limitation.** Except to the extent permitted by Section 4.8 and Section 414(v) of the Code, no Participant will be permitted to have Pretax Contributions made on his behalf under the Plan if those Pretax Contributions, when added to elective deferrals (as defined in Section 402(g)(3) of the Code) under any other plans for such calendar year, would cause the Participant to exceed the Section 402(g) Limit.

(b) **Correction.** Subject to Section 4.8 and to Section 414(v) of the Code, if any amount of elective deferrals in excess of the Section 402(g) Limit is made for any Participant in any calendar year, notwithstanding any provisions of the Plan to the contrary:

(i)     not later than the March 1 following the close of the calendar year, the Participant may allocate the amount of such excess elective deferrals among the Plan and, as applicable, any other plans under which the elective deferrals were made, and may notify the Plan Administrator, and, as applicable, each other plan's administrator of the portion allocated to it; and

(ii)     not later than the April 15 following the close of the calendar year, the Plan and, as applicable, each such other plan will distribute to the Participant any amount allocated to it under clause (i) plus the income and expenses and realized and unrealized gain and losses of the Trust Fund allocable thereto on such amount through the close of the calendar year in respect of which the deferrals were made

The notice required pursuant to clause (i) above will be made in writing to the Plan Administrator in such form as the Plan Administrator will require, *provided, however*, if the elective deferrals in excess of the Section 402(g) Limit arise solely under plans maintained by an Affiliate, the Participant will be deemed to have notified the Plan Administrator of any such excess elective deferrals.

4.10     **Compliance with Sections 401(k)(3) and 401(m) of the Code.** The Plan Administrator shall comply with the requirements of Sections 401(k)(3) and 401(m)(2) of the Code by making profit sharing contributions that are non-elective contributions in accordance with the safe harbor provisions of Sections 401(k)(12)(C) and 401(m)(11) of the Code. Each Eligible Employee shall be given, within a reasonable period of time, before the Plan Year, written notice of the Participant's relevant rights and obligations under the Plan which is sufficiently accurate and comprehensive to apprise the Participant of such rights and obligations and is written in a manner calculated to be understood by the average Participant.

**4.11    Changes Effected by the Plan Administrator.** Notwithstanding the preceding provision of this Section 4, the Plan Administrator is authorized to take such action with respect Pretax Contributions, After-tax Contributions, Catch-Up Contributions and Company Contributions of any Participant or groups of Participants as may be necessary to avoid the disqualification of the Plan, the loss of any tax deduction or the imposition of any excise tax; *provided, however,* that any such action will generally be applied in a uniform and nondiscriminatory manner.

**4.12    Compliance with Section 415 of the Code.**

(a) **Correction.** Anything in the Plan to the contrary notwithstanding, if the Annual Additions for a Plan Year with respect to a Participant would cause the limits of Section 415(c) of the Code applicable to that Participant to be exceeded, except to the extent permitted by Section 4.8 and Section 414(v) of the Code, the excess amount over the maximum Annual Addition will be disposed of in accordance with the following provisions and will not be deemed an Annual Addition:

(i)    first, to the extent an excess amount exists after application of clause (i), Supplemental Profit-Sharing Contributions as well as earnings attributable thereto will be reduced and allocated to a suspense account for the Plan Year and then will be allocated to all Participants in the next Plan Year to reduce Company Contributions for such Plan Year;

(ii)    second, to the extent an excess amount exists after application of clauses (i) and (ii), the unmatched Pretax Contributions made on behalf of the Participant, as well as any earnings attributable thereto, will be returned to such Participant; and

(iii)    third, to the extent an excess amount exists after application of clauses (i), (ii) and (iii), Basic Profit-Sharing Contributions and Matching Contributions, in that order, as well as earnings attributable thereto will be reduced and allocated to a suspense account for the Plan Year and then will be allocated to all Participants in the next Plan Year to reduce Company Contributions for such Plan Year.

(b) **Suspense Account.** If a suspense account is in existence at any time during a Plan Year pursuant to this Section 4.12, such account will be invested in the money market or equivalent Investment Fund and will participate in the allocation of the Trust's investment gains and losses in such Investment Fund. If a suspense account is in existence at any time during a particular Plan Year, all amounts in the suspense account must be allocated and reallocated to Participants' Accounts before any Company Contributions may be made to the Plan for that Plan Year. In the event that the Plan will be terminated, a partial termination will occur, or any Affiliate will completely discontinue contributions to the Plan, the amount in the suspense account, or,

in the case of a partial termination or complete discontinuance of contributions to the Plan, the portion of the suspense account allocable to the Participants affected by such partial termination or complete discontinuance, will be treated as a Company Contribution made immediately prior to such termination, partial termination or complete discontinuance of contributions, which amount will be allocated to the affected Participants on the basis that each such Participant's Compensation for such years bear to the Compensation of all other affected Participants.

(c) **Prohibition on Distribution.** Excess amounts above the maximum Annual Addition will not be distributed to Participants or former Participants.

(d) **Crediting Rule.** For purposes of this Section, an Annual Addition will be credited to a Participant's Accounts for a Plan Year if it is allocated to the Participant's Accounts under the terms of the Plan as of any date within that Plan Year. Such amount will not be deemed allocated as of any date within a Plan Year if such allocation is dependent upon participation in the Plan as of any date subsequent to such date. For purposes of this Section, Pretax and Profit-Sharing Contributions will not be deemed credited to a Participant's Accounts for a particular Plan Year, unless said contributions are actually made to the Plan no later than thirty days after the end of the period described in Section 404(a)(6) of the Code applicable to the taxable year with or within which the particular Plan Year ends.

(e) **Compensation.** For the purposes indicated in the Plan, including, without limitation, the limitations set forth in this Section 4.12, compensation shall have the meaning set forth in Section 415(c)(3) of the Code, which is incorporated herein by reference and which shall include elective amounts that are not includible in the gross income of the Employee by reason of Section 125, Section 402(e)(3) and, for limitation years beginning on and after January 1, 2001, Section 132(f)(4) of the Code.

**4.13    Special Definitions.**

"*Annual Addition*" means the sum of the following amounts credited to a Participant's Accounts for the Plan Year:

(a) Pretax Contributions,

(b) After-tax Contributions,

(c) Matching Contributions,

(d) Basic Profit-Sharing Contributions,

(e) Discretionary Profit-Sharing Contributions,

(f) Supplemental Profit-Sharing Contributions, and

(g) forfeitures, if any.

"*Company Contribution*" means the Matching Contributions and the Profit-Sharing Contributions made to the Plan by an Employer.

"*Section 402(g) Limit*" means $15,000 (or such amount for a Plan Year as may be permitted by reason of the application of Section 402(g)(1) of the Code, as adjusted for Section 402(g)(4) of the Code).

**4.14    Contributions for Participants Returning from Military Leave.**

(a) **General Rule.**  In accordance with Section 414(u) of the Code and notwithstanding any other provisions of the Plan, a Returning Veteran shall be entitled to make Pretax Contributions and Catch-Up Contributions, (if eligible) and to receive Matching Contributions and Profit-Sharing Contributions.  The provisions of this Section 4.14 shall apply only to the extent required by USERRA and Section 414(u) of the Code.

(b) **Base Compensation of a Returning Veteran.**  A Returning Veteran shall be treated as having received Base Compensation during such Military Leave in an amount equal to the Base Compensation such Returning Veteran would have received from the Company (or other applicable Employer), but for the Military Leave; *provided, however,* that, if a Returning Veteran's Base Compensation during Military Leave would not have been reasonably certain, such Returning Veteran shall be treated as having received Base Compensation during such Military Leave based upon the Returning Veteran's average Base Compensation from the Company (or other applicable Employer) either (i) during the twelve-month period preceding the Military Leave or (ii) if shorter, the Returning Veteran's service preceding the Military Leave.

(c) **Amount of Pretax Contributions.**  A Returning Veteran may make Pretax Contributions and, if eligible, Catch-Up Contributions without regard to any limitations that would otherwise apply in the year such Pretax Contributions are actually made.  The Pretax Contributions and Catch-Up Contributions must meet the applicable limitations for the Plan Year with respect to which such Contributions relate.  The Company (or other applicable Employer) shall permit the Returning Veteran to make additional Pretax Contributions and, if eligible, Catch-Up Contributions during the period that begins on the date of reemployment and ends on the sooner of (i) three times the period of the Military Leave or (ii) five years.

(d) **Amount of Matching Contributions and Profit Sharing Contributions.**  The Company (or other applicable Employer) shall make Matching Contributions and Profit Sharing Contributions that satisfy any obligation of the Plan to provide an "accrued benefit" within the meaning of

Section 411(a)(7) of the Code to a Returning Veteran. For this purpose, make-up Matching Contributions shall be allocated on behalf of the Returning Veteran with respect to each Plan Year in which the Returning Veteran was absent on Military Leave as of the last day of the Plan Year and shall not be subject to any limitations that would otherwise apply in the years that such Matching Contributions are made. Profit Sharing Contributions made pursuant to Section 4.6 with respect to each Plan Year in which the Returning Veteran was absent on Military Leave shall be allocated to such Returning Veteran's Account no later than the later of (i) 90 days following reemployment or (ii) the time when Profit-Sharing Contributions are normally made for the year in which the military service was performed; *provided, however*, that if the Company cannot make the Profit Sharing Contribution within the foregoing time periods, it shall be made as soon as practicable.

(e) **Earnings.** The Company (or other applicable Employer) shall neither be required to credit earnings to the Returning Veteran with respect to Pretax, Catch-Up, Matching or Profit-Sharing Contributions before such Contributions are made, nor to allocate any forfeitures of Matching Contributions which occurred during the period of the Military Leave to a Returning Veteran

(f) **Annual Additions.** Contributions on behalf of a Returning Veteran pursuant to this Section 4.14 shall not be considered an Annual Addition, as defined in Section 4.13, for the Plan Year in which such Contributions are made, but shall be considered Annual Additions for the Plan Year to which the Contributions relate.

(g) **No Duplicating Payments.** Nothing in this Section 4.14 shall in any way be construed as obligating the Company (or other applicable Employer) to make any duplicate Contributions in respect of any Returning Veteran or any other person.

## SECTION 5
### Investment of Contributions

**5.1    Investment of Contributions.**

(a) **Investment Allocations.** Subject to Sections 5.2 and 5.3, each Participant's Contributions shall be allocated for investment among the Investment Funds in accordance with the investment election made by the Participant pursuant to Section 3.2. A Participant may elect to invest all Contributions in a single Investment Fund or he may elect to allocate such Contributions among two (2) or more such Investment Funds; *provided, however*, that any such allocation shall be in amounts that are multiples of ten percent (10%) of the total amount of all Contributions; and *provided further* that the same proportion of a Participant's Pretax Contributions, Catch-Up Contributions, After-tax Contributions, Matching Contributions, Rollover Contributions, Basic Profit-Sharing Contributions, Supplemental Profit-Sharing Contributions and Discretionary Profit-Sharing Contributions subject to such investment election shall be invested in each Investment Fund so designated by the Participant, and the Participant may not make separate investment elections for each type of Contribution. Any investment direction given by a Participant shall be deemed a continuing direction until changed in accordance with Section 5.1(b).

(b) **Allocation Changes.** Subject to Sections 5.2 and 5.3, a Participant may change his investment election with respect to (i) the initial investment of all future Contributions, or (ii) the reallocation among the Investment Funds of the total amount already credited to his Accounts. An election to change investment elections for future Contributions or with respect to current investments under his Accounts shall specify the percentage, in ten percent (10%) increments from zero percent (0%) to one hundred percent (100%) of such total Contributions or such total value of his Accounts to be invested in the Investment Funds. An investment election with respect to the initial investment of future Contributions or a reallocation among the Investment Funds of the total amount already credited to his Accounts may be made under this Section 5.1(b) by inputting instructions at the times and in the manner specified by the Plan Administrative Committee.

(c) **Orderly Transfer.** If the Trustee or any Investment Manager shall advise the Plan Administrative or Plan Investment Committee that it is not reasonably able, in the interests of Participants, to prudently liquidate and transfer the necessary amounts from one (1) Investment Fund to another, the amount to be transferred with respect to each Participant who duly requested such a transfer shall be reduced in proportion to the ratio which the aggregate amount that the Trustee or Investment Manager had advised the Plan Administrative or Plan Investment Committee may prudently be so transferred bears to the aggregate amount which all Participants duly requested be so transferred.

(d) **Limitation on Trades.** Notwithstanding anything contained in the Plan to the contrary, the Plan Investment Committee or the Plan Administrator shall adopt any such other rules and procedures and take any and all actions as it deems necessary or advisable, with respect to all matters relating to the election and use of the Investment Funds, including, without limitation, rules, procedures and actions to prevent frequent trading with respect to the Investment Funds that appears to be for the purpose of taking advantage of short-term fluctuations in the securities market (as determined by the Plan Investment Committee or the Plan Administrator). Without limiting the generality of the foregoing, the Plan Investment Committee or the Plan Administrator shall have the right, without prior notice to any Participant and in accordance with criteria that are uniformly applied to all similarly situated Participants, to limit the frequency or number of trades between and among any and all Investment Funds, to suspend transfers between and among Investment Funds or to delay effecting transfers between and among Investment Funds for one or more days if the Plan Investment Committee or the Plan Administrator determines that such action is necessary or advisable (i) in light of unusual market conditions, (ii) in response to technical problems with the Plan's record keeper, (iii) in connection with any suspension of normal trading activity on the New York Stock Exchange, (iv) to prevent trading that the Plan Investment Committee or the Plan Administrator determines to be for the purpose of taking advantage of short-term fluctuations in the securities market or any other activity that the Plan Investment Committee or the Plan Administrator may determine is detrimental to the Plan or to other Participants or (v) to protect the interests of other Participants and their Beneficiaries. Notwithstanding anything in the Plan to the contrary, in no event shall any Participant be permitted to transfer any portion of his Account between and among the Investment Funds or otherwise use the Investment Funds at a time or in a manner that is prohibited by the prospectuses for the mutual funds underlying the Investment Funds to the extent any such restriction is considered applicable to Participants.

**5.2** **Investment of Supplemental Profit-Sharing Contributions.**

(a) **Initial Contributions.** Supplemental Profit-Sharing Contributions contributed for Plan Years prior to 2005 were initially allocated to the Ambac Financial Group, Inc. Stock Fund and a Participant was not permitted to diversify the investment of such Supplemental Profit-Sharing Contributions until specified conditions were satisfied. On and after January 1, 2006, Participants may invest Supplemental Profit-Sharing Contributions in the same manner as other Contributions in accordance with Section 5.1(a) and (b).

(b) **Diversification.** Effective as of January 1, 2005, Supplemental Profit-Sharing Contributions may be invested as directed by the Participant in accordance with Section 5.1(b).

**5.3    Default Allocation.** Anything in the Plan to the contrary notwithstanding, if a Participant (or alternate payee) fails to specify how Contributions are to be allocated among the Investment Funds, then the Contributions shall be allocated to the VMMR Prime Portfolio, or any successor Investment Fund designated as a default allocation fund by the Plan Investment Committee.

**5.4    Responsibility for Investments.** Each Participant, former Participant, Beneficiary or "alternate payee", as described in Section 414(p) of the Code, is subject to this Section 5 and is solely responsible for the investment of the amounts in his Accounts. Neither the Trustee, any Investment Manager, the Plan Investment Committee, the Plan Administrative Committee, nor any member thereof, the Company, any other Employer or Affiliate, nor any officer or other employee thereof is empowered to advise a Participant as to the manner in which such Accounts shall be invested.

## SECTION 6
## Vesting

**6.1** **General.**  A Participant shall at all times be one hundred percent (100%) vested in all amounts allocated to his Accounts under the Plan.

## SECTION 7
### Distribution and Transfer of Accounts

7.1     **Termination Payment.** Notwithstanding the date of termination, a Participant who is no longer employed by the Company, an Employer or an Affiliate for reasons other than death, or a Participant who suffers a Total and Permanent Disability while an Employee, shall be entitled to receive a distribution at the time and in the manner described in Section 7.2, of an amount equal to the total value of the Participant's Accounts, determined as of the Valuation Date coincident with, or immediately prior to, the date of such Participant's distribution.

7.2     **Form and Timing of Distributions.** (a) **General Rule.** A Participant who is eligible for a distribution under Section 7.1 or an alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, may elect to receive the entire balance of his Accounts under the Plan in an immediate lump sum or may elect to defer receipt of such lump sum payment, subject to the terms of Section 7.6(b) below; *provided, however,* that if the value of the Accounts of a Participant or alternate payee does not exceed the Cash-out Amount as of the date of distribution, the Account balance shall be distributed as set forth in 7.2(b), 7.2(c) or 7.2(d).

(b) **Distribution of Small Amounts.** Effective for distributions made prior to March 28, 2005, if the value of a Participant's Account does not exceed the Cash-out Amount, the Participant shall receive an immediate lump sum distribution of the entire balance in his Account as soon as practicable following the date of termination of employment.

(c) **Cash-outs and Automatic Rollovers.** Effective for distributions on and after March 28, 2005, if the value of a Participant's Account under Section 7.2(a) does not exceed the Cash-out Amount, then:

(i) if the balance in a Participant's Account does not exceed $1,000 (without consideration of any Plan loan offset), then the Participant shall receive an immediate lump sum distribution of the entire balance of his Account as soon a practicable following the date of termination of employment; or

(ii) if the balance in a Participant's Account exceeds $1,000 (without consideration of any Plan loan offset), then the Participant's Account shall be distributed in a Direct Rollover to an individual retirement plan previously designated by the Plan Administrator, unless (x) the Participant has elected pursuant to Section 7.7 that such amount be distributed in a Direct Rollover to an Eligible Retirement Plan specified by the Participant or (y) the Participant has elected pursuant to Section 7.2 that such amount be distributed directly to the Participant.

(d) **Alternate Payee.** Notwithstanding any other provision of the Plan to the contrary, if an amount payable to an alternate payee pursuant to a qualified

domestic relations order does not exceed the Cash-Out Amount, such amount shall be paid in a lump sum as soon as practicable following a determination by the Plan Administrator that the domestic relations order is a qualified domestic relations order. If such amount exceeds the Cash-Out Amount, it may be distributed to the alternate payee at any time following a determination that the domestic relations order is a qualified domestic relations order and without regard to any limitation in the Plan as to the time when such benefits would otherwise have been distributable; *provided, however*, that the alternate payee consents to such distribution and the domestic relations order provides for such payment; *provided further* that such distribution to the alternate payee shall begin not later than the date the Participant must begin payments pursuant to Section 7.6 in accordance with Section 401(a)(9) of the Code.

