Peter A. Ivanick
Richard W. Reinthaler
Allison H. Weiss
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333
     - and -
Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LeBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| *In re* | : | |
| | : | |
| | : | **Chapter 11** |
| **AMBAC FINANCIAL GROUP, INC.,** | : | |
| | : | **Case No. 10-15973 (SCC)** |
| Debtor. | : | |
| | : | |

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **AMBAC FINANCIAL GROUP, INC.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | **Adv. Pro. No. 11-01265 (SCC)** |
| v. | : | |
| | : | |
| **KARTHIKEYAN V. VEERA,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

-------------------------------------------------------------x

**DEBTOR'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF**

The Debtor,[1] Ambac Financial Group, Inc., by and through its undersigned attorneys, hereby submits this reply memorandum of law in further support of its motion for (i) summary judgment declaring that the protections of the automatic stay of section 362 of the Bankruptcy Code apply or should be extended to the claims asserted by Veera in the ERISA Action and related efforts to obtain discovery from the Debtor; and (ii) an injunction under section 105(a) of the Bankruptcy Code preventing Veera from prosecuting the ERISA Action and obtaining discovery from the Debtor until the effective date of a chapter 11 plan or further order of this Court, and respectfully represents:

## PRELIMINARY STATEMENT

When this adversary proceeding began, Veera was seeking relief from the automatic stay so that he could serve a massive subpoena on the Debtor containing 62 separate requests for production of "all" documents relating to the Debtor's business spanning a four-year period. Many of Veera's requests went well beyond what would be considered relevant to the narrow issues in the ERISA Action. The Debtor objected to the requests in light of their extraordinarily intrusive, burdensome, and unwarranted nature, the omnipresent specter of the Debtor's indemnification obligations, and the consequent likelihood that any judgment or settlement reached with the ERISA Defendants would result in significant indemnity claims being asserted against the Debtor's estate. It also signaled its intention to commence an adversary proceeding under sections 362(a) and 105(a) of the Bankruptcy Code to prevent Veera from prosecuting the ERISA Action and obtaining discovery from the Debtor pending consummation of a chapter 11 plan.

---

[1] Capitalized terms shall have the same meanings given to them in the Debtor's motion for summary judgment and injunctive relief.

On January 18, 2011 – the same day the Debtor commenced this adversary proceeding – Veera blinked. He submitted a new list, containing 46 requests, down from 62. But the new list was still exceedingly broad and all-encompassing in scope, as this Court recognized and informed Veera's counsel the very next day. However, rather than immediately address the concerns both the Debtor and the Court expressed about the expansive scope of the requests and the adverse impact allowing Veera to proceed would have on the Debtor's reorganization efforts, Veera did not withdraw or modify his requests. The Debtor was thus forced to incur significant legal fees and expenses drafting the Motion (and supporting declarations), in which, among other things, the Debtor explained both (i) the financial burden the Debtor's estate would be forced to bear (in the range of $4 million to $8 million) if it had to comply with Veera's 46 requests; and (ii) the burden, distraction, and delay such compliance would inevitably impose on the Debtor's reorganization effort, which, as the Court is well aware, is at a very critical and complicated stage.

After the Debtor was forced to incur these significant fees and expenses, and faced with the irrefutable facts set forth in the Doyle and Cotter Declarations, Veera blinked again. Effectively conceding that his prior requests were overbroad and that the Debtor's objections to them were both legitimate and compelling, on February 22, 2011, Veera "voluntarily" reduced his requests from 46 to 8 (and further reduced the alleged "Relevant Time Period" from 4 years to 2-½ years). Veera further expressed a willingness to pare his requests down even further, if necessary, to avoid a stay of the ERISA Action, and suggested that these magnanimous gestures should be sufficient to resolve the Debtor's objections.

Not quite. Although less burdensome, Veera's pared-down list still seeks a large volume of documents and e-mails of questionable relevance to the issues in the ERISA Action. Six of

the eight requests on their face appear to have nothing to do with the Savings Plan or the issues in the ERISA Action. Moreover, although only three of the requests seek the production of e-mails, a preliminary search of the various Ambac servers resulted in approximately 227,000 "hits" using the search terms proposed by Veera. In other words, Veera's pared-down list still seeks a substantial volume of documents. One of the requests, for example, seeks the production of all e-mails over a multi-year period from over a dozen custodians "concerning Ambac's exposure to losses from CDOs and MBSs." Given the nature of Ambac's business, that is tantamount to asking for "all" e-mails relating to Ambac's business and financial condition. The time and cost required to compile, review, and produce a quarter of a million e-mails (of questionable relevance), while less than the estimated cost of reviewing and producing the millions of documents previously sought by Veera, would still be very substantial (estimated at close to $2 million) and distracting to key members of Ambac's legal team and IT staff.