**7.3    Benefits Payable upon the Death of a Participant.**

(a) **General Rule.** The Beneficiary of a deceased Participant shall receive a single lump sum distribution of the total value of the Participant's Accounts, determined as of the Valuation Date coincident with, or immediately prior to, the date of such distribution. Such lump sum distribution shall be made as soon as practicable following the date of the Participant's death.

(b) **Compliance with Section 401(a)(9).** Notwithstanding anything in the Plan to the contrary, the payment to a Beneficiary pursuant to this Section 7.3 shall be in accordance with the applicable minimum distribution provisions of Section 401(a)(9) of the Code (and the final regulations thereunder, effective as of January 1, 2003), including the incidental death benefit requirement of Section 401(a)(9)(G) of the Code, which are incorporated herein by reference.

**7.4    Form of Payment.** Distributions of all or any portion of the value of a Participant's Accounts under the Plan may, at the election of the Participant, be made in (a) cash, or, (b) effective as of October 14, 2002, to the extent that such Participant's Accounts are invested in the Ambac Financial Group, Inc. Employer Stock Fund as of the date on which the distribution is made, in whole shares of common stock of the Company and cash in lieu of fractional shares; *provided, however*, that if, at the date of distribution the Participant has an outstanding unpaid balance on any loan made to the Participant under Section 9, the amount of cash or stock that would otherwise have been distributable shall be reduced by the amount of the outstanding unpaid balance on the loan represented by the note, as determined in accordance with Section 9.3, if applicable.

**7.5    Proof of Death and Right of Beneficiary or Other Person.** The Plan Administrative Committee may require and rely upon such proof of death and such evidence of the right of any Beneficiary or other person to receive any amounts distributable under this Section 7 as the Plan Administrative Committee deems necessary or appropriate.

### 7.6    Minimum Required Distributions.

(a) **General Rule.** If a Participant attains age seventy and one-half (70½) and (i) is still an Employee as of the April 1st following the calendar year in which he attained age seventy and one-half (70½) and (ii) is not a five percent (5%) owner, as defined in Section 416(i)(1) of the Code, distribution of the amount credited to his Account may commence, at his election, on such April 1st or the April 1st of the calendar year following the calendar year in which his termination of employment occurs; *provided, however,* that distributions must begin, at the latest, on the April 1st of the calendar year following the calendar year in which the Participant's employment terminates or the Participant attains age 70½, whichever is later. Notwithstanding the foregoing, if a Participant is a 5% owner as defined in Section 416(i) of the Code, distributions must begin, at the latest, on the April 1st of the calendar year following the calendar year in which the Participant attains age 70½.

(b) **Compliance with 401(a)(9).** Notwithstanding anything in the Plan to the contrary, effective as of January 1, 2003, all distributions under the Plan to Participants and their Beneficiaries shall be in accordance with the provisions of Section 401(a)(9) of the Code (including the incidental death benefit requirements of Section 401(a)(9)(G) of the Code), which are herein incorporated by reference, and the final regulations thereunder issued in 2002 and effective as of January 1, 2003, and such provisions shall override any distribution options in the Plan that are inconsistent with Section 401(a)(9) of the Code and such regulations. Notwithstanding any provision of the Plan to the contrary, with respect to distributions for 2002, the Plan will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the regulations under Code Section 401(a)(9) that were proposed on January 17, 2001. To the extent any provision of the Plan is inconsistent with Code Section 401(a)(9), such provision shall be disregarded.

### 7.7    Eligible Rollover Distributions.
Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election hereunder, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrative Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

### 7.8    QDROs.
Notwithstanding any other provision of the Plan to the contrary, benefits awarded to any alternate payee (as defined in Section 414(p) of the Code) pursuant to a Qualified Domestic Relations Order may, subject to the terms of such order, (i) be distributed to the alternate payee at any time upon the request of such alternate payee and without regard to any limitation in the Plan as to the time when such benefits would otherwise have been distributable to the Participant, and (ii) be distributed pursuant to Section 7.2(d).

**7.9    Voluntary Direct Transfers from the Plan to Another Qualified Plan.**

(a) **General Rule.** A Participant may elect to transfer his Account from the Plan to another Qualified Plan that will accept such transfer in accordance with this Section 7.9; *provided, however*, that such election is voluntary and fully informed. Alternatively, a Participant may elect not to make such transfer and to retain those benefits under the Plan to which he would be entitled under Section 411(d)(6) of the Code.

(b) **Direct Rollover to Eligible Retirement Plan.** Pursuant to Section 7.7, a Participant may make an Eligible Rollover Distribution.

(c) **Distributable Event Transfer.** In accordance with Section 411(d)(6) of the Code, if a Participant is entitled to an immediate distribution of his Account from the Plan pursuant to Section 7.1, such Participant shall be eligible to transfer his Account to another Qualified Plan that will accept such transfer; *provided, however*, that a Participant shall not be permitted to make an election under this Section 7.9(c) if his entire vested Account is immediately distributable in a single sum distribution that would consist entirely of an Eligible Rollover Distribution. A transfer under this Section 7.9(c) shall be subject to the following conditions:

(i)    The portion of a Participant's Account transferred to another Qualified Plan, together with any contemporaneous Eligible Rollover Distribution, shall equal such Participant's entire vested Account immediately prior to the transfer; and

(ii)    The transfer shall be subject to the mandatory distribution provisions of Section 7.2(b).

## SECTION 8
## Withdrawals While Still Employed

**8.1**     **Withdrawals of After-tax Contributions.** A Participant shall be permitted to withdraw at any time all or any portion of the total amount credited to his After-tax Contribution Account. The Plan Administrative Committee may prescribe uniform and non-discriminatory rules and procedures limiting the number of times that any Participant may make withdrawals under this Section 8.1 during any Plan Year and the minimum amount a Participant may withdraw on any single occasion.

**8.2**     **Withdrawals on or After Age 59½.** A Participant who has attained age 59½ shall be entitled to withdraw all or any portion of the total vested amount credited to his separate Accounts under the Plan. The Plan Administrative Committee may prescribe uniform and nondiscriminatory rules and procedures limiting the number of times a Participant may make withdrawals under this Section 8.2 during any Plan Year, the minimum amount a Participant may withdraw on any single occasion and other rules regarding the Contributions and Investment Funds from which withdrawals are to be made. Withdrawals under this Section 8.2 shall be made from Contributions in the following order: After-tax Contributions, Pretax Contributions, Catch-Up Contributions, Rollover Contributions, Matching Contributions, Basic Profit-Sharing Contributions and any Supplemental Profit-Sharing Contributions, exclusive of those Supplemental Profit-Sharing Contributions invested in the Ambac Financial Group, Inc. Stock Fund. Any other Contributions may be withdrawn in the order determined by the Plan Administrative Committee.

**8.3**     **Hardship Withdrawals.**

        (a) **Immediate and Heavy Financial Need.** A Participant shall be permitted to make a hardship withdrawal from the Plan if the Participant certifies that he has incurred an immediate and heavy financial need for funds. For these purposes, an "*immediate and heavy financial need*" shall include a need: (1) to pay deductible medical expenses described in Section 213(d) of the Code previously incurred by the Participant, his Spouse, his children, or his dependents (as defined in Section 152 of the Code) or to obtain medical care if the hardship withdrawal is necessary for these persons to obtain such medical care; (2) to purchase the principal residence of the Participant (excluding mortgage payments); (3) to pay tuition, related educational fees and room and board expenses for the next twelve months of post-secondary education for the Participant, his Spouse, his children, or his dependents; (4) to prevent the eviction of the Participant from his principal residence or foreclosure on the mortgage of the Participant's principal residence; or (5) to meet any other demonstrable emergency of the Participant as determined by the Plan Administrative Committee on a uniform and nondiscriminatory basis in accordance with regulations under Section 401(k) of the Code or other official guidance from the IRS.

(b) **Necessary to Satisfy Financial Need.** The amount of any hardship withdrawal by a Participant under Section 8.3(a) shall not exceed the amount which is necessary to satisfy the Participant's immediate and heavy financial need, as defined in Section 8.3(a), and which is not reasonably available from other resources of the Participant. The amount of an immediate and heavy financial need may include any amounts necessary to pay any federal, state or local income taxes or penalties reasonably anticipated to result from the distribution. A hardship withdrawal will be treated as necessary to satisfy an immediate and heavy financial need if all of the conditions are met: (1) the Participant has obtained all distributions, other than hardship distributions, and all nontaxable (at the time of the loan) loans from the Plan and any other plans maintained by the Company (or other applicable Employer); (2) the Plan and all qualified and nonqualified deferred compensation plans maintained by the Employer (as described in Treasury Regulation Section 1.401(k)-1(d)(2)(iv)(B)(4)) provide that the Participant's elective contributions and employee contributions will be suspended for six months after the receipt of the hardship distribution; and (3) the distribution is not in excess of the amount of the Participant's immediate and heavy financial need.

(c) **Limitations on Hardship Withdrawals.** Any hardship withdrawal by a Participant under Section 8.3(a) shall be made from the Participant's Pretax Contributions and Catch-Up Contributions to the Plan (exclusive of the earnings allocated thereon). For six months following the date of the hardship withdrawal, (i) the Participant's Pretax Contributions and Catch-Up Contributions shall be automatically suspended and (ii) the Participant will not be permitted to make contributions to any cash or deferred compensation arrangements maintained by the Employer as well as contributions to any stock option, stock purchase and similar plans (excluding the Ambac Financial Group, Inc. Flexible Benefits Plan) maintained by the Employer. With respect to hardship withdrawals after December 31, 2000, the limit on Pretax Contributions for the Participant's taxable year immediately following the taxable year in which the hardship withdrawal shall be the limit under Section 402(g) of the Code.

(d) **Prior Loans and Withdrawals of After-tax Contributions Required.** A Participant shall not be permitted to make a hardship withdrawal under Section 8.3(a) above unless he has already taken all loans available to him in accordance with Section 9. In addition, if the Participant has attained age 59½, such Participant shall not be permitted to make a hardship withdrawal under Section 8.3(a) unless he has already withdrawn, in accordance with Section 8.1, all available amounts credited to his After-tax Contribution Account and he has taken all withdrawals permitted under Section 8.2.

8.4    **Manner of Making Withdrawal.** Any withdrawal by a Participant under the Plan shall be made only after the Participant files a written request with the Plan

Administrative Committee specifying the nature of the withdrawal (and the reasons therefore, if a hardship withdrawal) and the amount of funds requested to be withdrawn. Upon approving any withdrawal, the Plan Administrative Committee shall furnish the Trustee with written instructions directing the Trustee to make the withdrawal in a lump-sum cash payment to the Participant.

**8.5** **Allocation of Withdrawals Among Investment Funds.** Withdrawals permitted under this Section 8 shall be allocated among the Investment Funds in which the Participant's Accounts are invested in the manner specified by the Participant.

**8.6** **Liquidity.** If the Trustee or any Investment Manager shall advise the Plan Administrative Committee that it is not reasonably able, in the interests of Participants, to prudently liquidate and distribute the necessary amounts from any of the Investment Funds to satisfy all Participants' requests for withdrawals from such Investment Fund as of any withdrawal date, the amount of cash to be distributed to each Participant who duly requested such a withdrawal shall be reduced in proportion to the ratio which the aggregate amount that the Trustee or Investment Manager has advised the Plan Administrative Committee may prudently be so distributed from such Investment Fund bears to the aggregate amount which all Participants duly requested be so distributed.

## SECTION 9
### Loans to Participants

**9.1**   **Application for Loan.** To request a loan, a Participant employed by the Company (or other applicable Employer) shall make an application to the Plan Administrative Committee or its delegate in accordance with procedures set forth by the Plan Administrative Committee.

**9.2**   **Amount Available for Loan.** The amount available for a loan (when added to the outstanding balance of all other loans from the Plan) shall not exceed the lesser of:

       (a) fifty percent (50%) of the value of the Participant's vested Accounts as of the Valuation Date immediately preceding the loan; or

       (b) $50,000 reduced by the excess (if any) of:

       (i)   the highest outstanding balance of all loans made to the Participant from the Plan during the preceding one-year period ending on the day before the date the loan was made, over

       (ii)   the outstanding balance of all loans to the Participant from the Plan on the date on which the loan was made;

provided, however that in the event a Participant has a loan that is deemed distributed and that has not been repaid, the maximum amount available for a subsequent loan to such Participant shall be reduced by the unpaid amount, including accrued interest, of the loan that is deem distributed.

**9.3**   **Terms and Conditions.** Determination of whether a loan shall be approved shall be made under procedures developed by the Plan Administrative Committee and applied in a uniform and nondiscriminatory manner. In addition to such other requirements, terms or conditions as the Plan Administrative Committee may prescribe, all loans shall comply with the following requirements, terms and conditions:

       (a) Up to three (3) loans to a Participant may be outstanding at any time.

       (b) The minimum amount of each loan to a Participant shall be five hundred dollars ($500).

       (c) Each loan to a Participant shall be adequately secured within the meaning of Section 4975(d) of the Code, which security shall consist, at a minimum, of a Participant's pledge of 50% of the balance of the Participant's Accounts as evidenced by the Participant's execution of a legally binding promissory note.

(d) The repayment of each loan to a Participant shall be adequately secured. Repayments shall be levelly amortized by payroll deduction with payments to be made not less frequently than quarterly. The Participant shall give his written authorization of such payroll deduction as a condition of receiving the loan. The Plan Administrative Committee may allow for forms of cash repayment in certain circumstances uniformly applied to all similarly situated Participants. All loan repayments shall be completed over a period not exceeding five (5) years; *provided, however*, that up to a 15-year repayment period may be permitted by the Plan Administrative Committee for any loan used to acquire any dwelling unit which is to be used as a principal residence of the Participant. Principal residence status will be determined at the time the loan is made. A Participant may repay any loan in full without penalty at any time.

(e) Each loan to a Participant shall bear interest at a reasonable rate to be fixed at the time the loan is made by the Plan Administrative Committee; *provided, however*, that, effective as of January 1, 2004, the rate of interest on a Plan loan granted prior to the commencement of the Military Leave shall be reduced to six percent during the period of the Military Leave solely to the extent that such reduction is required by the Servicemembers Civil Relief Act.

(f) To the extent permitted by ERISA, the Plan Administrative Committee may impose a reasonable loan origination fee on each loan made to a Participant.

**9.4    Loans Treated as Directed Investments**. Each loan to a Participant shall be treated as a directed investment by the Participant. Principal and related interest payments on each loan shall be allocated for investment among the Investment Funds in accordance with the investment elections for Contributions made by such Participant pursuant to Section 5 that is in effect at the time such payments are made.

**9.5    Loan Acceleration Events**. If, at any time prior to the full repayment of a Participant's loan, (i) the Plan terminates with respect to the Participant, (ii) the Participant fails to make a payment when due, or (iii) an event of default otherwise occurs under the documents evidencing the loan, the unpaid balance on the Participant's loan shall be accelerated and no further interest shall accrue, and the amount of the distribution otherwise payable in cash to the Participant (or, in the case of the Participant's death, his Beneficiary) shall be reduced by the unpaid balance owed on the loan at the time of the default or, if later, with respect to the portion of the Participant's loan derived from the Participant's Pretax Contribution Account, the earliest date permissible under Section 401(k) of the Code.

**9.6    Deduction of Loan Amounts from Investment Funds.** Amounts to be loaned to a Participant shall be deducted from the Investment Funds in which the Participant's Accounts are invested in the manner specified by the Participant.

**9.7    Liquidity.** If the Trustee or any Investment Manager shall advise the Plan Administrative Committee that it is not reasonably able, in the interests of Participants, to prudently liquidate and provide the necessary amounts from any of the Investment Funds to satisfy all Participants' approved loan applications as of any loan date, the amount to be provided to each Participant shall be reduced in proportion to the ratio which the aggregate amount that the Trustee or Investment Manager has advised the Plan Administrative Committee may prudently be so provided bears to the aggregate amount which all Participants duly requested be so provided.

**9.8    Suspension of Repayment of Loans.**

(a) **Military Leave.** In the event that any Participant with an outstanding loan from the Plan goes on Military Leave, such Participant may elect to have his repayment obligations with respect to such loan suspended until the earlier of (i) the Participant's return to active employment with the Company (or other applicable Employer) and (ii) the termination of the Participant's employment with the Company (or other applicable Employer). Effective as of January 1, 2004, if repayments are suspended during a period of Military Leave, the term of the loan shall be increased by the period of Military Leave.

(b) **Repayment by Returning Veteran.** Effective as of January 1, 2004, a Returning Veteran may, at his election, either increase his installment payments proportionately to reflect the period of suspension pursuant to Section 9.8(a) and the interest accrued during such period of suspension, or may elect that the payment remain equal to the installment payments prior to the commencement of Military Leave and be subject to a balloon payment at the end of the repayment period.

(c) **Leave of Absence.** In the event that the Company (or other applicable Employer) approves a Participant's request for a leave of absence (other than for a Military Leave), such Participant may elect to suspend his loan repayment obligations for a period of up to twelve months beginning with the first month of the leave of absence, *provided* that during such leave of absence the Participant will receive either (i) no compensation from the Company (or other applicable Employer) or (ii) any periodic compensation that is paid by the Company (or other applicable Employer) to such Participant is less than the periodic repayment requirements of the loan, subject to 9.8(b).

(d) **Term of Loan.** The term of a loan from the Plan shall not be extended beyond the limits imposed by Section 9.3(d) by reason of Section 9.8(c), regardless of whether a Participant's payments are suspended hereunder. Installments due on any loan from the Plan will be increased proportionately upon expiration of the Participant's leave of absence to compensate for the period of suspension, if necessary, subject to 9.8(b).

**9.9    Defaults.** If a Participant fails to comply with this Section IX or fails to make any scheduled repayment of principal and/or interest, the Plan Administrative Committee shall have the right to accelerate repayment of the loan (a "*Default*"), to demand immediate repayment of the entire amount outstanding or to renegotiate the terms of the loan.