Veera's opposing brief is also rife with inconsistencies, non-sequiturs, and statements belied by the record. For example, after initially representing to the Court that he "needed" the discovery sought in his original requests in order to pursue his claims, Veera now claims that "*he will be more than able to proceed with his claims against the Debtor [sic]" without any discovery from the Debtor*" (Opposition ¶39), which is a damning admission. Indeed, this admission establishes there is simply no justification for the financial burden and distraction of time the Debtor has already incurred in connection with this Motion and will additionally incur if ordered to comply with Veera's discovery requests.

Veera further claims that the Debtor's Motion should be denied because "genuine issues of material fact" exist. But he has submitted no affidavits, declarations, or evidence of his own

contradicting anything said in the Doyle, Cotter, or Weals Declarations (attached to the Motion as Exhibits A, B, and C, respectively), *which stand unrefuted.*

Veera's attempts to downplay the significance of the Debtor's indemnification obligations, by misstating the case law in this circuit and misreading the operative provisions of Delaware law, the Debtor's Certificate of Incorporation, By-laws, and the Savings Plan, are equally misplaced. As Veera himself is forced to concede (Opposition ¶52), numerous courts have held that the automatic stay applies to claims against non-debtor officers and directors where, as here, they hold rights of indemnity against a debtor that threaten to have an immediate adverse economic impact upon the debtor's estate. *See* Motion ¶¶41-43.

Veera tries to sweep these cases under the rug with a series of disjointed arguments that are both wrong and beside the point. He argues, first, that the Individual Defendants have no indemnification rights under section 145 of the Delaware General Corporation Law ("DGCL") and the Debtor's Certificate of Incorporation and By-laws because they are being sued in their capacities as ERISA Savings Plan fiduciaries rather than in their capacities as directors, officers, or employees of the Debtor. That argument makes no sense. The only reason the Individual Defendants are being sued as "fiduciaries" is because they were asked, in their capacities as directors, officers, or employees, to serve on the various Committee Defendants. To claim otherwise is to stand Delaware law on its head.

Veera's attempted end-run around section 145(a) of the DGCL and the Debtor's Certificate of Incorporation and By-laws is, in any event, largely academic, since, as expressly permitted by section 145(f) of the DGCL, each of the Individual Defendants has been granted a broad, non-contingent right to indemnification under Section 11.16 of the Savings Plan, which protects not only the members of the Administrative and Investment Committees, but also "*any*

5

*other current or former Employee, officer, or director*" of Ambac "against any all claims . . . on account of such person's action, or failure to act, in connection with the Plan."

With respect to the members of the Administrative and Investment Committees, all Veera can conjure up is the transparently meritless claim that, because *two* of the Individual Defendants may have sold some of the Debtor's common stock from their personal holdings during the putative class period, the "personal profit" exception to Section 11.16 applies to preclude indemnification for *them*. The exception in Section 11.16, however, only applies to those Individual Defendants who personally profited from the "act or transaction in respect of which indemnification is sought." In this instance, the "act or transaction" for which indemnification is being sought is the Individual Defendants' alleged breach of fiduciary duty, *i.e.*, maintaining the Debtor's common stock as an investment option, not the sale of the Debtor's common stock.

According to Veera, the sole issue left for the Court to decide on this Motion is whether his "voluntary" decision to prune 62 all-encompassing requests down to a "mere" 8 has tilted the balance of harms and public interest in Veera's favor. But it is not as simple as that, nor is the balancing of harms and public interest the proper test under section 362. Veera has not committed to limit discovery of the Debtor to these eight requests (or offered to reimburse the Debtor for the fees and expenses it will incur in responding to them). He has not agreed to dispense with, or limit the number of depositions of current Ambac officers, directors, and employees. He has not offered to delay taking such depositions until after the Debtor has had an ample opportunity to present, confirm, and consummate its chapter 11 reorganization plan. Nor has he offered to request an extension of the discovery deadline in the ERISA Action to minimize the impact the continued prosecution of that case will have on the Debtor. Indeed, Veera has not committed that, once he gets his foot in the discovery door, he will not renew his

prior overbroad requests or demand more. The discovery Veera seeks is just the beginning, not the end, of the discovery trail.

The Debtor does not have a cash-rich estate. The expenditure of $2 million (or more) to comply with Veera's discovery requests – money that would otherwise be available to benefit creditors – is not something the Debtor should have to undertake at the whim of a class action plaintiff, particularly where, as here, the Debtor is at a critical juncture of its reorganization efforts and needs the "breathing spell" afforded by section 362 (and where the plaintiff has conceded that the discovery is not necessary for him to pursue his claims). Although it is commendable that Veera has become sensitized to the tremendous imposition, distraction, and expense the ERISA Action and his discovery requests have placed on the Debtor, and has sought to mitigate somewhat the consequences of his actions to avoid having his entire lawsuit stayed, Veera's prior actions speak louder than his words, and his promise to "make life easier on the Debtor" rings hollow. If Veera truly believes he "will be more than able to proceed" with his claims without any help from the Debtor, he should withdraw his Stay Relief Motion, and proceed accordingly.