**9.10    Remedies.** If a Participant defaults on a loan from the Plan and such Participant is not entitled to a distribution from his Accounts, then the Plan Administrator shall declare a deemed distribution to have occurred with respect to such loan, effective as of the date of the Default. Such deemed distribution shall be applied toward the satisfaction of the Participant's loan at the time a distribution is made to the Participant in accordance with the terms of the Plan and the balance of the Participant's Accounts shall be reduced accordingly at such time. If a Participant Defaults on a loan and such Participant is eligible for a distribution from any of the Participant's Accounts in accordance with the terms of the Plan, the Plan Administrator shall cause a distribution from the Participant's Accounts to be applied towards satisfaction of the Participant's loan Default effective as of the date of Default and the balance of the Participant's Accounts shall be reduced accordingly. In the event of a loan taken out after 2001 that is deemed distributed and that has not been repaid (such as by a loan offset), the unpaid principal amount of the loan plus accrued interest thereon is considered outstanding for purposes of determining the maximum permissible loan under Section 9.2

**9.11    Valuation.** The value of a Participant's Accounts for purposes of any withdrawal or loan under this Article IX shall be determined as of the Valuation Date immediately prior to the date of the loan or withdrawal, and no interest or other earnings shall be credited on the amount of such withdrawal from such Valuation Date to the date the proceeds of the withdrawal or loan are received by the Participant or transferred, if applicable, to an Eligible Retirement Plan designated by the Participant.

**9.12    Death.** If a Participant should die prior to the payment of any withdrawal or the disbursement of the proceeds of any loan requested from the Plan under this Article IX, the Participant's withdrawal or loan request shall be void as of the date of death.

**9.13    Participant Deemed to Be In-Service.** For purposes of Section 9.1, a Participant whose employment is terminated, but does not incur a "severance from employment" within the meaning of Section 401(k)(2) of the Code, shall be deemed to be a Participant who is employed by the Company or an Employer.

## SECTION 10
## Accounts and Records of the Plan
## and Valuation of Accounts

**10.1    Accounts and Records.**  The Accounts and records of the Plan shall be maintained by the Plan Administrative Committee and shall accurately disclose the status of the Accounts of each Participant.  Each Participant shall be advised from time to time, at least once each Plan Year, and upon distribution to him, of the balance of each of his Accounts.  The Plan Administrative Committee shall have complete discretion to establish and utilize an accounting system to account for the interests of each Participant.  To the extent permitted by the Code and ERISA, the Plan Administrative Committee may change the accounting system from time to time.  The Plan Administrative Committee may delegate some or all of its responsibilities under this Section 10.1 to one or more recordkeepers for the Plan or to the Trustee.

**10.2    The Trust Fund.**  All amounts of money, securities or other property received under the Plan shall be delivered to the Trustee to be managed, invested, reinvested and distributed for the exclusive benefit of Participants and their Beneficiaries in accordance with the Plan, the Trust Agreement and any agreement with an insurance company or other financial institution constituting a part of the Plan and Trust Fund.  Except as otherwise provided in Section 11 and the Trust Agreement, the Trustee shall have responsibility with respect to the control or management of the assets of the Plan and the Trust Fund.  All amounts of money, securities or other property received under the Plan shall be delivered to the Trustee under the Trust Agreement, to be managed, invested, reinvested and distributed for the exclusive benefit of Participants and their Beneficiaries in accordance with the Plan, the Trust Agreement, and any agreement with an insurance company or other financial institution constituting a part of the Plan and Trust Agreement.

**10.3    Investment Funds and Valuation of Participants' Accounts.**

(a) **Allocation of Earnings.**  The dividends, capital gains distribution, and other earnings received on any share or unit of an Investment Fund that is specifically credited or earmarked to a Participant's Account under the Plan in accordance with the directed investment provisions of Section 5 shall be allocated to such Account and immediately reinvested, to the extent practicable, in additional shares or units of such Investment Fund.

(b) **Loans.**  Any Plan earnings or losses attributable to the investment of a Participant's Account under the Plan in a loan to the Participant under Section 9 shall be allocated to the Participant's Account in accordance with the procedures of Section 9.4.

(c) **Valuation.**  The assets of the Plan shall be valued at their current fair market value as of each Valuation Date, and the earnings or losses of an

Investment Fund since the immediately preceding Valuation Date shall be allocated to the Accounts of all Participants with an interest in such Investment Fund in the ratio that the fair market value of each such Account with an interest in such Investment Fund as of the immediately preceding Valuation Date, reduced by any distributions or withdrawals therefrom since such preceding Valuation Date, bears to the total fair market value of all Accounts with an interest in such Investment Fund as of the immediately preceding Valuation Date, reduced by any distributions or withdrawals therefrom since such preceding Valuation Date.

**10.4    No Rights Created by Allocation.** The establishment and maintenance of, or allocations and credits to, the Accounts of any Participant shall not vest in any Participant or his Beneficiary any right, title or interest in and to any Trust Fund assets or Plan benefits except at the time or times and upon the terms and conditions and to the extent expressly set forth in the Plan and the Trust Agreement.

**10.5    Non-Reversion.** Except as provided in Section 10.6, all contributions when made to the Trust Fund and all property of the Trust Fund, including income from investments and all other sources, shall be retained for the exclusive benefit of Participants or their Beneficiaries and shall be used to pay benefits provided hereunder or to pay expenses of administration of the Plan and the Trust Fund to the extent not paid by the Company.

**10.6    Return of Certain Contributions.** All Contributions to the Trust Fund by an Employer are conditioned upon deductibility under Section 404 of the Code. Any provisions of the Plan to the contrary notwithstanding, in the case of any Contribution to the Trust Fund that is made by an Employer as a result of a mistake of fact or that is not deductible under Section 404 of the Code, such Contribution, to the extent made by a mistake of fact or to the extent that the deduction for such Contribution is disallowed, shall be returned to the Employer; *provided, however,* that a Contribution shall be returned within one year after it is mistakenly made or one year after such deduction is disallowed, as the case may be. Any Contribution refunded as provided above shall only be adjusted to reflect its proportionate share of the Trust Fund's loss, if any, and shall not be adjusted to reflect its proportionate share of the Trust Fund's gain, if any.

**10.7    Source of Benefits.** The Trust Fund shall be the sole source of benefits under this Plan, and each Employee, Participant, joint or contingent annuitant, beneficiary or any other person who shall claim the right to any payment or benefit under this Plan shall be entitled to look only to the Trust Fund for the payment of benefits. Except as may be otherwise provided by ERISA or other applicable law, the Employer shall have no liability to make or continue from its own funds the payment of any benefit under the Plan.

## SECTION 11
## ADMINISTRATION OF THE PLAN

**11.1** **In General .** The administration, management and operation of the Plan and the responsibility for the management and investment of the assets of the Trust Fund shall be allocated among the Compensation Committee, the Plan Administrative Committee, the Plan Investment Committee (each, a "*Committee*"), the Plan Administrator, the Trustee and their respective delegates, agents and appointees in the manner described in Section 10 and this Section 11.

**11.2** **The Compensation Committee.**

(a) **General Responsibilities.** The Compensation Committee shall appoint the members of each Committee, and each Committee shall consist of such number of members as have been appointed from time to time by the Compensation Committee and who are then serving on the Committee. Committee members shall serve without compensation at the pleasure of the Compensation Committee. Committee vacancies shall be filled by the Compensation Committee. An individual may resign as a member of the Committee on thirty days' prior written notice to the Compensation Committee, or such lesser period as the Executive Committee shall allow on a case-by-case basis.

(b) **Powers and Duties.** The Compensation Committee shall have the following specific powers and duties:

(i) to appoint the members of the Plan Administrative Committee and the Plan Investment Committee; and

(ii) to evaluate the performance and policies of the Plan Administrative Committee and Plan Investment Committee and any Employee engaged in the management and administration of the Plan or Trust Fund.

**11.3** **Chairman, Secretary, Agents.**

Each Committee may appoint a chairperson from among its members, a secretary and such agents (who need not be members of the Committee) as it may deem necessary for the effective performance of its duties. The compensation, if any, of such agents shall be fixed by the Committee.

**11.4** **Meetings.** Each Committee shall hold meetings upon such notice, at such place or places, and at such intervals as it may from time to time determine. Meetings of a Committee may be held in person, by telephone, through other suitable communications media or in any combination thereof. .

**11.5   Powers and Duties of the Plan Administrative Committee.**

(a) **General Authority.**  Except as otherwise provided in this Section 11, the Plan Administrative Committee shall have responsibility for the interpretation and construction of the Plan and final authority with respect to operation and administration of the Plan.  The Plan Administrative Committee shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities under the Plan and to amend the Plan pursuant to Section 13.1.  All determinations of the Plan Administrative Committee as to any question involving its responsibilities under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary actions to be taken under the Plan, shall be solely at the discretion of the Plan Administrative Committee and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan.

(b) **Additional Powers and Duties.**  In addition to any implied powers and duties with which the Plan Administrative Committee shall be empowered to carry out the provisions of the Plan, the Plan Administrative Committee shall have the following specific powers and duties:

(i)      to make and enforce such rules and regulations as it shall deem necessary or proper for the efficient administration of the Plan;

(ii)      to construe and interpret the terms and provisions of the Plan and all documents which relate to the Plan and to decide any and all matters arising thereunder, including the right to remedy possible ambiguities, inconsistencies or omissions;

(iii)      to determine the eligibility for benefits under the Plan by investigation and review of the facts or otherwise;

(iv)      to make such factual or other determinations as shall be necessary or advisable for the administration of the Plan or for the determination of benefits under the Plan;

(v)      determine, in its sole and exclusive discretion, all questions relating to the interpretation of the Plan, the dates and other considerations regarding participation, retirement, or termination of employment, and the benefit to which any retired Participant or his or her surviving Spouse or Beneficiary may become entitled hereunder or any other factual determinations with respect to the foregoing;

(vi)      to formulate funding policy and method for the Plan that satisfies the requirements of Title I, Part 3 of ERISA, and to advise the Plan Investment Committee and the Trustee;

(vii)   to review the performance of, and direct the Trustee in, matters pertaining to the payment of benefits, and to settle accounts with the Trustee;

(viii)   to report to the Compensation Committee at reasonable intervals;

(ix)   to review and to make recommendations to the Compensation Committee when it deems necessary on any matter affecting the Plan; and

(x)   to review claim appeals under Section 11.7(b) and approve or deny any such claim appeal.

(c) **Instructions.** Any instructions of the Plan Administrative Committee or its designated agent shall be in writing, signed by a member of the Plan Administrative Committee or its agent.

(d) **Allocation of Duties.** The Plan Administrative Committee may allocate responsibilities among its members by appointing subcommittees with such powers as it shall determine, and may also authorize one or more of its members or any agent to execute or deliver any instrument or make any payment on its behalf. The Plan Administrative Committee may appoint an administrative body whose functions may include, but need not be limited to, the calculation of benefits and related matters. The administrative body may, but need not, consist of members of the Plan Administrative Committee.

(e) **Powers Not Allocated.** Any power, duty or responsibility with respect to Plan administration and operation not specifically allocated hereunder shall reside with the Plan Administrative Committee.

**11.6    Powers and Duties of the Plan Investment Committee.**

(a) **General Authority.** The Plan Investment Committee has the exclusive responsibility and authority to control and manage the assets of the Plan in accordance with the terms of the Plan and of the Trust. The Plan Investment Committee shall have the following specific powers, in addition to all other powers that may be implied hereunder as necessary to carry out the provisions of the Plan and of the Trust.

(b) **Additional Powers and Duties.** In addition to any implied powers and duties which may be needed to carry out the provisions of the Plan, the Plan Investment Committee shall have the following specific powers and duties:

(i)   to approve and review investment funding policies;

(ii)   to direct investments in the Trust Fund in accordance with the objectives established by the Compensation Committee and to authorize disbursements therefrom;

(iii)    to appoint, remove or change, from time to time, persons constituting "Investment Managers", as defined in Section 3(38) of ERISA, to manage the assets of the Trust, and to delegate to such Investment Managers the exclusive authority to manage (including the power to acquire and dispose of) all or such portion of the Trust Fund as the Plan Investment Committee shall designate at any time or from time to time or as may be allocated by Participants;

(iv)    to investigate and make factual determinations with regard to any matter related to the Trust Fund;

(v)    to make and enforce such rules and regulations as it shall deem necessary or proper for the efficient investment of the Trust Fund;

(vi)    to appoint the Trustee or Trustees and evaluate the performance of such Trustees;

(vii)    to approve the Trust Agreement and to authorize any officer of the Company to execute the Trust Agreement (or any amendments thereto) on behalf of the Company;

(viii)    to construe and interpret the terms and provisions of the Plan and the Trust Agreement and all documents which relate to the Trust Fund and to decide any and all matters arising thereunder, including the right to remedy possible ambiguities, inconsistencies or omissions;

(ix)    to direct investments in the Trust Fund and authorize disbursements therefrom; and

(x)    to review and to make recommendations to the Compensation Committee when the Plan Investment Committee deems necessary on any matter affecting the Trust.

(c) **Instructions.** Any instructions of the Plan Investment Committee to the Trustee shall be evidenced in writing, signed by a person acting as Named Fiduciary for Managing Plan Assets to whom such authority is delegated by a majority of the Plan Investment Committee.

(d) **Allocation of Duties.** The Plan Investment Committee may allocate responsibilities among its members by appointing subcommittees with such powers as it shall determine, and may also authorize one or more its members or any agent to execute or deliver any instrument or take any action permitted by the Trust in its behalf.

**11.7   Powers and Duties of the Plan Administrator.**

(a) **General Authority.** The Plan Administrator shall have day-to-day responsibility for the operation and administration of the Plan. With respect to the duties and powers set forth in this Section 11.7, the Plan Administrator shall have the responsibility for the interpretation and construction of the Plan and final authority with respect to the operation and administration of the Plan. The Plan Administrator shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities under the Plan. All determinations of the Plan Administrator as to any question involving its responsibilities under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary actions to be taken under the Plan, shall be solely at the discretion of the Plan Administrator and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan.

(b) **Additional Powers and Duties.** In addition to any implied powers and duties which may be needed to carry out the provisions of the Plan, the Plan Administrator shall have the following specific powers and duties to:

(i)     monitor and supervise the activities of the Plan recordkeeper and other third-party administrators appointed for the Plan;

(ii)     review benefit claims in accordance with Section 11.17 and approve or deny any benefit claim;

(iii)     review domestic relations orders and determine whether any such domestic relations order constitutes a QDRO;

(iv)     approve Plan distributions;

(v)     determine the eligibility for benefits under the Plan;

(vi)     investigate and make factual determinations with regard to any matter related to the Plan;

(vii)     compute the accrued benefit or the amount which shall be payable to any Participant or Beneficiary in accordance with the provisions of the Plan or review the computation or amount computed by any third-party administrator;

(viii)     supervise the Employees of the Company who are retained in connection with the operation of the Plan;

(ix)     determine which Plan expenses shall be charged to the Trust Fund; and

(x)     authorize disbursements from the Trust Fund.

**11.8** **Multiple Capacities.** The Plan Administrator or any other fiduciary designated by the Committees or the Plan Administrator may serve in more than one fiduciary capacity with respect to the Plan.

**11.9** **Conclusiveness of Reports, Etc.** The members of the Investment Committee, and the Plan Administrative Committee, the Plan Administrator and the Employer and the Company and their officers and directors, shall be entitled to rely upon all tables, valuations, certificates, and reports furnished by any enrolled actuary selected by the Plan Administrative Committee or the Plan Administrator, upon all certificates and reports made by any accountant selected by the Plan Administrative Committee, the Company, the Plan Administrator or the Employer, and upon all opinions given by any legal counsel selected by the Plan Administrative Committee. The members of the Plan Administrative Committee, the Plan Administrator and the Company and the Employer and their officers and directors, shall be fully protected with respect to any action taken or suffered by them in good faith in reliance upon any such actuary, or counsel, and all action so taken or suffered shall be conclusive upon all persons.

**11.10** **Delegation and Employment of Agents.** The Plan Administrator may employ agents, including, without limitation, custodians, accountants, consultants, or attorneys, to exercise and perform the powers and duties of the Plan Administrative Committee as it delegates to them, and to render such services to the Plan Administrative Committee as it may determine, and the Plan Administrative Committee may enter into agreements setting forth the terms and conditions of such service. The Plan Administrative Committee may appoint an independent public accountant to audit the Plan. The compensation of these agents shall be an expense chargeable in accordance with Section 11.15. Notwithstanding anything in this Section 11 to the contrary, each Committee and the Plan Administrator may authorize or delegate one or more persons to perform the routine administrative functions and to sign any statements of such Committee or Plan Administrator, instructions to the Trustee or notices and other communication to Participants, Beneficiaries or other persons.

**11.11** **Named Fiduciary.** For purposes of Title I of ERISA, the Plan Investment Committee shall be the "named fiduciary" for managing Plan assets and the Plan Administrative Committee shall be the "named fiduciary" for all other matters.

**11.12** **Action by Majority of Either Committee.** All action by the Plan Administrative Committee or the Plan Investment Committee hereunder shall be authorized by a majority of the members of the respective Committee, either by vote at a meeting or by a writing signed by such majority. The Plan Administrative Committee and the Plan Investment Committee may certify to the Trustee, by majority vote or action as provided for herein, the name of one member of such committee authorized to act for it in its relationship with the Trustee. The Trustee shall be and hereby is authorized to act in pursuance of the written instructions of any member of either of the Committees so designated. A member may send a deputy with full voting powers to any meeting of the Plan Administrative Committee or

the Plan Investment Committee that such member is unable to attend. Each Committee shall have the authority to ratify prior actions taken on behalf of such Committee.

**11.13   Rules and Regulations of the Committees.** The Plan Administrative Committee and the Plan Investment Committee may make and enforce such rules and regulations in connection with their obligations pursuant to the Plan as are consistent with the terms and provisions hereof.

**11.14   Committee Membership and Resignation.** Each Committee shall consist of at least two members. The Compensation Committee may remove any member of the Plan Administrative Committee or the Plan Investment Committee at any time. In the event of the removal, death, resignation, or inability to act of a member, said Compensation Committee may appoint a successor. Appointment and removal shall be by vote of the Compensation Committee and shall be effective upon the filing with the Trustee of a certificate setting forth such action. Any member of either Committee may resign at any time, effective upon delivering a written resignation to the Compensation Committee.

**11.15   Compensation and Expenses of the Committees.** The members of the Committees shall not receive any special compensation for serving as a member of a Committee. Unless otherwise determined by the Company, all expenses of each Committee shall be paid in accordance with the provisions of Section 15.15. Such expenses shall include any expenses incident to the functioning of the Plan, including without limitation attorneys' fees and the compensation of other agents, accounting and clerical charges, expenses, if any, of being bonded as required by ERISA, and any other costs of administering the Plan.