## <u>ARGUMENT</u>

1.      The relevant background for this reply memorandum of law has previously been set forth in the Adversary Complaint, the Motion (and supporting declarations), and the Debtor's Objection to Veera's Stay Relief Motion, to which the Court is respectfully referred. There are a few additional relevant facts that have come to light since the Debtor filed its Motion. First, the Debtor has learned that Veera has served no less than six third-party subpoenas upon certain of the Debtor's former officers, directors, and advisors. The document requests in these subpoenas are substantially similar in number and scope to the 62 requests set forth in the original proposed subpoena filed with Veera's Stay Relief Motion, and cover the same four-year

period (October 2006 until September 2010) as Veera's original proposed requests to the Debtor. To the best of the Debtor's knowledge, information and belief, Veera has not "voluntarily" offered to reduce the number of, scope of, or "Relevant Time Period" covering these subpoenas to conform to the reduced scope of discovery Veera now claims it is willing to live with vis-à-vis the Debtor.

2.      It is the cumulative impact Veera's continued prosecution of the ERISA Action will have on the Debtor, not just the impact Veera's proposed document requests to the Debtor itself will have, that is the driving force behind the Motion.

## I.      THE DEBTOR IS ENTITLED TO SUMMARY JUDGMENT PURSUANT TO SECTION 362(a) OF THE BANKRUPTCY CODE

3.      In its Motion, the Debtor demonstrated that it is entitled to summary judgment, declaring that the protections of the automatic stay apply or should be extended to the claims asserted in the ERISA Action and Veera's related efforts to obtain discovery from the Debtor, because: (i) Veera's claims against the Committee Defendants – which lack independent legal status apart from, share an identity of interests with, and are inextricably a part of, the Debtor – are entirely duplicative, and nothing more than disguised claims against the Individual Defendants; (ii) the Individual Defendants all have iron-clad indemnification rights against the Debtor, which is all that is required in order to satisfy the "immediate adverse economic consequences" standard adopted by the Second Circuit in *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003); and (iii) allowing the ERISA Action to proceed would impede the Debtor's reorganization efforts by (a) distracting key members of the Debtor's "reorganization team," including Ambac's General Counsel and his in-house legal staff, Ambac's IT department, and other key members of management; and (b) causing the Debtor to incur millions of dollars of fees and expenses in connection with the review (for responsiveness and privilege) and potential

production of millions of pages of documents by the Debtor's outside counsel and counsel for the Office of the Commissioner of the State of Wisconsin.

4. In response, Veera advances a number of meritless legal and procedural arguments, effectively conceding that his prior requests were overbroad and that the Debtor's objections to them were well-taken. Much of Veera's opposition is thus spent explaining how he now "understands" the Debtor's concerns and defending the "voluntary" steps he is willing to take to "alleviate" the burden and cost the continued prosecution of the ERISA Action will impose on the Debtor and its estate. But, as explained below, even those steps do not go far enough.

### A. Veera's Assertion that Genuine Issues of Material Fact Exist is Incorrect

5. Veera's principal argument is that summary judgment should be denied because genuine issues of material fact exist with respect to: (i) the amount of time and degree of involvement Ambac's legal department will need to have in monitoring and assisting in the defense of the ERISA Action and in the collection, review, and production of documents (Opposition ¶33-34); (ii) the amount of time the Current Officers and Directors, who are represented by counsel in the ERISA Action, will need to devote to their defense (*id.* ¶34); (iii) the amount of time and degree of involvement the Current Officers and Directors will need to have in the Debtor's current reorganization efforts (*id.* ¶36); and (iv) the burden and expense the Debtor will incur if required to comply with Veera's trimmed-down set of discovery requests (*id.* ¶¶32, 40).

6. None of these arguments is persuasive, for several reasons. First, Veera has submitted no affidavit, declaration, or evidence contradicting the uncontested sworn statements in the Doyle, Cotter, and Weals declarations. A party cannot by fiat create a disputed issue of

material fact, simply by claiming in a brief that he disagrees with something said in a sworn statement. Were it so easy to manufacture a disputed issue of material fact, no summary judgment motion would ever be granted. *See Park Ave. Tower Associates v. City of New York*, 746 F.2d 135, 141 (2d Cir. 1984) (holding that reliance on pleadings and memorandum of law, rather than submitting a challenging affidavit, is insufficient to create a factual dispute on a motion for summary judgment). Moreover, rather than dispute the facts set forth in these declarations, Veera actually *concedes* that the burden, distraction, and expense described in the declarations raised legitimate concerns, which, in lieu of contesting, he attempts to mitigate by substantially reducing the number of requests (from 46 to 8) and narrowing the relevant time period by 18 months.