**11.16   Indemnity for Liability.** To the maximum extent allowed by law and to the extent not otherwise indemnified, the Employer shall indemnify each member (and former member) of each of the Plan Administrative Committee and Plan Investment Committee, and any other current or former Employee, officer, or director of the Company or the Employer (the "*Indemnitees*"), against any and all claims, losses, damages, expenses, including counsel fees, incurred by any such person on account of such person's action, or failure to act, in connection with the Plan, including, in the case of amounts paid in settlement, only such amounts as are paid with the Employer's approval, except that no indemnification shall be provided to an Indemnitee who personally profited from any act or transaction in respect of which indemnification is sought, or who knew another Indemnitee would so profit.

**11.17   Claims.** In accordance with ERISA, all claims for benefits under the Plan shall be determined by the Plan Administrator or the Plan Administrative Committee in accordance with the terms of this Section 11.17.

(a) **Initial Review.** In the event any person or his authorized representative (a "*Claimant*") disputes the amount of, or his entitlement to,

any benefits under the Plan or their method of payment, such person shall file a claim in writing with, and on the form prescribed by, the Plan Administrator for the benefits to which he believes he is entitled, setting forth the reason for his claim. The Plan Administrator shall consider the claim and within 90 days of receipt of such claim, unless special circumstances exist, the Plan Administrator shall inform such person of its decision with respect to the claim. In the event of special circumstances, the response period can be extended for an additional 90 days, as long as the Claimant receives written notice advising of the special circumstances and the date by which the Plan expects to make a determination (the "*Extension Notice*") before the end of the initial 90-day response period indicating the reasons for the extension and the date by which a decision is expected to be made. If the Plan Administrator denies the claim, the Plan Administrator shall give to such person (i) a written notice setting forth the specific reason or reasons for the denial of the claim, including references to the applicable provisions of the Plan, (ii) a description of any additional material or information necessary to perfect such claim along with an explanation of why such material or information is necessary, (iii) appropriate information as to the procedure to be followed for review of such claim by the Plan Administrator, including time limits and (iv) the Claimant's right to commence a civil action under Section 502(a) of ERISA.

(b) **Appeal of Denial.**

(i)     A Claimant whose claim is denied by the Plan Administrator may request a review of the Plan Administrator's decision by filing a written request with the Plan Administrative Committee for such review within 60 days after his receipt of the written denial of the claim. Such written request for review shall contain all relevant additional information that the Claimant wishes the Plan Administrative Committee to consider. In connection with that review, the Claimant (or his authorized representative) may examine, and receive free of charge, copies of pertinent Plan documents and submit such written comments as may be appropriate. Written notice of the decision on review shall be furnished to the Claimant within 60 days after receipt by the Plan Administrative Committee of a request for review. In the event of special circumstances, the response period can be extended for an additional 60 days, as long as the Claimant receives an Extension Notice before the end of the initial 60-day response period. Any decision of the Plan Administrative Committee shall be in writing and shall include (i) the specific reasons for the adverse determination, (ii) references to applicable Plan provisions, (iii) a statement that the Claimant is entitled to receive, free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim and (iv) a statement of the Claimant's right to bring an action under Section 502(a) of ERISA. The Claimant will be notified no later than five days after a decision is made with respect to the appeal.

(ii)     Notwithstanding anything in Section 11.17(b)(i) to the contrary, if the Plan Administrator is a member of the Plan Administrative Committee, he shall recuse himself for purposes of Section 11.17(b).

(c) **Limitation of Action.** A Claimant wishing to seek judicial review of an adverse benefit determination under the Plan, whether in whole or in part, must file any suit or legal action, including, without limitation, a civil action under Section 502(a) of ERISA, within one year of the date the final decision on the adverse benefit determination on review is issued or should have been issued under Section 11.17(b) or lose any rights to bring such an action. If any such judicial proceeding is undertaken, the evidence presented shall be strictly limited to the evidence timely presented to the Plan Administrative Committee. Notwithstanding anything in the Plan to the contrary, a Claimant must exhaust all administrative remedies available to such Claimant under the Plan before such claimant may seek judicial review pursuant to Section 502(a) of ERISA.

11.18 **Members' Own Participation.** A member of one or more of the Committees shall not act, vote or otherwise influence a decision of any one of the Committees specifically relating to his own participation under the Plan.

11.19 **Qualified Domestic Relations Orders.** The Plan Administrator shall establish, and may modify from time to time, reasonable procedures to determine the qualified status of any domestic relations orders, as defined in Section 414(p) of the Code. Such procedures may restrict the right of any Participant to receive amounts potentially subject to a qualified domestic relations order for such periods as the Plan Administrator may provide.

11.20 **Mandatory No-Trading Periods.** Effective as of May 6, 2003, Section 4, or such other sections, of the Company's *Statement of Policies and Procedures Concerning Insider Trading*, dated as of April 1999 and as amended from time to time, imposing mandatory no-trading periods (referred to as "*blackout periods*") during each Plan Year, shall be incorporated herein by reference and all Participants who are Employees shall be subject thereto."

## SECTION 12
### Withdrawal of an Employer, Merger, Consolidation and Transfers of Assets

**12.1 Procedures for Withdrawal.**

(a) **Timing of Withdrawal.** Any Employer may terminate its participation in the Plan, in whole or in part, by giving the Plan Administrative Committee prior written notice specifying a termination date which shall be the last day of a month at least sixty (60) days subsequent to the date such notice is received by the Plan Administrative Committee. The Plan Administrative Committee may terminate any Employer's participation in the Plan, in whole or in part, as of any termination date specified by the Plan Administrative Committee, for any reason, including, but not limited to, the failure of the Employer to comply with any provision of the Plan.

(b) **Notice of Withdrawal.** Notice of any withdrawal of an Employer under Section 12.1(a) from the Plan by the Employer shall be given to the Plan Administrative Committee, which, in turn, shall notify the Company, the withdrawing Employer, the Trustee or any other funding agency, and, if appropriate, any Investment Manager.

(c) **Partial Termination.** Notwithstanding the foregoing provisions of this Section 12.1, the sale of an Employer or Affiliate or a facility, operation, trade or business of the Company or any other Affiliate to an entity that is not an Affiliate or a determination by the Plan Administrative Committee or the IRS that there has been a "*partial termination*" of the Plan under Section 411(d)(3) of the Code with respect to a group of Participants shall be treated as a withdrawal by an Employer, in whole or in part, under this Section 12.

**12.2 Contributions upon Withdrawal.** Upon any withdrawal of an Employer from the Plan, no further contributions on behalf of affected Employees of the Employer shall be made, and, unless otherwise specified by the Plan Administrative Committee, no amount shall thereafter be payable under the Plan to or in respect of any such Participants except as provided in this Section 12. Anything in the Plan to the contrary notwithstanding, no Discretionary Profit-Sharing Contribution for a given Plan Year shall be allocated to Participants of the Plan who are employed by any corporation or entity that is not an Employer on the last day of such Plan Year. To the maximum extent permitted by ERISA, any rights of Participants employed by other Employers or otherwise not involved in the withdrawal, and the participation of any other Employer in the Plan, shall be unaffected by such withdrawal and any transfers, distributions or other dispositions of the assets of the Plan as provided in this Section 12 shall constitute a complete discharge of all liabilities under the Plan with respect to such Employer's participation in the Plan and with respect to any affected Participant or his Beneficiary.

**12.3    Effect of Withdrawal.** Upon any Employer's withdrawal from the Plan, the Plan Administrative Committee may direct, in accordance with ERISA and the Code, that any or all of the Accounts of affected Participants may continue to be maintained by the Plan, or, after payment of or provision for expenses and charges as described in Section 11.8 and appropriate adjustment of the Accounts of all such Participants, the Plan Administrative Committee may direct, subject to ERISA and the Code, that the value of any or all of such Accounts may be paid from the Trust Fund in the manner described in Section 7 (as if each affected Participant had a termination of employment) or transferred, subject to Section 12.4, to a successor Qualified Plan.

**12.4    Merger, Consolidation or Transfer of Plan Assets.** To the extent permitted by ERISA and the Code, the Plan Administrative Committee may direct that this Plan be merged or consolidated with one (1) or more other Qualified Plans or that a portion of this Plan's assets attributable to one (1) or more Participants may be transferred to one (1) or more other Qualified Plans or spun off and a new Qualified Plan established; *provided, however*, that no transfer of any of the Plan's assets and liabilities to any such successor Qualified Plan (whether by merger or consolidation with such successor Qualified Plan or otherwise) shall be made unless each Participant would, if either the Plan or such successor Qualified Plan then terminated, receive a benefit immediately after such transfer which (after taking account of any distribution or payments to them as part of the same transaction) is equal to or greater than the benefit he would have been entitled to receive immediately before such transfer if the Plan or successor plan had then been terminated. The Plan Administrative Committee may also request appropriate indemnification from the employer or employers maintaining such Qualified Plan before making such a transfer.

**12.5    Determinations, Approvals and Notifications.** All determinations, approvals and notifications that the Plan Administrative Committee deems necessary or appropriate with respect to any withdrawal of an Employer or any transaction contemplated by Section 12.4 shall be in form and substance and from a source satisfactory to the Plan Administrative Committee.

**12.6    Voluntary Direct Transfers into the Plan from Another Qualified Plan.** In accordance with Section 411(d)(6)(d) of the Code and Section 12.4 above, the Plan shall accept elective and voluntary direct transfers from other defined contribution plans; *provided, however*, that such plans are not subject to the annuity requirements of Sections 401(a)(11) and 417 of the Code.

## SECTION 13
## Amendment and Termination

**13.1    Right to Amend or Terminate Plan and Trust.**

(a) **General Authority.** The Compensation Committee shall have all the powers, authority and responsibilities as set forth in this Section 13.

(b) **Amendments to Plan and to Contracts.** Subject to Section 13.1(h), the Compensation Committee reserves the right at any time to amend, suspend or terminate the Plan, any contributions thereunder, the Trust or any contract with an administrative or other service agency, an Investment Manager, Investment Fund provider or an insurance carrier or any other party forming a part of the Plan, in whole or in part and for any reason and without the consent of any Employer, Affiliate, Participant or Beneficiary.

(c) **Amendments to Plans.** The Plan Administrative Committee may adopt amendments which do not materially affect the cost of the Plan or have a material effect on the benefits under the Plan and which may be necessary or appropriate to facilitate the administration, management, or interpretation of the Plan or to conform the Plan thereto, or to qualify or maintain the Plan and Trust as a plan and trust meeting the requirements of Sections 401(a) and 501(a) of the Code, or any other applicable section of law (including ERISA), as now in effect or as hereafter amended, and the regulations issued thereunder, and may exercise such additional powers and authority as may be granted by the Compensation Committee from time to time.

(d) **Restriction on Certain Amendment.** Notwithstanding the foregoing Section 13.1(c), Section 4.6(b) shall not be amended more than once every six months other than to comply with changes in the Code or ERISA; *provided* that the immediately preceding proviso shall cease to apply if and when the Plan Administrative Committee determines that such proviso is no longer necessary or advisable in order for the Plan to comply with the exemptive provisions of Rule 16b-3 under Section 16 of the Securities Exchange Act of 1934, as amended, and any successor provisions thereto.

(e) **Delegation by Adopting Employer.** Each Employer by its adoption of the Plan shall be deemed to have delegated this authority to the Compensation Committee.

(f) **Automatic Termination.** The Plan shall automatically be terminated upon complete and final discontinuance of Contributions thereunder.

(g) **Delegation of Amendment Authority.** The Board and the Compensation Committee may delegate the authority to modify or amend the Plan to one or more officers of the Company; *provided, however*, that any

such action delegated to an officer shall be evidenced by a written certificate or certification executed by such officer.

(h) **Restriction on Amendments.** No Amendment or modification shall be made which would:

(i) actively reduce or restrict the right to any benefit under the Plan which any Participant or Beneficiary would otherwise have had at the date of such amendment by reason of the contributions theretofore made and credited to his Account, except to such extent as may be necessary or appropriate to qualify or maintain the Plan, the Trust and any contract with an administrative or other service agency, an Investment Manager, Investment Fund provider or an insurance carrier or any other party which may form a part of the Plan as a plan and trust meeting the requirements of Sections 401(a) and 501(a) of the Code, or any other applicable section of law (including ERISA), as now in effect or as hereafter amended or adopted, and the regulations issued thereunder, or

(ii) make it possible for any part of the funds of the Plan (other than such part as is required to pay taxes, if any, and administrative expenses) to be used for or diverted to any purposes other than for the exclusive benefit of Participants and their Beneficiaries and other eligible survivors under the Plan prior to the satisfaction of all liabilities with respect thereto.

(i) Subject to Section 13.1(h), any amendment, modification, suspension or termination of any provisions of the Plan may be made retroactively if necessary or appropriate to qualify or maintain the Plan and Trust as a plan and trust meeting the requirements of Sections 401(a) and 501(a) of the Code or any other applicable section of law (including ERISA) and the regulations issued thereunder.

**13.2    Termination of the Plan.**

(a) **Vesting Upon Termination.** Upon termination of the Plan with respect to all Employers, the interest of each Participant in his Account, to the extent not already vested, shall become fully vested as of the date of such termination, no further Contributions shall be made under the Plan, and no amount shall thereafter be payable under the Plan to or in respect of any Participant except as provided in this Section 13. To the maximum extent permitted by ERISA, transfers, distributions or other dispositions of the assets of the Plan as provided in this Section 13 shall constitute a complete discharge of all liabilities under the Plan. The Plan Administrative Committee shall remain in existence and all of the provisions of the Plan that the Plan Administrative Committee deems necessary or appropriate for the execution of the Plan and the administration and distribution, transfer or other disposition of the assets of the Plan in accordance with this Section 13.2 shall remain in force.

(b) **Distribution Upon Termination.** To the extent permitted by ERISA and the Code, and subject to such determinations, approvals and notifications as the Plan Administrative Committee deems necessary or appropriate, after (i) payment of or provision for all expenses and charges referred to in Section 11.8, and all expenses and charges of liquidation or termination which are not paid by the Company (or other applicable Employer), and (ii) adjustment for earnings, profits and losses of the Trust Fund to such termination date in the manner described in Section 10, the full current value of the Participant's Accounts shall, subject to ERISA and the Code, be paid, subject to Section 7.4, in a single cash lump sum distribution as soon as practicable from the Trust Fund to each Participant (or, in the event of the death of a Participant, the Beneficiary thereof); *provided, however*, that the Plan Administrative Committee has received a favorable determination letter for the Plan from the IRS upon such termination which is in form and substance and from a source satisfactory to counsel for the Plan; and *provided further* that no distribution shall be made pursuant to this Section 13.2 if the Employer maintains a successor Qualified Plan within the meaning of Treasury Regulation Section 1.401(k)-1(d)(3). The Plan Administrative Committee may direct that any or all of the Participant's Accounts be transferred, subject to Sections 12.4 and 12.5, to the successor Qualified Plan.

# SECTION 14
## Top-Heavy Provisions

**14.1   Top-Heavy Plan.**

(a) Notwithstanding anything in the Plan to the contrary, the Plan shall be subject to this Section 14 for any Plan Year in which (i) the Company makes a Discretionary Profit Sharing Contribution (pursuant to Section 4.6(c)) and (ii) the Plan is determined to be a Top-Heavy Plan, as such term is used in Section 14.1(b), as of the last day of the preceding Plan Year (the "*Determination Date*"). The provisions of this Section 14 shall be reasonably construed by the Plan Administrator to comply with Section 416 of the Code.

(b) For such Plan Year, the Plan will be a Top-Heavy Plan if any of the following conditions exist:

(i)     The Plan is not part of a Required Aggregation Group or Permissive Aggregation Group and the Top-Heavy Ratio for the Plan exceeds sixty percent.

(ii)    The Plan is part of a Required Aggregation Group but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Required Aggregation Group exceeds sixty percent.

(iii)   The Plan is part of a Required Aggregation Group and a Permissive Aggregation Group and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds sixty percent.

(c) If, in accordance with Section 14.1(a), the provisions of this Section 14 apply, they shall supersede all other provisions in the Plan during each Plan Year with respect to which the Plan is determined to be a Top-Heavy Plan.

**14.2   Top-Heavy Ratio.** For purposes of this Section 14, "*Top-Heavy Ratio*" will be determined as follows:

(a) If the Affiliates maintain one or more defined contribution plans and the Affiliates have not maintained any defined benefit plan which, during the one-year period ending on the Determination Date, then the Top-Heavy Ratio for the Plan or for the Required or Permissive Aggregation Group, as appropriate, is a fraction (x) the numerator of which is the sum of the Account Balances of all Key Employees as of the Determination Date and (y) the denominator of which is the sum of all Account Balances. The Account Balances as of the Determination Date shall be increased by the distributions made with respect to such accounts during the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions made (a) after a termination of service or (b) under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under

Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than a termination of employment, death, or Total and Permanent Disability, this provision shall be applied by substituting 'five-year period' for 'one-year period'. The account of any individual who has not performed services for an Employer during the one-year period ending on the Determination Date shall not be taken into account. Both computed in accordance with Section 416 of the Code. Both the numerator and denominator of the Top-Heavy Ratio will be increased to reflect any contribution not actually made as of the Determination Date, but which is required to be taken into account on that date under Section 416 of the Code.

(b) If the Affiliates maintain one or more defined contribution plans and the Affiliates maintain or have maintained one or more defined benefit plans which, during the one-year period ending on the Determination Date, the Top-Heavy Ratio for any Required or Permissive Aggregation Group, as appropriate, is a fraction (x) the numerator of which is the sum of Account Balances under the aggregated defined contribution plans for all Key Employees, determined in accordance with clause (i) above, plus the present value of accrued benefits under the aggregated defined benefit plans for all Key Employees as of the Determination Date and (y) the denominator of which is the sum of the Account Balances under the aggregated defined contribution plans for all Participants, determined in accordance with clause (i) above, plus the present value of accrued benefits under the defined benefit plans for all Participants as of the Determination Date; all determined in accordance with Section 416 of the Code. The accrued benefits under a defined benefit plan in both the numerator and denominator of the Top-Heavy Ratio will be increased by an amount equal to any distribution of an accrued benefit made in the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than termination of employment, death or Total and Permanent Disability, this provision shall be applied by substituting "five-year period" for "one-year period".

(c) For purposes of clauses (i) and (ii) above, the value of Account Balances and the present value of accrued benefits will be determined as of the most recent Top-Heavy Valuation Date that falls within or ends with the twelve-month period ending on the Determination Date, except as provided in Section 416 of the Code, for the first and second plan years of a defined benefit plan. The Account Balances and accrued benefits of a Participant who is not a Key Employee but who was a Key Employee in a prior year or who has not been credited with at least one Hour of Service at any time during the one-year period ending on the Determination Date will be disregarded.