7. The Second Declaration of Kevin J. Doyle in Further Support of Debtor's Motion for Summary Judgment and Injunctive Relief, dated March 1, 2011 and attached hereto as Exhibit A ("Second Doyle Declaration"), describes how the current requests, although less burdensome and expensive, would still impose a significant burden (more than 227,000 e-mails, of questionable relevance, have preliminarily been identified as potentially responsive to Veera's last three requests alone) and expense (which is still likely to exceed seven figures) on the Debtor and disrupt its reorganization efforts (Second Doyle Decl. ¶¶5-6).[2] As he explains, Veera's

---

[2] Veera misunderstands the Debtor's position on this. The Debtor is not arguing that the Current Officers and Directors (along with the in-house legal department and IT staff) are devoting, and will need to devote, all of their time to the reorganization effort. What the Debtor is arguing is that Ambac's key managers are now spending all of their time either running Ambac's current business (including maximizing the value of the Debtor's most valuable asset, AAC) or working towards reaching an agreement on a consensual plan of reorganization with the Creditors' Committee, the IRS, OCI, and the independent directors of AAC. As explained in the Motion, the purpose of section 362(a) is to give debtors and their key managers a "breathing spell" from the distraction of lawsuits like the ERISA Action, which if left unchecked, can distract management and delay the Debtor's reorganization efforts, to the substantial detriment of creditors. That is as true today, notwithstanding Veera's offer to prune down his requests, as it was when the Motion was filed.

document requests to the Debtor are merely the tip of the iceberg. Veera is seeking discovery from numerous other parties and non-parties (many of whom have indemnification rights from the Debtor). He has not committed to limit his discovery from the Debtor to these eight requests (or even a slimmed down version of them). Once the discovery door is opened, there will undoubtedly be additional follow-up requests and supplemental requests, not to mention requests for depositions from current officers, directors, and employees. Veera has not offered to extend the discovery deadline or await the plan drafting and confirmation process (and has not offered to reimburse the Debtor for the costs in complying with his requests). Nor has he committed not to seek in the future any of the original 62 requests that he has ostensibly withdrawn in an effort to avoid application of the automatic stay.

8.     Tellingly, *Veera now claims that he does not need any discovery from the Debtor in order to prosecute his claims* against the ERISA Defendants! That, of course, is 180 degrees different from what he argued in his Stay Relief Motion. *See* Opening Brief ¶13 ("Barring Veera from obtaining documents and testimony from the Debtor will cripple his prosecution against the Non-debtor Defendants in the Class Action"). Now, with his back to the wall and facing a stay of his entire case, Veera claims that, although it may be a bit more difficult, *"he will be more than able to proceed with his claims against the Debtor [sic]" without any discovery from the Debtor* (Opposition ¶39). If he truly believes this, he should simply withdraw his Stay Relief Motion.

**B.     The ERISA Defendants Share an Identity of Interests with the Debtor and Allowing the ERISA Action to Continue Would Impede the Debtor's Reorganization**

9.     Veera's responses to the Debtor's legal arguments are equally meritless. He claims that the ERISA Defendants do not share an identity of interests with the Debtor. He is wrong. This is particularly true with respect to the Committee Defendants, which are not

separate legal entities with assets of their own independent of the Debtor.[3] Veera tries to contest the fact that he seeks to recover the assets of the Debtor through his claims against the Committee Defendants by arguing that these claims are duplicative of his claims against their individual members and that, accordingly, any judgment he may obtain against the Committee Defendants would only be enforceable against the Individual Defendants, not the Debtor (Opposition ¶¶43-44). Putting aside the obvious question as to why Veera asserted claims against the Committee Defendants in the first instance if they were entirely duplicative of his claims against the Individual Defendants, Veera's argument both misses the point that the Committee Defendants themselves have no legal existence apart from the Debtor and ignores the fact that, as discussed below, the Individual Defendants have iron-clad indemnification rights against the Debtor.

10. Veera's assertion that the Individual Defendants do not share an identity of interests with the Debtor is likewise without merit, and is based on a fundamental misreading of applicable law and the operative documents from which the Individual Defendants' rights of indemnification spring. Veera begins by claiming that the indemnification rights afforded directors, officers, and employees under section 145 of the DGCL and the Debtor's Certificate of Incorporation and By-laws do not apply to the members of the Administrative and Investment Committees because they are being sued in their capacities as "fiduciaries" and not as "directors, officers, or employees" of Ambac. (Opposition ¶46). But this *ipse dixit* ignores both the letter and the spirit of the law. The only reason the Individual Defendants are committee members is

---

[3] Judge Baer's refusal to dismiss Veera's claims against the Committee Defendants because they appear to fall within the scope of 29 U.S.C. §1002(9) does not mean, as Veera alleges in conclusory fashion, that they do not share an identity of interests with the Debtor for purposes of the automatic stay. All it means is that for ERISA purposes, the Committee Defendants are entities which may be sued.

because they were asked to serve as such by the Debtor.  But for the fact they were directors, officers, or employees of Ambac, they would not have become members of the Committee Defendants.[4]

11.    As section 145(a) of the DGCL (as well as Section 7.1(a) of the Certificate of Incorporation and Section 9.01(a) of the By-Laws) makes clear, the right to indemnification not only applies to any person made a party to a lawsuit by reason of the fact that he or she is or was a director, officer, employee, or agent of the corporation, but also to any person who "is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust *or other enterprise . . .* " (emphasis added).  The Savings Plan is precisely the kind of "other enterprise" this catch-all was meant to capture.  But even if Veera were right in arguing to the contrary, it would get him nowhere, given the absolute indemnification rights the members of the Administrative and Investment Committees have pursuant to Section 11.16 of the Savings Plan (discussed below).