(d) The calculation of the Top-Heavy Ratio and the extent to which distributions, rollovers, and transfers are taken into account will be made in

accordance with Section 416 of the Code. Deductible employee contributions will not be taken into account for purposes of computing the Top-Heavy Ratio. When aggregating plans, the value of Account Balances and accrued benefits will be calculated with reference to the Determination Dates that fall within the same calendar year.

(e) The accrued benefit of a Non-Key Employee will be determined under the method, if any, that uniformly applies for accrual purposes under all defined benefit plans maintained by the Affiliate or, if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Section 411(b)(1)(C) of the Code.

## 14.3    Minimum Employer Contribution.

(a) If the Plan is a Top-Heavy Plan in a Plan Year, the Company will contribute a Company Contribution on behalf of each Participant who is (i) a Non-Key Employee for such Plan Year and (ii) still a Participant on the last day of the Plan Year (to the extent not otherwise contributed by the Affiliate for such Plan Year on behalf of the Participant to any other qualified plan maintained by the Affiliates) which is equal to at least three percent of a Participant's "annual compensation" (the "*Employer Minimum Contribution*"). If, however, the Employer Minimum Contribution, under this or any other defined contribution plan required to be included in the Required or Permissive Aggregation Group and maintained by the Affiliates for any Non-Key Employee is less than three percent of such Non-Key Employee's "annual compensation" not in excess of $200,000 (or such amount for a Plan Year as may be permitted by reason of the application of Section 401(a)(17)(B) of the Code), then the Employer Minimum Contribution on behalf of each Non-Key Employee who is still employed as of the end of the Plan Year will equal the amount which results from multiplying such Non-Key Employee's "annual compensation" times the highest contribution rate.

(b) Notwithstanding anything in Section 14.3(a) to the contrary, if a Participant who is not a Key Employee is also a participant under one or more defined benefit plans in an affiliation group of plans maintained by the Employer in any Plan Year in which this Plan is top-heavy, such Participant shall accrue the minimum benefit provided in the Pension Plan of Ambac Financial Group, Inc., in accordance with Treasury Regulation Section 1.416-1 M-12, based on such Participant's "annual compensation", and shall not accrue the benefit described in Section 14.3(a). No additional contributions to such defined benefit plans shall be required to be made on behalf of such Participant pursuant to Section 416 of the Code.

(c) For purposes of Section 14.3, "annual compensation" shall be determined in accordance with Section 4.13(e).

(d) For purposes of satisfying the minimum benefit requirement of Section 14.3, in determining years of service with the Employer, any service with the Employer shall be disregarded to the extent that such service occurs during a Plan Year when the Plan benefits (within the meaning of Section 410(b) of the Code) no Key Employee or former Key Employee.

(e) Basic Profit Sharing Contributions and Supplemental Profit Sharing Contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Section 416(c)(2) of the Code for any plan of the Required Aggregation Group or Permissive Aggregation Group.

**14.4    Special Definitions.**

"*Account Balance*" means, for purposes of Section 14, the sum of (i) the aggregate balance of the Accounts of a Participant under the applicable plans of the Aggregated Group as of the Top-Heavy Valuation Date, (ii) any contribution allocated to such accounts after the most recent Valuation Date and on or before the Top-Heavy Valuation Date and (iii) the aggregate distributions made with respect to such accounts during the Determination Period and not reflected in the value of the accounts as of the most recent Top-Heavy Valuation Date under clause (i) above.

"*Key Employee*" has the meaning set forth in Section 416(i) of the Code, which is incorporated herein by reference. For purposes of this definition, compensation shall be determined in accordance with Section 4.13(e).

"*Non-Key Employee*" means any Employee who is not a Key Employee.

"*Permissive Aggregation Group*" means the Required Aggregation Group plus any other qualified plans maintained by the Affiliates that would continue to satisfy the requirements of Sections 401(a)(4) and 410(b) of the Code when considered as a group.

"*Required Aggregation Group*" means the group composed of (i) each qualified plan maintained by the Affiliates in which at least one Key Employee participates, or participated in the Plan Year containing the Determination Date, or any of the four preceding Plan Years, regardless of whether the plan has been terminated, and (ii) any other qualified plan maintained by the Affiliates which enables a plan described in clause (i) during the period tested to meet the requirements of Section 401(a)(4) or 410(b) of the Code.

"*Super Top-Heavy Plan*" means a Top-Heavy Plan which would continue to be a Top-Heavy Plan if ninety were substituted for sixty percent each place it appears in the definition of "*Top-Heavy Plan*."

"*Top-Heavy Ratio*" means the ratio(s) described in Section 14 hereof; *provided* that the Participants' Accounts will be valued on the Top-Heavy Valuation Date for purposes of determining the Top-Heavy Ratio.

"*Top-Heavy Valuation Date*" means, with respect to a Plan Year in which the Committee makes a determination as to the Top-Heavy Ratio of the Plan, the Determination Date.

## SECTION 15
## Miscellaneous

**15.1** **No Enlargement of Employee Rights.** Nothing contained in the Plan shall be deemed to give an employee the right to be retained in the service of the Company, the Employer or any other Affiliate or to interfere with the right of such employer to discharge any employee at any time. The adoption and maintenance of the Plan shall not constitute a contract between the Company, the Employer or any other Affiliate and any employee or consideration for, or an inducement to or condition of, the employment of any employee.

**15.2** **Sole Source of Benefits.** The Trust Fund shall be the sole source of benefits under the Plan and, except as otherwise required by ERISA, the Company, the Employer, the Plan Administrative Committee, the Plan Investment Committee, any Investment Managers and the Trustee assume no liability or responsibility for payment of such benefits, and each Participant, his Spouse or Beneficiary, or other person who shall claim the right to any payment under the Plan shall be entitled to look only to the Trust Fund for such payment and shall not have any right, claim or demand therefor against the Plan Administrative Committee or any member thereof, the Plan Investment Committee or any member thereof, the Company, the Employer, any Affiliate, any Investment Manager, any Investment Fund provider, administrative service agency, the Trustee, or any employee or director thereof.

**15.3** **Trust Agreement.** Any and all rights or benefits accruing to any persons under the Plan shall be subject to the terms of the Trust Agreement or any other funding instrument that is part of the Plan and the Trust Fund.

**15.4** **Restrictions on Alienation.**

(a) **Alienation of Benefit.** Except as provided in Section 9 or insofar as may otherwise be required by law or pursuant to the terms of a "*qualified domestic relations order,*" as described in Section 414(p) of the Code, or as otherwise permitted by ERISA or the Code, no benefit payable under the Plan and the Trust Fund to any person shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void. No such benefit shall be in any manner liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any person, nor shall it be subject to attachment or legal process for, or against, any person, and the same shall not be recognized under the Plan and Trust Fund, except to the extent provided in Section 9 or as otherwise may be permitted by ERISA and the Code.

(b) **Reduction of Benefit.** A Participant's accrued benefit may be reduced to satisfy liabilities of the Participant to the Plan due to (i) the Participant being convicted of committing a crime involving the Plan, (ii) a

civil judgment (or consent order or decree) entered by a court in an action brought in connection with a violation of such Participant's fiduciary duties with respect to the Plan or (iii) a settlement agreement between the Secretary of Labor or the Pension Benefit Guaranty Corporation and the Participant in connection with a violation of the fiduciary provisions of ERISA; *provided, however*, that the court order establishing such liability shall require that the Participant's accrued benefit be applied to satisfy the liability.

**15.5    Incompetence.**  If the Plan Administrative Committee shall find that any person to whom any amount is payable under the Plan is unable to care for his affairs because of illness or accident, or is a minor, or has died, then any payment due such person or his estate (unless a prior claim therefor has been made by a duly appointed legal representative) may, if the Plan Administrative Committee so elects, be paid to such person's Spouse, a child, a relative, an institution maintaining or having custody of such person, or any other person deemed by the Plan Administrative Committee to be a proper recipient on behalf of such person otherwise entitled to payment.  Any such payment shall be a complete discharge of the liability of the Plan and the Trust Fund therefor.

**15.6    Notice of Address.**

(a) **Notice to Plan Administrative Committee.**  Each person entitled to benefits under the Plan shall file with the Plan Administrative Committee, in writing, his mailing address and each change of mailing address.  Any communication, statement or notice addressed to such person at such address shall be deemed sufficient for all purposes of the Plan, and there shall be no obligation on the part of the Company, an Employer, or any Affiliate, the Plan Administrative Committee or the Trustee to search for or to ascertain the location of such person.

(b) **Cancellation of Payment.**  In the event a notice of payment due under the Plan is mailed to the last known address of such person, as shown on the records of the Plan Administrative Committee, and the Social Security Administration has been contacted by the Plan Administrative Committee for assistance in locating such person, and within three (3) months after such mailing, such person has not made written claim therefor, the Plan Administrative Committee, if it so elects, after receiving advice from counsel, may direct that such payment and all remaining payments otherwise due to such person be cancelled on the records of the Plan and the Trust Fund and the amount thereof applied to reduce the contributions of the Company (or other applicable Employer), and upon such cancellation, the Plan and the Trust Fund shall have no further liability therefor except that, in the event such person later notifies the Plan Administrative Committee of his whereabouts and requests the payment or payments due to him under the Plan, the amount so treated shall be contributed to the Trust Fund by the Company, or other applicable Employer as appropriate, and paid to him as provided in Section 7.

**15.7  Required Information.**  Each Participant shall file with the Plan Administrative Committee such pertinent information concerning such Participant, his Spouse or Beneficiary as the Plan Administrative Committee may specify, and no Participant, his Spouse or Beneficiary, or other person shall have any rights or be entitled to any benefits under the Plan unless such information is filed by or with respect to him.

**15.8  Representations.**  Any person who is in any way responsible for the administration, management or supervision of the administration or management of the Plan or the Trust Fund shall be entitled to rely on representations made by Participants, Employees, and their Beneficiaries, with respect to age and other personal facts.

**15.9  Exclusive Benefit.**  The Contributions to the Trust Fund shall be for the exclusive purpose of providing benefits to the Participants and their Beneficiaries and defraying expenses of Plan and Trust Fund administration and no part of the Trust Fund shall revert to the Company or any other applicable Employer; *provided, however*, that the making of any Contribution to the Trust Fund is expressly conditioned upon the following:

(a) If a Contribution is made to the Trust Fund by the Company or an Employer under mistake of fact, such Contribution shall be returned to such Employer, or to the Company, if the Company so elects, within one (1) year after its payment; and

(b) If any part or all of a Contribution is disallowed as a deduction with respect to the Company or any Employer, then to the extent of such disallowance it shall be returned to such Employer, or to the Company, if the Company so elects, within one (1) year after the disallowance.

**15.10  Communications.**

(a) **Form of Communications.**  All elections, designations, requests, notices, instructions and other communications from an Affiliate, Employer, Participant, Beneficiary or other person to the Company or the Plan Administrative or Plan Investment Committee required or permitted under the Plan shall be in writing and in such form as is prescribed from time to time by the Plan Administrative or Plan Investment Committee, shall be mailed by first-class mail or delivered to such location as shall be specified by the Company or the Plan Administrative or Plan Investment Committee.

(b) **Electronic Media.**  Notwithstanding anything in the Plan to the contrary, pursuant to DOL Regulations 2520.104b-1 and 2520.107-1, electronic media may be used to satisfy all disclosure and recordkeeping obligations imposed on the Plan under Title I of ERISA, as the Plan Administrator shall deem necessary, appropriate or desirable.

**15.11   Headings.**  The headings and captions of the Plan are inserted for convenience of reference only and shall have no effect upon the meaning of the provisions hereof.

**15.12   Interpretation of Plan.**  To the extent not preempted by ERISA or other federal law, the provisions and validity and construction of this Plan shall be subject to and governed by the substantive internal laws (but not the conflict of law provisions) of the State of New York.

**15.13   Trust Agreement.**  Any and all rights or benefits accruing to any persons under the Plan shall be subject to the terms of the Trust Agreement, which the Company shall enter into with the Trustee.

**15.14   Severability.**  In the event that any provision of this Plan is held to be invalid or illegal for any reason, such invalidity or illegality shall not affect the remaining parts of the Plan and the Plan shall be enforced and construed as if such provision had never been inserted herein.

**15.15   Expenses.**  To the maximum extent permitted by ERISA, all expenses incurred in connection with the administration and management of the Plan and Trust Fund, including, but not limited to, the compensation of the Trustee, the reasonable fees of counsel for legal services rendered in connection with the Plan and Trust, the fees of duly appointed enrolled actuaries and the fees of Investment Managers appointed with respect to the investment and reinvestment of the Trust Fund, shall be paid from the Trust Fund, unless otherwise paid by the Company.  There also shall be paid from the Trust Fund all taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws upon or in respect of the Trust Fund or any property of any kind forming a part thereof, and all expenses including brokerage costs and transfer taxes incurred in connection with the investment and reinvestment of the Trust Fund.

**15.16   Service of Legal Process.**  The Plan Administrative Committee, or such other person as may from time to time be designated by the Plan Administrative Committee, shall be the agent for service of process under the Plan.

**15.17   Governing Law.**  The Plan shall be construed in accordance with the laws of the State of New York except where such laws have been preempted by laws of the United States.

## APPENDIX A

## Participating Affiliates

Ambac Assurance Corporation (through December 31, 2000)

Ambac Capital Corporation (through December 31, 2000)

# EXHIBIT D

## (Fiduciary Liability Policy)



**IMPORTANT NOTE:  THIS IS CLAIMS MADE COVERAGE.  PLEASE READ THIS POLICY CAREFULLY.**

**THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY CLAIMS FIRST MADE DURING THE POLICY PERIOD OR THE DISCOVERY PERIOD IF EXERCISED.  THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS.**

# FIDUCIARY

# LIABILITY

# POLICY

**NEW YORK**

*\* Provided for internal review purposes only. \* This policy is neither issued nor certified. \**

© 2000 The St. Paul Travelers Companies, Inc. All Rights Reserved

# FIDUCIARY LIABILITY POLICY
## DECLARATIONS

*IMPORTANT NOTE: THIS IS CLAIMS MADE COVERAGE. PLEASE READ THIS POLICY CAREFULLY. THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY CLAIMS FIRST MADE DURING THE POLICY PERIOD OR THE DISCOVERY PERIOD IF EXERCISED. THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS.*

**Item 1. Named Company and Address:**

AMBAC Financial Group, Inc.
One State Street Plaza
New York, NY 10004

**Policy Number:** 590CM3741

**Prior Policy Number:** 590CM3413

**Item 2. Insurer Duty to Defend Coverage Elected**　　　　　Yes ☒　　　　No ☐

**Item 3 Limit of Liability:**

$5,000,000　　　　Each Policy Period

*Note that the Limit of Liability and any Retention are reduced or exhausted by Defense Costs.*

**Item 4. Policy Period:**

From 12:01 A.M. **07/18/2009** To 12:01 A.M. **07/18/2010** Local Time at the address shown in Item 1.

**Item 5. Retention Amount each Claim:**

(A) Non-Indemnifiable Loss in each Claim　　　　$0
(B) Indemnifiable Loss in each Claim　　　　$100,000

**Item 6. Additional Insureds:**

N/A

**Item 7. Additional Extended Discovery Period**

(A) Additional Premium: $190,125.　　　　% (per Subsection III.C. of the Policy)
(B) Additional Period: 12 months

**Item 8. Prior Litigation Date:**　　July 18, 2005

**Item 9. Continuity Date:** N/A

**Item 10. Endorsements Effective at Inception:**

TR000 01-08, D0146 01-08, FL264 09-99, FL265 09-99,
MEL1223 10-03, MEL1445 03-04, MEL1494 04-04, MEL1750 07-04, MEL2063 11-04,
MEL2242 01-05, MEL2664 03-05, MEL2928 05-05, MEL3018 06-05, MEL3377 08-05,
MEL3755 09-05, MEL4503 04-06, MEL4504 04-06, MEL4505 04-06, MEL4993 02-07,
MEL5632 12-07

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Insurer.

**Countersigned:**　　　　　　　　　**ST. PAUL MERCURY INSURANCE COMPANY**

_____　_____
Authorized Representative　　Countersigned At

_____
Countersignature Date

*Secretary*　　　　*President*

FL263 Rev. 3-00　　　　　　　　Page 2　　　　　　　　New York
© 2000 The Travelers Companies, Inc.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

# NEW YORK APPLICATION AND DECLARATIONS PAGE ADDENDA

1. This Policy is written on a claims-made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period, or the Additional Extended Discovery Period, if exercised, for a Wrongful Act otherwise covered under this Policy taking place before or during the Policy Period.

2. If this Policy contains a retroactive date applicable to prior acts, this Policy will not provide coverage on account of any Claims based upon, arising out of, or attributable to any Wrongful Act which took place prior to the retroactive date.

3. Coverage under this Policy ceases upon the effective date of termination or upon the expiration of the Policy Period, except for the Automatic Discovery Period or the Additional Extended Discovery Period, if exercised.

4. An Automatic Discovery Period of sixty days is provided at no charge. An Additional Extended Discovery Period of at least ten months may also be purchased.

5. Potential coverage gaps may arise upon expiration of the Automatic Discovery Period and the Additional Extended Discovery Period.

6. With respect to any Claim submitted for coverage under this Policy, the Insureds shall have the right to select the defense attorney, participate in and direct the defense of any Claim and, agree to a settlement with the Insurer's prior written consent, which consent shall not be unreasonably withheld. The Insurer shall have the right and shall be given an opportunity to effectively associate with, and shall be consulted in advance by, the Insureds regarding (1) the selection of appropriate defense counsel, (2) substantive defense strategies, including without limitation decisions regarding the filing and content of substantive motions, and (3) settlement negotiations.

7. If the Limit of Liability is exhausted by payment of Loss, which includes Defense Costs, no further coverage is provided by this Policy. Upon receipt of a written request, the Insurer will provide an accounting of Defense Costs actually expended that are applied against either the Retention Amount or coinsurance amount or to reduce the Limit of Liability.

   When the Limit of Liability has been exhausted by payment of Loss, the Insurer will notify the Named Company in writing as soon as practicable that:
   a. the Limit of Liability has been exhausted; and
   b. the Insurer's obligations under the Policy have ended.