12.    Veera next argues that the members of the Compensation Committee (who are not Savings Plan fiduciaries and are thus entitled, as even Veera concedes, to indemnification under section 145(a) of the DGCL and the Debtor's Certificate of Incorporation and By-laws) are not entitled to indemnification under the Savings Plan because that committee is not expressly mentioned in Section 11.16 (Opposition ¶¶46-49).  Once again, Veera is wrong.  On its face, Section 11.16 applies not just to the members of the Administrative and Investment Committees,

---

[4]  Courts have interpreted the term "officer" to include any person employed or appointed for a specific purpose by a company's board of directors.  *See*, *e.g.*, *U.S. Trustee v. Fieldstone Mortg. Co. (In re Fieldstone Mortg. Co.)*, No. CCB-08-755, 2008 WL 4826921, at *3-4 (D. Md. Nov. 5, 2008) (observing that the Clayton Antitrust Act, Model Business Corporation Act, and state statutes define individuals as officers by virtue of their appointment by the board of directors and interpreting the term "officer" in a similar manner in the context of a bankruptcy case).

but also to "*any other current or former Employee, officer, or director*" of Ambac who is sued "on account of such person's action, or failure to act, in connection with the Plan" (emphasis added). This language clearly includes the members of the Compensation Committee, who in Section 11.12 of the Savings Plan were granted the right to appoint the members of the Administrative and Investment Committees.

13. The only other argument Veera musters (half-heartedly) with respect to Section 11.16 of the Savings Plan is that the rights set forth therein are not "absolute" and do not apply to two of the Individual Defendants who allegedly sold some of the Debtor's common stock during the putative class period (Opposition ¶¶50-51).[5] This argument, however, in addition to conceding the "absolute" nature of the indemnification rights with respect to every other committee member, is belied both by the language of Section 11.16 and the allegations in Veera's amended complaint.

14. Section 11.16 expressly provides that "no indemnification shall be provided to an [officer or director] who personally profited from any act or transaction *in respect of which indemnification is sought*" (emphasis added). That is the only exception set forth in the Savings Plan. Here, the act or transaction for which indemnification is sought by the two Individual Defendants who sold the Debtor's common stock (from their personal holdings as opposed to out

---

[5] According to Form 4 filings with the Securities and Exchange Commission made by Gregg L. Bienstock and William T. McKinnon, the number of shares of the Debtor's common stock owned by each such former officer increased significantly over the course of the putative class period as a result of their respective acquisitions of the Debtor's common stock during such period. *See* Form 4 filings with the Securities and Exchange Commission for Gregg L. Bienstock and William T. McKinnon, copies of which are attached as <u>Exhibit 2</u> to the Second Doyle Declaration. Moreover, certain of the "sales" complained of by Veera, including the disposition of 12,000 shares by Gregg L. Bienstock on December 18, 2006 and the disposition of 8,250 shares by William T. McKinnon on February 15, 2007, occurred on the same dates that each such former officer acquired an equivalent number of shares via the exercise of derivative securities. *Id*.

of their Savings Plan) is an alleged breach of fiduciary duty arising out of their continuing to offer or maintain the Debtor's common stock as an investment option when it was allegedly no longer prudent to do so. They are not being sued for violating ERISA because they sold the Debtor's common stock.[6] Accordingly, they are entitled to indemnity to the same extent as their fellow committee members.

15. Veera also contends, incorrectly, that an absolute right to indemnification does not satisfy the "immediate adverse economic consequence" standard articulated in *Queenie*. In the process, Veera misinterprets the meaning of the words "real party defendant" as used in *Queenie*, and leaps to the conclusion that courts only deem the automatic stay applicable to third parties where the debtor either is a named defendant or the suit was commenced against other parties to circumvent the automatic stay (Opposition ¶¶55-61, 67). That, however, is not the law.

16. In *A.H. Robins Co. v. Piccinin*, the seminal case regarding the applicability of the automatic stay to third parties, the Fourth Circuit expressly held that:

> An illustration of [a situation in which the debtor may be said to be a real party defendant] would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.