8. During the first several years of claims-made coverage, claims-made rates are comparatively lower than occurrence rates. Substantial annual premium increases, independent of overall rate increases, can be expected until the claims-made relationship reaches maturity.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

# TABLE OF CONTENTS

I.   INSURING AGREEMENT ................................................................................... **5**

II.  DUTY TO DEFEND PROVISION ..................................................................... **5**

III. EXTENSIONS .................................................................................................... **5**

    A.    Estates and Legal Representatives ................................................. 5

    B.    Spousal Liability ............................................................................ 5

    C.    Automatic Discovery Period and Additional Extended Discovery Period .... 6

IV.  DEFINITIONS .................................................................................................. **6**

V.   EXCLUSIONS ................................................................................................... **8**

    A.    Exclusions ...................................................................................... 8

    B.    Severability of Exclusions ............................................................. 9

VI.  GENERAL CONDITIONS AND LIMITATIONS ........................................ **10**

    A.    Limit of Liability and Retention ................................................... 10

    B.    Notice ............................................................................................. 10

    C.    Defense and Settlement ................................................................. 11

    D.    Other Insurance ............................................................................. 12

    E.    Changes in Exposure ..................................................................... 12

    F.    Representations and Severability ................................................... 13

    G.    Territory and Valuation ................................................................. 14

    H.    Cancellation and Non-renewal ...................................................... 14

    I.    Subrogation .................................................................................... 16

    J.    Action Against the Insurer ............................................................ 16

    K.    Authorization Clause ..................................................................... 16

    L.    Alteration and Assignment ............................................................ 16

    M.    Arbitration ..................................................................................... 16

\* Provided for internal review purposes only. \* This policy is neither issued nor certified. \*

© 2000 The Travelers Companies, Inc.

# FIDUCIARY LIABILITY COVERAGE

In consideration of payment of the premium and in reliance upon the statements made in the Application, which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions and other terms of this Policy, the Insurer and the Insureds agrees as follows:

## I.  INSURING AGREEMENT

The Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against the Insureds during the Policy Period, the Automatic Discovery Period or, if exercised, during the Additional Extended Discovery Period, for a Wrongful Act taking place before or during the Policy Period by an Insured or by any person for whose Wrongful Acts the Insured is legally responsible.

## II.  DUTY TO DEFEND PROVISION

If the Insurer duty-to-defend option is elected as provided in Item 2 of the Declaration, then, subject to the provisions of Subsection VI.C., the Insurer shall have the right and duty to appoint counsel and defend any Claim for which coverage under this Policy applies, even if any of the allegations are groundless, false or fraudulent.  If the Insurer duty-to-defend option is not elected as provided in Item 2 of the Declarations, then, subject to the provisions of Subsection VI.C., it shall be the duty of the Insureds and not the duty of the Insurer to appoint counsel and defend any Claim for which coverage under this Policy applies.

## III.  EXTENSIONS

### A.  Estates and Legal Representatives

This Policy shall afford coverage for Claims for the Wrongful Acts of Insured Persons made against the estates, heirs, legal representatives or assigns of Insured Persons who are deceased or against the legal representatives or assigns of Insured Persons who are incompetent, insolvent or bankrupt to the extent that in the absence of such death, incompetence, insolvency or bankruptcy, such Claims would have been covered by this Policy.

### B.  Spousal Liability

If a Claim against an Insured Person includes a claim against the Insured Person's lawful spouse solely by reason of (i) such spouse's legal status as a spouse of the Insured Person, or (ii) such spouse's ownership interest in property which the claimant seeks as recovery for alleged Wrongful Acts of the Insured Person, all loss which such spouse becomes legally obligated to pay by reason of such Claim shall be treated for purposes of this Policy as Loss which the Insured Person becomes legally obligated to pay on account of the Claim made against the Insured Person.  All terms and conditions of this Policy, including without limitation the Retention Amount, applicable to Loss incurred by such Insured Person in the Claim shall also apply to such spousal loss.

The coverage extension afforded by this Subsection III.B. does not apply to the extent the Claim alleges any wrongful act or omission by the Insured Person's spouse.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

© 2000 The Travelers Companies, Inc.

## C. Automatic Discovery Period and Additional Extended Discovery Period

1. Automatic Discovery Period

   If the Insurer or the Insureds do not renew this Policy or if the Named Company terminates this Policy, the Insureds shall have the right to an extension of the coverage granted by this Policy for the period of sixty (60) days following the effective date of such nonrenewal or termination, herein called the Automatic Discovery Period, but only with respect to a Wrongful Act otherwise covered under this Policy taking place prior to the effective date of such nonrenewal or termination. Any Claim made during the Automatic Discovery Period shall be deemed to have been made during the Policy Period.

   The Insureds shall not be entitled to elect the Automatic Discovery Period under this Subsection III.C. if an extension of coverage is elected pursuant to Subsection VI.E.2 of this Policy.

2. Additional Extended Discovery Period

   If the Insurer or the Insureds do not renew this Policy or if the Named Company terminates this Policy, the Insureds shall have the right, upon payment of the additional premium described below, to an extension of the coverage granted by this Policy for the period set forth in Item 7(B) of the Declarations (Additional Extended Discovery Period), which shall not be less than ten months, following the effective date of such nonrenewal or termination, but only with respect to a Wrongful Act otherwise covered under this Policy taking place prior to the effective date of such nonrenewal or termination. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the Insureds to the Insurer within thirty (60) days following the effective date of termination or nonrenewal. Any Claim made during the Additional Extended Discovery Period shall be deemed to have been made during the Policy Period.

   The premium due for the Additional Extended Discovery Period shall equal that percent set forth in Item 7(A) of the Declarations of the original annualized premium and the fully annualized amount of any additional premiums charged by the Insurer for or during the Policy Period set forth in Item 4 of the Declarations. The entire premium for the Additional Extended Discovery Period shall be deemed fully earned and non-refundable upon payment.

   The Insureds shall not be entitled to elect the Additional Extended Discovery Period under this Subsection III.C. if an extension of coverage is elected pursuant to Subsection VI.E.2 of this Policy.

## IV. DEFINITIONS

When used in this Policy:

A. **Administration** means (i) counseling employees (except legal counsel), beneficiaries, or Plan participants with respect to any Plans, (ii) providing interpretations with respect to any Plan, (iii) handling records in connection with any Plan, or (iv) enrolling, terminating or canceling employees under any Plan.

B. **Application** means all signed applications, including attachments and materials submitted therewith, for this Policy or for any policy of which this Policy is a renewal or replacement. All such applications, attachments and materials are deemed attached to and incorporated into this Policy.

C. **Claim** means:

   1. a written demand against an Insured for monetary damages,

   2. a civil proceeding against an Insured commenced by the service of a complaint or similar pleading,

   3. a criminal proceeding against an Insured commenced by a return of an indictment,

*Provided for internal review purposes only. * This policy is neither issued nor certified. *

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

4. a formal civil administrative or regulatory proceeding against an Insured commenced by the Insured's receipt of a notice of charges, formal investigative order or similar document, or

5. any fact-finding investigation of an Insured by the Department of Labor or the Pension Benefit Guaranty Corporation,

for a Wrongful Act, including any appeal therefrom.

D. **Defense Costs** means that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Sponsor Company or Plans) incurred in defending or investigating Claims and the premium for appeal, attachment or similar bonds.

E. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

F. **Executive Officers**, either in the singular or plural, means the chairperson, president, chief executive officer, chief financial officer and in-house general counsel of the Sponsor Company and the trustees of the Plans.

G. **Financial Impairment** means the status of the Sponsor Company resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the Sponsor Company, or (2) the Sponsor Company becoming a debtor in possession.

H. **Insured Persons**, either in the singular or plural, means:

1. any one or more natural persons who were, now are or shall be duly elected or appointed directors, trustees, officers or employees of the Sponsor Company or any Plan, or

2. any other natural persons listed in Item 6 of the Declarations.

I. **Insureds**, either in the singular or plural, means:

1. the Sponsor Company,

2. the Plans, and

3. the Insured Persons.

J. **Interrelated Wrongful Acts** means all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

K. **Loss** means the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims in the Policy Period and the Automatic Discovery Period and the Additional Extended Discovery Period, if exercised, made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements and Defense Costs. Loss does not include (1) any amount for which the Insureds are absolved from payment, (2) the cost to comply with any injunctive or other non-monetary relief or any agreement to provide any such relief, or (3) matters uninsurable under the law pursuant to which this Policy is construed.

L. **Named Company** means the organization first named in Item 1 of the Declarations.

M. **Plan** means:

1. any employee benefit plan (as defined by ERISA) which is operated solely by the Sponsor Company or jointly by the Sponsor Company and a labor organization for the benefit of the employees of the

Sponsor Company located anywhere in the world, if such plan existed before the Policy Period or is afforded coverage pursuant to Subsection VI.E.1 of this Policy,

2. any other employee benefit plan not subject to Title 1 of ERISA sponsored solely by the Sponsor Company for the benefit of the employees of the Sponsor Company, if such plan existed before the Policy Period or is afforded coverage pursuant to Subsection VI.E.1 of this Policy,

3. any other employee benefit plan listed in Item 6 of the Declarations, or

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for employees of the Sponsor Company,

provided "Plan" shall not include any multiemployer plan or employee stock ownership plan (as defined in ERISA) unless such plans are specifically listed in Item 6 of the Declarations.

N. **Policy** means, collectively, the Declarations, the Application, this policy form and any endorsements hereto.

O. **Policy Period** means the period of time specified in Item 4 of the Declarations, subject to prior termination in accordance with Subsection VI.H. of this Policy.

P. **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. Pollutants shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products.

Q. **Sponsor Company** means, collectively, the organization(s) named in Item 1 of the Declarations and their Subsidiaries.

R. **Subsidiary**, either in the singular or plural, means any organization in which more than 50% of the outstanding voting securities representing the present right to vote for election of directors is owned, directly or indirectly, in any combination, by one or more Sponsor Companies.

S. **Wrongful Act** means:

1. any breach of the responsibilities, obligations or duties imposed upon Insureds in their capacity as fiduciaries of any Plan by ERISA or by the common or statutory law of the United States or any other jurisdiction anywhere in the world,

2. any other matter claimed against the Sponsor Company or an Insured Person solely because of their service as fiduciaries of any Plan, or

3. any negligent act, error or omission solely in the Administration of any Plan.

## V. EXCLUSIONS

### A. Exclusions

The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1. based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a renewal or replacement;

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

*Provided for internal review purposes only. * This policy is neither issued nor certified. *

2. based upon, arising out of, or attributable to any prior or pending litigation against any Insured as of the applicable Prior Litigation Date set forth in Item 8 of the Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

3. based upon, arising out of, or attributable to any actual or alleged obligation of an Insured under any law governing workers compensation, unemployment, social security or disability benefits, except the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended;

4. for discrimination in violation of any law other than ERISA;

5. for bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof, or for libel, slander, defamation of character or violation of a person's right of privacy;

6. based upon, arising out of, or attributable to (i) the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of Pollutants into or on real or personal property, water or the atmosphere; or (ii) any direction or request that the Sponsor Company or the Insured Persons test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or any voluntary decision to do so;

7. for any deliberately fraudulent act or omission or any willful violation of any statute or regulation if a judgment or other final adjudication adverse to such Insured establishes that such Insured committed such an act, omission or willful violation;

8. for liability of others assumed by the Insured under any contract or agreement, provided this exclusion shall not apply to the extent (i) the Insured would have been liable in the absence of such contract or agreement, or (ii) the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which the Plan was established; or

9. based upon, arising out of, or attributable to such Insured gaining in fact any personal profit, remuneration or financial advantage to which such Insured was not legally entitled.

10. to the extent such Loss constitutes criminal or civil fines or penalties imposed by law, taxes, punitive or exemplary damages, or the multiple portion of any multiplied damage award, provided this exclusion shall not apply to (i) the 20% or less civil penalties imposed upon an Insured under § 502 (l) of ERISA, or (ii) the 5% or less civil penalties imposed upon an Insured under § 502 (i) of ERISA to the extent state law other than New York is applicable and provides for the insurability of such civil penalties under § 502 (i) of ERISA and such civil penalties are insurable under applicable law;

11. to the extent such Loss constitutes (i) benefits due or to become due under any Plan, or (ii) benefits which would be due under any Plan if such Plan complied with all applicable law, or (iii) that portion of any settlement or judgment which constitutes benefits; provided, this exclusion does not apply to the extent that recovery for such benefits is based upon a covered Wrongful Act by an Insured Person and such benefits are payable as a personal obligation of such Insured Person; or

12. to the extent such Loss constitutes contributions owed by the Sponsor Company to any Plan for which any of the Insureds failed to collect, unless such failure is because of the negligence of an Insured.

## B. Severability of Exclusions

No fact pertaining to or knowledge possessed by any Insured Person shall be imputed to any other Insured Person for purposes of applying the exclusions set forth in this Section V. Only facts pertaining to or knowledge possessed by an Executive Officer shall be imputed to the Sponsor Company or Plan for purposes of applying the exclusions set forth in this Subsection V.

# VI. GENERAL CONDITIONS AND LIMITATIONS

## A. Limit of Liability and Retention

For the purposes of this Policy, all Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed one Claim, and such Claim shall be deemed to be first made on the date the earliest of such Claims is first made against them, regardless of whether such date is before or during the Policy Period.

Except as otherwise provided in this Subsection VI.A., the Insurer's maximum liability for all Loss on account of all Claims first made during the same Policy Period shall be the Limit of Liability for each Policy Period set forth in Item 3 of the Declarations. Defense Costs shall be part of and not in addition to such Limit of Liability, and Defense Costs shall reduce such Limit of Liability.

For purposes of this Subsection VI.A., the applicable Limit(s) of Liability for the Automatic Discovery Period and the Additional Extended Discovery Period, if exercised, shall be part of and not in addition to the applicable Limit(s) of Liability for the Policy Period. The purchase of the Additional Extended Discovery Period shall not increase or reinstate the Limit(s) of Liability set forth in Item 3 of the Declarations, which shall be the maximum liability of the Insurer for all Loss on account of all Claims first made during such Policy Period and Additional Extended Discovery Period, combined.

Except as otherwise provided in this Subsection VI.A., the Insurer's liability with respect to Loss arising from each Claim shall apply only to that part of Loss which is excess of the applicable Retention Amount set forth in Item 5 of the Declarations and such Retention Amount shall be borne by the Sponsor Company and Plan uninsured and at their own risk.

The Retention Amount for non-indemnifiable Loss set forth in Item 5(A) of the Declarations shall apply to Loss incurred by any Insured Person for which the Sponsor Company either (1) is not permitted or required by common or statutory law to indemnify, or (2) is permitted or required to indemnify but does not do so by reason of its Financial Impairment. The Retention Amount for indemnifiable Loss set forth in Item 5(B) of the Declarations shall apply to all other Loss.

If Loss arising from a single Claim is subject in part to the Retention Amount set forth in Item 5(A) and in part to the Retention Amount set forth in Item 5(B) of the Declarations, the applicable Retention Amounts shall be applied separately to each part of such Loss, but the largest applicable Retention Amount set forth in Item 5 of the Declarations shall be the maximum Retention Amount applicable to all Loss on account of such Claim.

## B. Notice

The Insureds shall, as a condition precedent to their rights under this Policy, give to the Insurer or to any licensed agent of the Insurer in the State of New York, with particulars sufficient to identify the Insureds and this Policy, written notice of any Claim made against the Insureds as soon as reasonably possible and during (i) Policy Period; (ii) the Automatic Discovery Period; or, if exercised, (iii) the Additional Extended Discovery Period.

If during the Policy Period, the Automatic Discovery Period or the Additional Extended Discovery Period (if exercised), the Insureds become aware of circumstances which could give rise to a Claim for a Wrongful Act taking place before or during the Policy Period and give written notice of such circumstances and the other information referenced below to the Insurer or to any licensed agent of the Insurer in the State of New York, with particulars sufficient to identify the Insureds and this Policy, during the Policy Period, the Automatic Discovery Period or the Additional Extended Discovery Period (if exercised), then any Claims subsequently arising from such circumstances shall be considered to have been first made during the Policy Period, the Automatic Discovery Period or the Additional Extended Discovery Period, in which the circumstances were first reported to the Insurer or to any licensed agent of the Insurer in the State of New York.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

The Insureds shall, as a condition precedent to exercising their rights under this Policy, (1) include within any notice of Claim or circumstance a description of the Claim or circumstances, the nature of the alleged Wrongful Act, the nature of the alleged or potential damage, the names of actual or potential claimants and Insureds involved, and the manner in which the Insureds first became aware of the Claim or circumstances, and (2) give to the Insurer such other information and cooperation as the Insurer may reasonably request.

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or fax properly addressed to the appropriate party. Notice to the Insureds may be given to the Named Company at the address shown in Item 1 of the Declarations. Notice to the Insurer of any Claim or circumstance shall be given to St. Paul Travelers, 233 Broadway, 26th Floor, New York, New York 10279, Attention: Professional E&O Claim Unit [telephone number (212) 898-9200], or to any licensed agent of the Insurer in the State of New York, with full particulars sufficient to identify the Insureds and this Policy. All other notices to the Insurer under this Policy shall be given to the same addressee but at 385 Washington Street, St. Paul, MN 55102-1396, to the attention of the Financial and Professional Services Unit. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

## C. Defense and Settlement

The Insurer may, with the consent of the Named Company, settle any Claim for any monetary amount that the Insurer deems reasonable. If the Named Company withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer to the Named Company. The Insurer's duty to defend, if elected as provided in Item 2 of the Declarations, shall cease with respect to such Claim as of such date, and the Insureds shall thereafter have the duty to defend such Claim.

The Insurer shall be entitled to the Insureds' full cooperation, and all information and particulars it may request from the Insureds in order to conduct its investigation or to reach a settlement of a Claim or, if the Insurer duty-to-defend option is elected as provided in Item 2 of the Declarations, to defend a Claim. The Insureds agree that in the event of a Claim, the Insureds will do nothing that may prejudice the Insurer's position or its potential or actual rights of recovery.

The Insureds shall not incur any Defense Costs, settle or offer to settle any Claim, assume any contractual obligation, admit liability, voluntarily make any payment or confess or otherwise consent to any damages or judgments with respect to any Claim covered by this Policy without the written consent of the Insurer, which shall not be unreasonably withheld. The Insurer shall not be liable for any Defense Costs, settlement, assumed obligation, admitted liability, voluntary payment, or confessed damages or judgment to which it has not consented.

If the Insurer duty-to-defend option is not elected as provided in Item 2 of the Declarations, then the Insurer shall advance on behalf of the Insureds covered Defense Costs which the Insureds have incurred in connection with Claims made against them, prior to disposition of such Claims, provided that to the extent it is finally established that any such Defense Costs are not covered under this Policy, the Insureds, severally according to their interests, agree to repay the Insurer such Defense Costs.

The Insurer shall have the right to appeal any judgment with respect to any Claim covered in whole or in part by this Policy but the expense of appealing such judgment shall be part of Defense Costs as defined herein.