788 F.2d 994, 999 (4th Cir. 1986). The Second Circuit cited *A.H. Robins* approvingly in *Queenie*. 321 F.3d at 288. Thus, in order to satisfy the "real party defendant" requirement, all that is required under *A.H. Robins* and *Queenie* is for the third party to have rights to indemnification from the debtor. That is why the courts in *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990) and *In re North Star Contracting Corp.*, 125 B.R. 368, 370 (S.D.N.Y. 1991)

---

[6] Although one of the *remedies* requested by Veera in his amended complaint seek the imposition of a constructive trust on any profits realized from these sales by these two Individual Defendants, that is not a proper remedy under ERISA for the wrong alleged.

extended the automatic stay to the debtors – not because the debtor was an actual defendant in or "the intended party" to a lawsuit.

17.     Veera also places unwarranted emphasis on the so-called "independent liability" exception to the standards adopted in *Queenie* and *A.H. Robins* (Opposition ¶¶64-67). Under this exception, the automatic stay does not apply to a third party non-debtor where such party is "independently liable [*i.e.*,] where the debtor and another are joint tort feasors or where the nondebtor's liability rests upon his own breach of duty." *A.H. Robins*, 788 F.2d at 999. Veera claims that a non-debtor falls within this exception whenever he or she is accused of breaching a fiduciary duty (Opposition ¶¶62-66). He is wrong again.

18.     In *A.H. Robins*, the Fourth Circuit emphasized that the "independent liability" exception only applies where the debtor does not have an indemnification obligation, holding "*[b]ut, in contrast to those situations* [where the third-party defendant was "independently liable"], where . . . a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to the debtors would be frustrated." 788 F.2d at 999 (emphasis added and citations omitted).[7] That is precisely the case here.

---

[7]  The cases cited by Veera are not to the contrary, and are readily distinguishable. For example, in *CAE Indus. Ltd. v. Aerospace Holdings Co.*, the court declined to extend the automatic stay to the debtor's former chairman and CEO in connection with a case in which he stood accused of fraud and tortious interference, but only after the court determined that "continuation of this action . . . will have no material effect upon [the] reorganization effort" despite the debtor's potential indemnification obligations. 116 B.R. 31, 33-34 (S.D.N.Y. 1990). Similarly, in *DeSouza v. PlusFunds Group, Inc.*, the court declined to extend the automatic stay to former directors, holding that the "independent liability" exception applied to an action asserting fraudulent conveyance, tortious interference and conversion claims against them, which, if proven, would not have entitled them to indemnification. No. 05-cv-5990, 2006 WL 2168478, at *2-3 (S.D.N.Y. Aug. 1, 2006). Finally, in *Standard v. Foamex L.P.*, the court declined to extend the automatic to non-debtor defendants in an ERISA suit because "Foamex's indemnification obligations do not appear absolute," as the relevant agreements, unlike the Savings Plan here, specifically provided that

*continued on next page…*

19.    Further, Veera asserts, after conceding that modification of his discovery requests is necessary to avoid impeding the Debtor's reorganization efforts, that allowing the ERISA Action to proceed (with or without requiring the Debtor to produce documents in response to Veera's current "streamlined" requests) would not impede the Debtor's reorganization efforts or result in an *immediate* adverse economic consequence to the Debtor until such time as a judgment is entered against the ERISA Defendants (Opposition ¶¶69-70).[8]

20.    In addition to highlighting the glaring inconsistencies between Veera's prior and current positions, this assertion makes no sense and is belied by the undisputed record. The Doyle Declaration, the Cotter Declaration, and the Second Doyle Declaration describe in detail how allowing the ERISA Action (and the discovery Veera seeks from the Debtor and its Current Officers and Directors) to proceed would impose a substantial burden and expense on the Debtor and impede the Debtor's reorganization efforts. *See* Doyle Decl. ¶¶23-36; Cotter Decl. ¶¶9-12; Second Doyle Decl. ¶¶5-6.[9]  The fact that Veera continues to narrow its requests confirms the

---

*continued from previous page…*

Foamex would not be required to indemnify the defendants for breaches of fiduciary duties. No. 07-cv-4225, 2009 WL 1033607, at *2 n.9 (E.D. Pa. April 15, 2009).

[8]  The claim that the Debtor will not suffer an *immediate* adverse consequence until a judgment is entered defies logic. As long as the ERISA Action continues, the ERISA Defendants will continue to consume the remaining coverage available under the Fiduciary Liability Policy to pay their defense costs. Once this policy is exhausted, every dollar spent in defense of the ERISA Action will result in additional claims by such defendants against the Debtor's estate, whether incurred before or after a judgment is entered. Moreover, that policy likely affords no coverage for the Debtor's defense costs.