Except as otherwise provided in this Subsection VI.C., the Insurer duty-to-defend option, if elected as provided in Item 2 of the Declarations, ceases upon exhaustion of the applicable Limit of Liability as stated in Item 3 of the Declarations, by the payment of Loss and the Insurer shall not be liable for any Defense Costs incurred after such exhaustion of the applicable Limit of Liability, whether or not Defense Costs coverage is within the Limit of Liability.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

If the Insurer's duty to defend ceases with respect to any Claim(s) as provided in this Subsection VI.C., the Insurer shall notify the Sponsor Company of such Claim(s) so that the Sponsor Company can arrange to take control of their defense. The Insurer agrees to take whatever steps are necessary to avoid a default judgment during a transfer of control of the defense of any outstanding Claim. If the Insurer does so, the Insureds agree to repay the reasonable expenses incurred by the Insurer during the transfer and further agree that, in undertaking the steps necessary to avoid a default judgment during the transfer, the Insurer has not waived or given up any rights under this Policy.

## D. Other Insurance

When both this Policy and any other insurance or self insurance apply to a Claim on the same basis, whether primary, contributory, contingent or excess, the Insurer shall not be liable under this Policy for a greater proportion of Loss than the applicable Limit of Liability under this Policy bears to the total applicable limit(s) of liability of all valid and collectible insurance against such Claim. Subject to the foregoing, in the event a Claim is made involving two or more policies, each of which provides that its insurance is excess, this Policy will contribute pro rata with such other insurance.

## E. Changes in Exposure

1. Acquisition or Creation of Another Organization or Plan

   If during the Policy Period the Sponsor Company:

   (a) acquires securities in another organization or creates another organization, which as a result of such acquisition or creation becomes a Subsidiary,

   (b) acquires any organization by merger into or consolidation with the Company, or

   (c) creates a Plan,

   such organization, Plan and their Insureds shall be covered under this Policy as follows:

   If the fair value of all cash, securities, assumed indebtedness and other consideration paid by the Sponsor Company for any such acquisition or creation is less than 20% of the total assets of all of the Sponsor Companies as reflected in the Sponsor Companies' most recent financial statements as of the inception of the Policy Period, such organization, Plan and their Insureds shall automatically be covered under this Policy, but only with respect to Wrongful Acts taking place after such acquisition or creation, unless the Insurer agrees after presentation of a complete application and all appropriate information to provide coverage by endorsement for Wrongful Acts taking place prior to such acquisition or creation.

   With respect to all other acquisitions or creations described in subparts (a), (b) or (c) above, such organization, Plan and their Insureds shall automatically be covered under this Policy, but only for ninety (90) days or the remainder of the Policy Period, whichever is less, following the effective date of such acquisition or creation ("Automatic Coverage Period") and only with respect to Wrongful Acts taking place after such acquisition or creation. The Named Company, as a condition precedent to further coverage with respect to such organization, Plan or their Insureds after such Automatic Coverage Period, shall give written notice of such acquisition or creation to the Insurer as soon as practicable but in no event later than forty-five (45) days following the effective date of such acquisition or creation, and shall thereafter promptly provide to the Insurer such information as the Insurer may request. Upon receipt of such notice and other information, the Insurer shall promptly provide to the Named Company a quotation for coverage under this Policy for such organization, Plan and their Insureds for the remainder of the Policy Period. If the Named Company fails to comply with such condition precedent, or if within thirty (30) days following receipt of such quotation the Named Company fails to pay any additional premium or fails to agree to any additional coverage terms and conditions as set forth in such quotation, coverage otherwise afforded by this Subsection VI.E.1 for

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

such organization, Plan and their Insureds shall terminate upon expiration of such Automatic Coverage Period.

Notwithstanding the foregoing, no coverage shall be afforded by this Subsection VI.E.1. with respect to any multiemployer plan or employee stock ownership plan (as defined in ERISA) or its Insureds unless such coverage is specifically granted by endorsement to this Policy.

2. Acquisition of Named Company

If during the Policy Period:

(a) the Named Company merges into or consolidates with another organization, or

(b) another organization or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Named Company,

coverage under this Policy shall continue until termination of this Policy but only with respect to Claims against those who were Insureds before such merger, consolidation, or acquisition, for Wrongful Acts taking place prior to such merger, consolidation, or acquisition. As of the effective date of such merger, consolidation, or acquisition, all premiums paid or due at any time under this Policy shall be deemed fully earned and non-refundable.

The Named Company shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable, together with such information as the Insurer may request. Upon receipt of such notice and information and at the request of the Named Company, the Insurer shall promptly provide to the Named Company a quotation for a three-year (or such lesser or greater period as may be negotiated with the Insurer) extension of coverage with respect to Claims for Wrongful Acts taking place prior to such merger, consolidation, or acquisition. Any coverage extension pursuant to such quotation shall be conditioned upon the Insureds, within sixty (60) days after receipt of such quotation: (i) giving to the Insurer written notice of their desire to elect such extended coverage; (ii) paying any additional premium required by the Insurer, which shall be deemed fully earned upon inception of such coverage extension; and (iii) accepting any additional terms and conditions required by the Insurer.

Such coverage extension shall not increase or reinstate the maximum Limit of Liability set forth in Item 3 of the Declarations and the Limit of Liability for such coverage extension shall be part of and not in addition to the Limit of Liability for the Policy Period.

The Insureds shall not be entitled to elect an extension of coverage under this Subsection VI.E.2 if a Discovery Period is elected pursuant to Subsection III.C of this Policy.

3. Cessation of Subsidiaries

If before or during the Policy Period an organization ceases to be a Subsidiary, coverage with respect to such Subsidiary and its Insureds shall continue until termination of this Policy but only with respect to Claims for Wrongful Acts taking place prior to the date such organization ceased to be a Subsidiary.

4. Termination of Plan

If before or during the Policy Period a Plan is terminated, coverage with respect to such Plan and its Insureds shall continue until termination of this Policy. Such coverage continuation shall apply with respect to Claims for Wrongful Acts taking place prior to or after the date the Plan was terminated.

## F. Representations and Severability

*Provided for internal review purposes only. * This policy is neither issued nor certified. *

In granting coverage under this Policy, the Insurer has relied upon the statements and representations in the Application and upon any declarations and statements in the written application submitted to another insurer in respect of the prior coverage incepting as of the Continuity Date set forth in Item 9 of the Declarations. The Insureds represent that all such statements and representations are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth thereof.

The Insureds agree that in the event any such statements or representations are untrue, this Policy shall not afford any coverage with respect to any of the following Insureds:

1. any Insured Person who knew the facts that were not truthfully disclosed in the Application,

2. the Sponsor Company and the Plan if any Executive Officer knew the facts that were not truthfully disclosed in the Application.

whether or not such Insured Person or Executive Officer knew of such untruthful disclosure in the Application.

## G.  Territory and Valuation

Coverage under this Policy shall extend to Wrongful Acts taking place or Claims made anywhere in the world.

All premiums, limits, retentions, Loss, Defense Costs, and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of Loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, the amount of settlement is agreed upon or the other element of Loss is due, respectively.

## H.  Cancellation and Non-renewal

a.  Cancellation

This Policy may be canceled by the Named Company at any time by delivering to the Insurer at the address shown in Subsection VI.B., or by delivering to any licensed agent of the Insurer in the State of New York, with particulars sufficient to identify the Insureds and this Policy, written notice stating when the cancellation shall be effective, provided this Policy may not be canceled by the Named Company after the effective date of the Named Company merger, consolidation or acquisition as described in Subsection VI. E 2.

This Policy is non-cancelable by the Insurer during the Policy Period or any Extended Reporting Period, except for non-payment of premium. This Policy may be canceled by the Insurer for failure to pay a premium when due, by giving to the Named Company, at the address as shown in Item 1 of the Declarations, and to the Named Company's authorized agent or broker, written notice stating when, not less than fifteen (15) days thereafter, the cancellation shall be effective. The cancellation shall not be effective if the premium is paid within such fifteen (15) day period. The notice of cancellation shall contain the reason for the cancellation.

The Insurer shall refund the unearned premium computed at a customary short rate if this Policy is canceled by the Named Company, except as otherwise provided in part b. "Non-renewal" of this Subsection. Under any other circumstances the refund shall be computed pro rata. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of such cancellation, but such payment shall be made as soon as practicable.

b.  Non-renewal

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

© 2000 The Travelers Companies, Inc.

If the Insurer non-renews this Policy (note: when used in this Subsection VI. H. b. the term "non-renewal" means "not to issue or not to offer to issue by the insurer a policy superseding a policy previously issued and delivered by the same insurer"), or if the Insurer renews this Policy subject to:

- a change in the type of coverage;
- a decrease in the Limit of Liability;
- a reduction of coverage;
- an increased retention;
- an addition of an exclusion; or
- an increase in premium in excess of 10%, exclusive of any premium increase due to and commensurate with an increase in exposure units, or as a result of experience rating, loss rating, retrospective rating or audit;

the Insurer shall give written notice of the non-renewal or the conditional renewal to the Named Company, at the address as shown in Item 1 of the Declarations, and to the Named Company's authorized agent or broker, at least 60 but not more than 120 days before the expiration date of the Policy Period. Such notice shall (i) include the specific reason(s) for non-renewal or conditional renewal, including the amount of any premium increase for conditional renewal and a description of any other changes, and (ii) advise the Insureds of the availability of the following loss information under this Policy within twenty days after the Named Company or the Named Company's authorized agent or broker, gives to the Insurer a written request for such information.

Upon receipt of such request, the Insurer shall deliver the following loss information covering a period of years specified by the New York Superintendent of Insurance by regulation or the period of time fiduciary liability coverage has been provided by the Insurer to the Insureds, whichever is less:

(i) information on closed Claims against the Insureds, including date and description of occurrence, and any payments;

(ii) information on open Claims against the Insureds, including date and description of occurrence, and amounts of any payments; and

(iii) information on notice of any occurrences submitted under this Policy by the Insureds to the Insurer, including date and description of occurrence.

The Insurer may charge a reasonable fee as determined by the New York Superintendent of Insurance for providing such information, except that the Insurer may not charge a fee for providing any information which the Insurer is otherwise required to provide to the Insureds even in the absence of a request.

If the Insurer violates the above provisions by sending a late or an incomplete non-renewal or conditional renewal notice prior to the expiration of the Policy Period, coverage will remain in effect under this Policy at the same terms and conditions and the Policy Period shall be extended to 60 days after such notice is delivered, unless the Named Company, during such 60 day period, has replaced or elects to cancel this Policy, in which case any return premium due the Named Company will be computed on a pro rata basis. Such coverage extension shall be subject to and conditioned upon the Insureds paying to the Insurer an additional premium equal to the pro rata daily premium, applying the lower of the current rates or the immediately preceding Policy Period's rates, multiplied by the number of days the coverage is extended.

If the Insurer violates any of the above provisions by sending a late or an incomplete non-renewal or conditional renewal notice on or after the expiration of the Policy Period, coverage will remain in effect under this Policy at the same terms and conditions for another Policy Period, unless the Named Company, during this additional Policy Period, has replaced or elects to cancel this Policy, in which case any return premium due the Parent Company will be computed on a pro rata basis. Such coverage extension shall be subject to and conditioned upon the Insureds paying to the Insurer an additional premium equal to the pro rata daily premium for the current or immediately preceding Policy Period, whichever is less, multiplied by the number of days the coverage is extended.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

The Insurer shall not be required to send notice of non-renewal or conditional renewal if the Named Company, or its authorized agent or broker or another insurer of the Named Company, gives written notice to the Insurer that this Policy has been replaced or is no longer desired.

## I. Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the Sponsor Company's, the Plan's and the Insured Persons' rights of recovery. The Sponsor Company, the Plan and the Insured Persons shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Insureds.

## J. Action Against the Insurer

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all terms of this Policy. No person or organization shall have any right under this Policy to join the Insurer as a party to any action against Insureds to determine the Insured's liability nor shall the Insurer be impleaded by the Insureds or their legal representatives. Bankruptcy or insolvency of an Insured or of the estate of any Insured Person shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

## K. Authorization Clause

By acceptance of this Policy, the Named Company agrees to act on behalf of the Insureds with respect to the giving and receiving of notice of Claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this Policy, the agreement to and acceptance of endorsements and the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for the Discovery Period), and the Insureds agree that the Named Company shall act on their behalf.

## L. Alteration and Assignment

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy signed by an authorized representative of the Insurer.

## M. Arbitration

Only if requested by the Insureds, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree, the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel shall consist of one arbitrator selected by the Insureds, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

*\* Provided for internal review purposes only. \* This policy is neither issued nor certified. \**

© 2000 The Travelers Companies, Inc.

The following spaces preceded by an (*) need not be completed if this endorsement or rider and the Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE POLICY |
|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 |

* ISSUED TO

**Ambac Financial Group, Inc.**

## NEW YORK AMENDATORY ENDORSEMENT
## FL264 Ed. 9/99

In consideration of the premium charged, it is understood and agreed that this Policy is amended as follows:

1. Subsection III. C. is amended to read in its entirety as follows:

   **C. Automatic Discovery Period and Additional Extended Discovery Period.**

   Upon Termination of Coverage, the Insureds shall have the right to an Automatic Discovery Period and an Additional Extended Discovery Period as follows:

   1. Automatic Discovery Period

      The Insureds shall have the right to an extension of the coverage granted by this Policy for the period of sixty (60) days following the effective date of such Termination of Coverage, herein called the Automatic Discovery Period, but only with respect to a Wrongful Act otherwise covered under this Policy taking place prior to the effective date of such Termination of Coverage. Any Claim made during the Automatic Discovery Period shall be deemed to have been made during the Policy Period.

      The Insureds shall not be entitled to an Automatic Discovery Period under this Subsection III.C. if an extension of coverage is elected pursuant to Subsection VI.E.2 of this Policy.

      The Limit of Liability for the Automatic Discovery Period shall be part of and not in addition to the Limit of Liability for the Policy Period. The Automatic Discovery Period shall not increase or reinstate the Limit of Liability set forth in Item 3 of the Declarations, which shall be the maximum liability of the Insurer for all Loss on account of all Claims made during such Policy Period and the Automatic Discovery Period, combined.

   2. Additional Extended Discovery Period

      Upon payment of the additional premium described below, there shall be an extension of the coverage granted by this Policy for the period set forth in Item 7(B) of the Declarations, which shall not be less than ten months, herein called the Additional Extended Discovery Period, following the effective date of such Termination of Coverage, but only with respect to a Wrongful Act otherwise covered under this Policy taking place prior to the effective date of such Termination of Coverage. Any Claim made during the Additional Extended Discovery Period shall be deemed to have been made during the Policy Period.

      If the current fiduciary liability claims-made relationship between the Insurer and the Insureds has continued for less than one year, the Insureds shall not be entitled to an Additional Extended Discovery Period if this Policy is canceled by the Insurer for non-payment of premium.

      The Insureds shall not be entitled to an Additional Extended Discovery Period under this Subsection III.C. if an extension of coverage is elected pursuant to Subsection VI.E. 2 of this Policy.

      The Limit of Liability for the Additional Extended Discovery Period shall be part of and not in addition to the Limit of Liability for the Policy Period. The Additional Extended Discovery Period

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

© 1999 The St. Paul Travelers Companies, Inc. All Rights Reserved

shall not increase or reinstate the Limit of Liability set forth in Item 3 of the Declarations, which shall be the maximum liability of the Insurer for all Loss on account of all Claims made during such Policy Period and the Additional Extended Discovery Period, combined.

3. Notice to Insurer

If the current fiduciary liability claims-made relationship between the Insurer and the Insureds has continued for less than one year, then as a condition precedent to the right to purchase the Additional Extended Discovery Period, the total premium for this Policy must have been paid. The right to purchase the Additional Extended Discovery Period shall end unless written notice and full payment of the premium for such period is received by the Insurer within the greater of either sixty days from the effective date of the Termination of Coverage, or thirty days from the date of mailing or delivery of the written notice provided pursuant to Subsection III.C. 4. below.

4. Notice to Named Company

The Insurer must provide written notice advising the Named Company of the Automatic Discovery Period and the availability of, the premium for, and the importance of, purchasing the Additional Extended Discovery Period. Such notice must be mailed or delivered no earlier than the effective date of the Termination of Coverage, nor later than 30 days after the effective date of the Termination of Coverage. However, if the current fiduciary liability claims-made relationship between the Insurer and the Insureds has continued for less than one year, the Insurer shall not be required to provide such written notice upon cancellation of coverage for nonpayment of premium.

5. Additional Premium

The premium due for the ten month Additional Extended Discovery Period shall equal 75%, as set forth in Item 7(A) of the Declarations, of the original annualized premium and the fully annualized amount of any additional premiums charged by the Insurer for or during the Policy Period set forth in Item 4 of the Declarations.

The premium due for an Additional Extended Discovery Period that is greater than ten months shall equal that percent set forth in Item 7(A) of the Declarations of the original annualized premium and the fully annualized amount of any additional premiums charged by the Insurer for or during the Policy Period set forth in Item 4 of the Declarations.

The entire premium for the Additional Extended Discovery Period shall be deemed fully earned and non-refundable upon payment.

6. Reduction in Coverage

If the Automatic Discovery Period or the Additional Extended Discovery Period is available as a result of a reduction in coverage as described in Subsection IV., the definition of "Termination of Coverage", as amended by this endorsement, the coverage afforded under this Subsection III.C. is further limited only to the coverage which was reduced and, notwithstanding Subsection III.C. 5. above, the Additional Extended Discovery Period coverage is available only upon payment of an additional premium to be determined by the Insurer using the rates in effect as of the inception of this Policy.

7. Liquidation or Bankruptcy of the Named Company

If the Named Company has been placed in liquidation or bankruptcy or permanently ceases operation and the Named Company or its designated trustee does not purchase the Additional Extended Discovery Period, an Insured(s) may submit a written request to the Insurer for the Additional Extended Discovery Period coverage within 120 days following the effective date of the Termination of Coverage. The Insurer shall have no obligation to provide any notice to any such Insured(s) of the availability of the Additional Extended Discovery Period coverage and, notwithstanding Subsection III.C. 5 above, the Insurer may charge any such Insured(s) for whom the Additional Extended Discovery Period coverage is provided a premium commensurate with such coverage.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

© 1999 The St. Paul Travelers Companies, Inc. All Rights Reserved

2. The following definition is added to Section IV. Definitions:

**Termination of Coverage** means

1. the Named Company or the Insurer canceling or failing or refusing to renew this Policy, or

2. decrease in limit of liability, reduction of coverage, increased retention, new exclusion, or any other change in coverage under this Policy less favorable to the Insureds, whether such decrease in limit of liability, reduction of coverage, increased retention, new exclusion, or any other change in coverage under this Policy less favorable to the Insureds occurs at renewal of this Policy or at any other time during the Policy Period.