[9]  Veera claims (again, contrary to the only evidence before the Court) that Ambac's legal and IT departments, as well as the Current Officers and Directors, are not truly critical to the reorganization effort because none of them are CEO, CFO, or COO (Opposition ¶36). This, too, is wrong, as courts have found individuals to be critical to a reorganization effort despite not being CEO, CFO, or COO. *See, e.g.*, *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401 (S.D.N.Y. 2007) (S.D.N.Y. 2007) (affirming the bankruptcy court's grant of an injunction staying certain litigation on account of the fact that it would have a distracting effect on the Director of Transmission Management at Calpine). It is also hypocritical for Veera to argue, on the one hand, that the balance of harms and public interest weigh

*continued on next page…*

validity of the Debtor's previous objections, but does not mean that his current requests are not also objectionable. The Debtor is still facing requests that seek close to 250,000 documents, not to mention depositions and the inevitable follow-up requests. The eight requests do not by any stretch limit the discovery universe the Debtor is facing.

## C.    Veera's Procedural Argument is Meritless

21.     Finally, Veera makes the procedural argument that the Debtor's Motion, to the extent it seeks summary judgment, should be denied for failure to comply with Rule 7056-1(b) of the Local Bankruptcy Rules of the Southern District of New York (the "Local Rules") (Opposition ¶¶26-27). This argument, even if correct (which it is not), would, of course, have no impact on the Debtor's separate request for injunctive relief under section 105(a). Local Rule 7056-1(b) provides that motions for summary judgment shall include "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The purpose of Local Rule 7056-1(b) is "to streamline the consideration of summary judgment motions by freeing . . . courts from the need to hunt through voluminous records without guidance from the parties." *Gallo v. Alitalia-Linee Aeree Italiane-Societa Per Azioni*, 585 F. Supp. 2d 520, 529 (S.D.N.Y. 2008) (citing *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)). And as Veera argues, the Local Rule is intended to "clarify the elements of the substantive law which remain at issue because they turn on contested facts" (Opposition ¶26) (citation omitted). The Second Circuit has recognized this Court "may in its discretion opt to review the record independently even

---

*continued from previous page…*

in favor of *not* granting an injunction because Ambac reduced its staff significantly prior to filing for bankruptcy, while arguing on the other hand, that none of Ambac's remaining employees (other than the CEO, CFO, and COO) are "critical."

where one of the parties has failed to file a [Local Rule 7056-1(b) statement] – or, presumably, where the statement filed by a party fails to satisfy the dictates of [the Local Rule]." *Id.* (citing *Monahan*, 214 F.3d at 292).

22.     The Court has everything it needs to decide this Motion.  Although not labeled as such, the three declarations submitted by the Debtor in support of its Motion – *which have not been refuted by any affidavit, declaration, or evidence submitted by Veera,* clearly contain separate, short, and concise statements, in numbered paragraphs, of the material facts that the Debtor believes are undisputed (and indisputable).  These declarations, along with the papers filed in this adversary proceeding, are certainly not voluminous and clearly identify the "elements of the substantive law" which are at issue.  Accordingly, even if the Court determines that the Debtor has failed to satisfy Local Rule 7056-1(b), the Court is not required to – and should not – deny the Debtor's request for summary judgment for this reason.

## II.     THE DEBTOR IS ENTITLED TO INJUNCTIVE RELIEF PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE

23.     The Debtor demonstrated in its opening brief that, regardless of whether the automatic stay applies or should be extended to the ERISA Action and/or related discovery efforts, the Debtor is entitled to a stay of the ERISA Action under section 105(a) of the Bankruptcy Code, which authorizes the Court to enjoin any acts that impair the Debtor's ability to reorganize, even if they are not proscribed by the automatic stay.  The Debtor further demonstrated that it met all four conditions for issuance of an injunction under section 105(a), namely: (i) a reasonable likelihood that the debtor will successfully reorganize; (ii) that the debtor's estate will suffer irreparable harm in the absence of an injunction; (iii) that the balance of harms tips decidedly in the debtor's favor; and (iv) that the public interest favors an injunction.

24. In response, Veera contends that none of these factors is present in this case. Veera claims that (i) a successful reorganization is not reasonably likely because the Debtor was not able to negotiate a prepackaged chapter 11 filing, no chapter 11 plan has been filed and the Debtor is locked in litigation with the IRS over complex tax matters; (ii) the Debtor would only suffer irreparable harm if it lacked the requisite liquidity to participate in the ERISA Action; (iii) the harm caused to Veera by delaying speculative recovery by a number of months outweighs the concrete harm caused to the Debtor in terms of both costs incurred by the litigation and distraction from the reorganization; and (iv) the speculative recovery available to Veera is of greater public interest than preserving the value of the Debtor's estate and Ambac's successful reorganization (Opposition ¶¶72-96).