3. Subpart 2 of Subsection VI.E. is amended to read in its entirety as follows:

2. Acquisition of Named Company

If during the Policy Period:

(a) the Named Company merges into or consolidates with another organization, or

(b) another organization, or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Named Company,

coverage under this Policy shall continue until termination of this Policy but only with respect to Claims for Wrongful Acts taking place prior to such merger, consolidation or acquisition. As of the effective date of such merger, consolidation or acquisition, all premiums paid or due at any time under this Policy shall be deemed fully earned and non-refundable.

The Named Company shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may request. Upon receipt of such notice and information and at the request of the Named Company, the Insurer shall promptly provide to the Named Company a quotation for a three-year (or such lesser or greater period as may be negotiated with the Insurer) extension of coverage with respect to Claims for Wrongful Acts taking place prior to such merger, consolidation or acquisition. Any coverage extension pursuant to such quotation shall be conditioned upon the Insureds, within sixty (60) days after receipt of such quotation or (ii) 30 days from the date of mailing or delivery of such quotation, whichever is greater: (i) giving to the Insurer written notice of their desire to elect such extended coverage; (ii) paying any additional premium required by the Insurer, which shall be deemed fully earned upon inception of such coverage extension, and (iii) accepting any additional terms and conditions required by the Insurer.

Such coverage extension shall not increase or reinstate the maximum Limit of Liability set forth in Item 3 of the Declarations and the Limit of Liability for such coverage extension shall be part of and not in addition to the Limit of Liability for the Policy Period.

The Insureds shall not be entitled to elect an extension of coverage under this Subsection VI.E. 2 if a Discovery Period is elected pursuant to Subsection III.C of this Policy.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

_____
Authorized Representative

© 1999 The St. Paul Travelers Companies, Inc. All Rights Reserved

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

The following spaces preceded by an (*) need not be completed if this endorsement or rider and the Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE POLICY |
|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 |

* ISSUED TO
Ambac Financial Group, Inc.

## NEW YORK NOTICE CONCERNING DEFENSE EXPENSES WITHIN POLICY LIMITS AND RETENTION APPLYING TO DEFENSE EXPENSES
### FL265 Ed. 9/99

The Insureds are aware that the Policy Retention Amount applies to Defense Costs and that the Policy's Limit of Liability listed in Item 3 of the Declarations shall be reduced, and may be completely exhausted, by Defense Costs and, to the extent that the Policy Limit of Liability is hereby exceeded, the Insurer shall not be liable for Defense Costs or for the amount of Loss, including damages, judgments or settlements.

The Insureds acknowledge having read the above notice.

Acknowledged by:

Name _____

Title _____

on behalf of the Insureds.

Dated _____

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

Authorized Representative

INSURED

© 1999 The St. Paul Travelers Companies, Inc. All Rights Reserved

| ATTACHED TO AND FORMING PART OF BOND OR POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER | |
|---|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 | 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE BOND OR POLICY |

\* ISSUED TO

**Ambac Financial Group, Inc.**

## COMPLIANCE FEE COVERAGE FOR VOLUNTARY COMPLIANCE PROGRAM ENDORSEMENT (INCLUDING THE TAX SHELTERED ANNUITY VOLUNTARY CORRECTION PROGRAM)
### (for use with FL263 Ed. 03-00)
### MEL5632 Ed. 12-07

In consideration of the premium charged, it is hereby understood and agreed that this Policy is amended as follows:

1.  Only for purposes of coverage under this Endorsement, the following is added to Item 3 of the Declarations:

    **Item 3. Sublimit of Liability under the Compliance Fees Coverage Insuring Agreement**:

    $100,000        Each Policy Period, which shall be part of, and not in addition to, the Limit of Liability applicable to all other Insuring Agreements under this Policy.
    ***Note that the Limit of Liability and any Retention are reduced or exhausted by Defense Costs***

2.  The following is added to Section I - Insuring Agreement:

    **Compliance Fees Coverage**

    The Insurer shall pay on behalf of the Insureds Compliance Fees which are incurred by the Insureds on account of any Voluntary Compliance Program initiated during the Policy Period or during the Discovery Period, for a Wrongful Act taking place before or during the Policy Period by an Insured or by any person for whose Wrongful Acts the Insured is legally responsible.

    The Insurer shall not be liable under any other Insuring Agreement under this Policy for Compliance Fees on account of any Voluntary Compliance Program.

3.  When used in this Endorsement:

    a.  **Compliance Fees**, either in the singular or plural, means the "VCR compliance fee", or the "compliance correction fee", paid to the Internal Revenue Service by the Insureds on account of any Voluntary Compliance Program. Compliance Fees do not include (i) attorneys' fees or costs in investigating or defending claims leading to a Voluntary Compliance Program, or (ii) the amount of any corrective contributions or payments, or earnings thereon, made on account of a Voluntary Compliance Program.

    b.  **Voluntary Compliance Program**, either in the singular or plural, means the Voluntary Compliance Resolution ("VCR") Program or the Walk-In Closing Agreement Program ("Walk-In CAP"), both as described in the Employee Plans Compliance Resolution System ("EPCRS"), IRS Rev. Proc. 98-22, as amended, or the Tax Sheltered Annuity Voluntary Correction Program ("TVC"), or the Delinquent Filer Voluntary Compliance Program (DFVC) for a Wrongful Act involving the actual or alleged noncompliance by any Plan with any statute, rule or regulation.

    c.  **Endorsement** means this Compliance Fee Coverage For Voluntary Compliance Program Endorsement, and any endorsements amending this Endorsement.

4.  Only for purposes of coverage under this Endorsement, the definitions in Section IV of this Policy of the following terms (wherever used in this Policy including this Endorsement) are amended to read in their entirety as follows:

© 2007 The Travelers Companies, Inc.

\* *Provided for internal review purposes only.* \* *This policy is neither issued nor certified.* \*

**Claim** means a Voluntary Compliance Program.

**Loss** means Compliance Fees.

5.  Only for purposes of coverage under this Endorsement, the following exclusions are added to Section V. A.:

The Insurer shall not be liable for Loss on account of any Voluntary Compliance Program:

based upon, arising out of, or attributable to any Wrongful Act taking place prior to                    ;

based upon, arising out of, or attributable to a Plan which, as of the earlier of the inception of this Policy or inception of the first policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a renewal or replacement, any Insured knew to be actually or allegedly noncompliant with any applicable statute, rule or regulation;

6.  Notwithstanding anything in Subsection VI. A. of this Policy to the contrary:

a.  The Insurer's maximum liability under the Compliance Fees Coverage Insuring Agreement for all Compliance Fees on account of all Voluntary Compliance Programs initiated during the same Policy Period shall be the Limit of Liability for the Compliance Fees Coverage Insuring Agreement set forth in Item 3 of the Declarations as amended by this Endorsement. Such Limit of Liability is a sublimit which further limits and does not increase the Insurer's maximum liability under this Policy. Any Compliance Fees paid by the Insurer under the Compliance Fees Coverage Insuring Agreement shall reduce or exhaust the Limit of Liability applicable to all other Insuring Agreements.

7.  Only for purposes of coverage under this Endorsement, the phrases "any Claim made against any Insured" or "Claim made against the Insureds", wherever used in this Policy, are amended to read in each of their entirety "any Voluntary Compliance Program".

*Provided for internal review purposes only. * This policy is neither issued nor certified. *

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Bond or Policy, other than as above stated.

By _____

_____
Authorized Representative

**INSURED**

© 2007 The Travelers Companies, Inc.

The following spaces preceded by an (*) need not be completed if this endorsement or rider and the Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE POLICY |
|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 |

* ISSUED TO

**Ambac Financial Group, Inc.**

**AMEND DEFINITION OF CLAIM AND SUBSECTION A (10) OF SECTION V. EXCLUSIONS REGARDING FINES AND PENALTIES**

**(For Use with FL263)**

**MEL1223 Ed. 10-03**

In consideration of the premium charged, it is hereby understood and agreed that this Policy is amended as follows:

1.  The following replaces subpart 5. of Section **IV. DEFINITIONS**, C. **Claim**, of this Policy:

    5.  any fact-finding investigation of an Insured by: (i) the Department of Labor, (ii) the Pension Benefit Guaranty Corporation, (iii) the Pensions Ombudsman appointed by the Secretary of State for Social Services, or (iv) the Occupational Pensions Regulatory Authority or any successor body to such Authority,

2.  Subpart 10 of Section **V. EXCLUSIONS**, A. **Exclusions**, is replaced by the following:

    10. to the extent such Loss constitutes criminal or civil fines or penalties imposed by law, taxes, punitive or exemplary damages, or the multiple portion of any multiplied damage award;

    provided this exclusion shall not apply to:

    (i)   the 5% or less, or the 20% or less, civil penalties imposed upon an Insured under § 502 (i) or (l), respectively, of ERISA;

    (ii)  civil penalties imposed by the Pension Ombudsman of England and the Occupational Pensions Regulatory Authority of England pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, and rules and regulations thereunder, provided that the funds or assets of the pension scheme shall not be used to fund, pay or reimburse the premium for this coverage or any portion thereof; or

    (iii) punitive or exemplary damages;

    to the extent that: (a) this Policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to the laws of any jurisdiction other than New York, and (b) such civil penalties or such punitive or exemplary damages are insurable under the laws of such jurisdiction.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

                                    Authorized Representative

**INSURED**

© 2003 The St. Paul Travelers Companies, Inc.  All Rights Reserved

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

| ATTACHED TO AND FORMING PART OF POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE POLICY |
|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 |

* ISSUED TO

Ambac Financial Group, Inc.

## AMEND SUBSECTION VI.B. NOTICE - NEW YORK
## (For use with FL263 Rev. 03/00)
## MEL1445 Ed. 03-04

In consideration of the premium charged, it is understood and agreed that Subsection VI.B., Notice, is amended to read in its entirety as follows:

The Insureds shall, as a condition precedent to their rights under this Policy, give to the Insurer or to any licensed agent of the Insurer in the State of New York, with particulars sufficient to identify the Insureds and this Policy, written notice of any Claim made against the Insureds as soon as reasonably possible after the Risk Manager or General Counsel of the Sponsor Company first learns of such Claim and during the (i) Policy Period; (ii) the Automatic Discovery Period; or, if exercised, (iii) the Additional Extended Discovery Period.

If during the Policy Period, the Automatic Discovery Period or the Additional Extended Discovery Period (if exercised), the Risk Manager or General Counsel of the Sponsor Company become aware of circumstances which could give rise to a Claim for a Wrongful Act taking place before or during the Policy Period and give written notice of such circumstances and the other information referenced below to the Insurer or to any licensed agent of the Insurer in the State of New York, with particulars sufficient to identify the Insureds and this Policy, during the Policy Period, the Automatic Discovery Period or the Additional Extended Discovery Period (if exercised), then any Claims subsequently arising from such circumstances shall be considered to have been first made during the Policy Period, the Automatic Discovery Period or the Additional Extended Discovery Period, in which the circumstances were first reported to the Insurer or to any licensed agent of the Insurer in the State of New York.

The Insureds shall, as a condition precedent to exercising their rights under this Policy, (1) include within any notice of Claim or circumstance a description of the Claim or circumstances, the nature of the alleged Wrongful Act, the nature of the alleged or potential damage, the names of actual or potential claimants and Insureds involved, and the manner in which the Insureds first became aware of the Claim or circumstances, and (2) give to the Insurer such other information and cooperation as the Insurer may reasonably request.

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or fax properly addressed to the appropriate party. Notice to the Insureds may be given to the Named Company at the address shown in Item 1 of the Declarations. Notice to the Insurer of any Claim or circumstance shall be given to St. Paul Travelers, Attention: Professional E&O Claim Unit, 233 Broadway, 26th Floor, New York, New York 10279, [telephone number (212) 898-9200], or to any licensed agent of the Insurer in the State of New York, with full particulars sufficient to identify the Insureds and this Policy. All other notices to the Insurer under this Policy shall be given to the same addressee but at 385 Washington Street, St. Paul, MN 55102-1396, to the attention of the Financial and Professional Services Unit. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

Authorized Representative

INSURED

© 2004 The St. Paul Travelers Companies, Inc. All Rights Reserved

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

| ATTACHED TO AND FORMING PART OF BOND OR POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER | |
|---|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 | 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE BOND OR POLICY |

* ISSUED TO
Ambac Financial Group, Inc.

## REPLACE SUBSECTION III. B. SPOUSAL LIABILITY; ADD DEFINITION OF DOMESTIC PARTNER
### (for use with FL263)
### MEL2664 Ed. 3-05

In consideration of the premium charged, it is understood and agreed that:

1. Subsection **III. EXTENSIONS B. Spousal Liability** is replaced by the following:

    **B. Spousal and Domestic Partner Liability**

    If a Claim against an Insured Person includes a claim against the Insured Person's lawful spouse or Domestic Partner solely by reason of:

    (i)  such spouse's or such Domestic Partner's legal status as a spouse or  Domestic Partner, respectively, of the Insured Person; or

    (ii) such spouse's or such Domestic Partner's ownership interest in property which the claimant seeks as recovery for alleged Wrongful Acts of the Insured Person;

    all loss which such spouse or such Domestic Partner  becomes legally obligated to pay by reason of such Claim shall be treated for purposes of this Policy as Loss which the Insured Person becomes legally obligated to pay on account of the Claim made against the Insured Person. All terms and conditions of this Policy, including without limitation the Retention Amount, applicable to Loss incurred by such Insured Person in the Claim shall also apply to such spousal or Domestic Partner loss.

    The coverage extension afforded by this Subsection III. B. does not apply to the extent the Claim alleges any wrongful act or omission by the Insured Person's spouse or Domestic Partner.

2. The following is added to Section **IV. DEFINITIONS**:

    **Domestic Partner** means any natural person who qualifies as a domestic partner under the provisions of any applicable federal, state, provincial or local law, or under the provisions of any formal program established by the Company.

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

_____
Authorized Representative

**INSURED**

© 2005 The Travelers Companies, Inc.

The following spaces preceded by an (*) need not be completed if this endorsement or rider and the Bond or Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF BOND OR POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER | |
|---|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 | 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE BOND OR POLICY |

* ISSUED TO

Ambac Financial Group, Inc.

## AMEND EXCLUSION V A. (9) EXCLUSIONS
## (for use with FL263)
## MEL3755 Ed. 9-05

In consideration of the premium charged, it is understood and agreed that subsection **V. <u>EXCLUSION</u>S A. Exclusions** (9) of this Policy is replaced by the following:

9.  based upon, arising out of, or attributable to such Insured gaining any personal profit, remuneration or financial advantage to which such Insured was not legally entitled if a judgment or other final adjudication adverse to the Insured establishes that such Insured was not legally entitled to such personal profit, remuneration or financial advantage;

*Provided for internal review purposes only. * This policy is neither issued nor certified. *

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Bond or Policy, other than as above stated.

By _____

Authorized Representative

INSURED

© 2005 The St. Paul Travelers Companies, Inc. All Rights Reserved

The following spaces preceded by an (*) need not be completed if this endorsement or rider and the Bond or Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF BOND OR POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER | |
|---|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 | 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE BOND OR POLICY |

\* ISSUED TO
Ambac Financial Group, Inc.

## DELETE EXCLUSION V. A. (12) - CONTRIBUTIONS
### (for use with FL263)
### MEL4503 Ed. 4-06

In consideration of the premium charged, it is understood and agreed that exclusion 12 in Subsection **V. EXCLUSIONS** A. **Exclusions** is deleted.

*\* Provided for internal review purposes only. \* This policy is neither issued nor certified. \**

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

Authorized Representative

INSURED

© 2006 The St. Paul Travelers Companies, Inc. All Rights Reserved

The following spaces preceded by an (*) need not be completed if this endorsement or rider and the Bond or Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF BOND OR POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER | |
|---|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 | 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE BOND OR POLICY |

* ISSUED TO
Ambac Financial Group, Inc.

# AMEND EXCLUSION V. A. (1) - PRIOR NOTICE
## (for use with FL263)
### MEL4504 Ed. 4-06

In consideration of the premium charged, it is understood and agreed that the following replaces exclusion 1 in Subsection **V. EXCLUSIONS** A. **Exclusions**:

1.  based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given under any fiduciary liability policy of which this Policy is a renewal or replacement;

* Provided for internal review purposes only. * This policy is neither issued nor certified. *

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

_____
Authorized Representative

INSURED

© 2006 The St. Paul Travelers Companies, Inc. All Rights Reserved

| ATTACHED TO AND FORMING PART OF BOND OR POLICY NO. | DATE ENDORSEMENT OR RIDER EXECUTED | * EFFECTIVE DATE OF ENDORSEMENT OR RIDER | |
|---|---|---|---|
| 590CM3741 | 08/26/09 | 07/18/09 | 12:01 A.M. LOCAL TIME AS SPECIFIED IN THE BOND OR POLICY |

* ISSUED TO
Ambac Financial Group, Inc.

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 (HIPAA) EXTENSION ENDORSEMENT - AMENDED BODILY INJURY/PROPERTY DAMAGE/PERSONAL INJURY EXCLUSION
## (For use with FL263)
## MEL4505 Ed. 4-06

In consideration of the premium charged, it is understood and agreed that this Policy is amended as follows:

1.  The following replaces paragraph 1 of the definition of Wrongful Act under Section **IV. <u>DEFINITIONS</u>** S. Wrongful Act:

    1.  any breach of the responsibilities, obligations or duties imposed upon Insureds in their capacity as fiduciaries of any Plan by: (a) ERISA; (b) the Health Insurance Portability and Accountability Act of 1996 (HIPAA); or (c) the common or statutory law of the United States or any other jurisdiction anywhere in the world;

2.  Exclusions 3 and 5 under Section **V. <u>EXCLUSIONS</u> A. Exclusions** are replaced, respectively, by the following:

    3.  based upon, arising out of, or attributable to any actual or alleged obligation of an Insured under any law governing workers compensation, unemployment, social security or disability benefits, except the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or HIPAA, as amended;

    5.  for bodily injury, sickness, disease or death of any person, for damage to or destruction of any tangible property including loss of use thereof;

*Provided for internal review purposes only. * This policy is neither issued nor certified. *

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

By _____

Authorized Representative

INSURED

© 2006 The St. Paul Travelers Companies, Inc. All Rights Reserved