25. None of these arguments withstands scrutiny. First, at this early yet critical juncture in the Debtor's chapter 11 case, there is no reason to doubt the reasonable likelihood that the Debtor will be able to successfully reorganize. While it may be true that a prepackaged proceeding would have sped up the reorganization process and that the existence of a dispute with the IRS adds to the complexity of this case, Veera's assertion that it is unreasonable to expect a successful reorganization, because the Debtor has not yet resolved all outstanding disputes with creditors and filed a confirmable plan of reorganization within a few months of the commencement date, is contrary to what every interested party (and the Court) has stated, and believes.[10] As this Court recently recognized, "the Debtor has demonstrated that it is attempting

---

[10] Veera's reliance on *In re United Healthcare*, 210 B.R. 228 (S.D.N.Y. 1997), to support its argument is misplaced. While the court there decided that a successful liquidation was likely where the parties had reached a settlement agreement, it did not hold that this was the standard of "reasonable likelihood of successful reorganization." In fact, the bankruptcy court in which United filed its chapter 11 case had issued a section 105(a) injunction protecting non-debtor principals and officers of the United welfare benefit plan from ERISA litigation shortly after United filed its chapter 11 case. *See id.* at 230-31.

to secure the support of major constituents before proceeding forward with a plan of reorganization." *See* Exclusivity Hearing Tr. at 233:24-234:1 (Feb. 18, 2011), relevant portions of which are attached hereto as <u>Exhibit B</u>. This Court has granted the Debtor a 120-day extension of its exclusivity period for filing a chapter 11 plan and disclosure statement, in part in order to "keep the parties motivated, to work expeditiously on a resolution of all issues which will hopefully lead to a consensual and viable plan of reorganization." *Id.* at 235:2-4. Given the efforts the Debtor has made to date to reach such a successful conclusion, and this Court's commitment to facilitating that process, it is by no means unreasonable to believe a successful resolution of all outstanding issues will be achieved.

26. Second, Veera misinterprets the measure of irreparable harm. As was explained in the Motion, the "irreparable harm" prong of a standard preliminary injunction analysis is altered in the context of a section 105(a) injunction, and courts in this district have held that if irreparable harm must be shown at all, it is established by showing that the action sought to be enjoined would delay or impede the reorganization effort. *See In re Lyondell Chemical Co.*, 402 B.R. 571, 590-91 (S.D.N.Y. 2009); *Calpine*, 365 B.R. at 412.[11] Veera's prosecution of the ERISA Action has already diverted the attention of key Ambac personnel critical to the reorganization efforts and will continue to do so if the ERISA Action is not stayed. This distraction, combined with the very substantial cost of reviewing and producing the documents Veera has requested, as described in the Second Doyle Declaration, will undoubtedly impede the

---

[11] Veera also appears to be citing *United* for the proposition that the appropriate measure of irreparable harm is lack of sufficient liquidity to participate in the litigation sought to be stayed (Opposition ¶83). While there is no doubt that such facts would demonstrate the requisite hurdle to reorganization, the *United* court recognized that courts had stayed actions that "would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort." 210 B.R. at 232.

Debtor's reorganization (Second Doyle Decl. ¶6). Veera has submitted no evidence to the contrary.

27.     Third, in balancing the harms, Veera has put his thumb on the scale by balancing the harms alleged in the ERISA Action against the harms caused to the Debtor's reorganization through continuation of the ERISA Action, and argues that the costs of discovery are outweighed by the harm allegedly done to Savings Plan participants. This would be appropriate if the Debtor were asking this Court to dismiss the ERISA Action outright. Rather, the Debtor is asking this court for a stay of the ERISA Action pending its reorganization. The harm to be balanced against the distraction of Ambac directors and officers intimately involved with the reorganization and the cost of reviewing and producing hundreds of thousands of documents is that caused by a delay of several months of litigation that is still in the early stages of discovery. The Debtor is not asking this Court to deprive Veera of the opportunity to prove his case in the ERISA Action, but simply to wait a few months until all of the interested parties in the ERISA Action have sufficient time and resources to adequately represent their interests in the litigation. The balance of harms thus clearly weighs in the Debtor's favor.

28.     Veera similarly misbalances the scales in discussing whether a stay of the ERISA Action would serve the public interest. He appears to argue that staying the ERISA Action would necessitate a finding that there was "no societal interest in providing Ambac's Plan participants with immediate recourse against their fiduciaries" (Opposition ¶96). This is not the Debtor's position. Rather, the Debtor's position is that the public interest in an efficient and successful reorganization outweighs any interest the public may have in the expeditious resolution of Veera's claims. Any harm to Veera that may be caused by a delay in the ERISA

Action, weighed against the societal harm posed by a threat to the Debtor's reorganization, is negligible.

## <u>CONCLUSION</u>

The Debtor respectfully requests that this Court enter the proposed order attached to the Motion (i) granting summary judgment to the Debtor in respect of its request for declaratory relief confirming that the automatic stay applies to claims asserted against the ERISA Defendants in the ERISA Action and/or any related efforts to obtain discovery from the Debtor and (ii) enjoining Veera from continuing to prosecute the ERISA Action against the ERISA Defendants or obtaining discovery from the Debtor prior to the effective date of a confirmed chapter 11 plan or further order of the Court.

Dated: March 1, 2011
      New York, New York

Respectfully Submitted,

/s/ Richard W. Reinthaler
Peter A. Ivanick
Richard W. Reinthaler
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

- and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*